# 15-3912

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

United States of America,

*Plaintiff-Appellee,*

*vs.*

Scott Valente,

*Defendant-Appellant.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

**APPENDIX OF DEFENDANT-APPELLANT,**
**SCOTT VALENTE**

BRUCE R. BRYAN, ESQ.
Attorney for Defendant-Appellant,
Scott Valente
333 East Onondaga Street
Syracuse, New York 13202
(315) 476-1800
(315) 474-0425 *Facsimile*

**TABLE OF CONTENTS**


Index to record ........ A.1

Plea Agreement ........ A.9

Waiver of Indictment ........ A.37

Transcript of plea hearing ........ A.38

Government's sentencing memorandum ........ A.66

Defendant's Redacted Sentencing Memorandum ........ A.76

Government's response ........ A.136

Transcript of sentencing hearing ........ A.142

Judgment ........ A.206

Notice of Appeal ........ A.212

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1] (Albany)
# CRIMINAL DOCKET FOR CASE #: 1:15-cr-00124-GLS-1

Case title: USA v. Valente

Date Filed: 05/11/2015
Date Terminated: 11/20/2015

---

Assigned to: Judge Gary L. Sharpe

**Defendant (1)**

**Scott Valente**
*TERMINATED: 11/20/2015*

represented by

**Joel D. Schwartz**
Shulman Rogers PA
12505 Park Potomac Avenue
6th Floor
Potomac, MD 20854
301-230-5200
Fax: 301-230-2891
Email: jschwartz@shulmanrogers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Russell D. Duncan**
Shulman Rogers PA
12505 Park Potomac Avenue
6th Floor
Potomac, MD 20854
301-230-5200
Fax: 301-945-9247
Email: rduncan@shulmanrogers.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

**Disposition**

The defendant is sentenced to a term of imprisonment of 240 months on Count 1 and 2 to run concurrently. The defendant is sentenced to a term of imprisonment of 36 months on Count 3 to turn concurrently with the sentence on Counts 1 and 2 for a total term of imprisonment of 240 months. Supervised Release for a term of 3 years

MANIPULATIVE AND DECEPTIVE DEVICES
(1)

on Counts 1, 2 and 3 to run concurrently for a total term of 3 years. Standard and Special Conditions of supervision. Special Assessment in the amount of $300.00 imposed and ordered remitted. The defendant shall consent to an entry of forfeiture to the items outlined in the Preliminary Order of Forfeiture. Resitution imposed in the amount of $8,200,579.69 with the language outlined in the government's submission. No fine imposed. Parties advised of appeal rights. Defendant is remanded to the custody of the U.S. Marshal

The defendant is sentenced to a term of imprisonment of 240 months on Count 1 and 2 to run concurrently. The defendant is sentenced to a term of imprisonment of 36 months on Count 3 to turn concurrently with the sentence on Counts 1 and 2 for a total term of imprisonment of 240 months. Supervised Release for a term of 3 years on Counts 1, 2 and 3 to run concurrently for a total term of 3 years. Standard and Special Conditions of supervision. Special Assessment in the amount of $300.00 imposed and ordered remitted. The defendant shall consent to an entry of forfeiture to the items outlined in the Preliminary Order of Forfeiture. Resitution imposed in the amount of $8,200,579.69 with the language outlined in the government's submission. No fine imposed. Parties advised of appeal rights. Defendant is remanded to the custody of the U.S. Marshal

FRAUDS AND SWINDLES
(2)

The defendant is sentenced to a term of imprisonment of 240 months on Count 1 and 2 to run concurrently. The defendant is sentenced to a term of imprisonment of 36 months on Count 3 to turn concurrently with the sentence on Counts 1 and 2 for a total term of imprisonment of 240 months. Supervised Release for a term of 3 years on Counts 1, 2 and 3 to run concurrently for a total term of 3 years. Standard and Special Conditions of supervision. Special Assessment in the amount of $300.00 imposed and ordered remitted. The defendant shall consent to an entry of

CORRUPT OR FORCIBLE INTERFERENCE
(3)

forfeiture to the items outlined in the Preliminary Order of Forfeiture. Resitution imposed in the amount of $8,200,579.69 with the language outlined in the government's submission. No fine imposed. Parties advised of appeal rights. Defendant is remanded to the custody of the U.S. Marshal

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Richard D. Belliss**<br>Office of United States Attorney - Albany<br>James T. Foley U.S. Courthouse<br>445 Broadway, Room 218<br>Albany, NY 12207-2924<br>518-431-0247<br>Fax: 518-431-0249<br>Email: richard.belliss@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Assistant US Attorney*<br><br>**Sean K. O'Dowd**<br>Office of the United States Attorney - Albany Office<br>445 Broadway, Room 218<br>Albany, NY 12207<br>518-431-0247<br>Fax: 518-431-0249<br>Email: Sean.ODowd@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 05/11/2015 | 1 | WAIVER OF INDICTMENT as to Scott Valente. (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | 2 | INFORMATION as to Scott Valente (1) count(s) 1, 2, 3. (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | 3 | PLEA AGREEMENT as to Scott Valente (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | | Text Only Minute Entry for proceedings held before Chief Judge Gary L. Sharpe: CRD: John Law. Waiver and Plea Hearing as to Scott Valente held on 5/11/2015. Appearances Made: Rick Belliss, AUSA, for the USA, Joel Schwartz, Esq., for the defendant and Melyssa Inman for Probation. Waiver of Indictment is executed, accepted and filed along with the Information. Plea entered by Scott Valente (1) Guilty Count 1,2,3. Court accepts guilty plea and the Plea Agreement is accepted and handed up for filing as to Scott Valente. Sentencing is scheduled for September 11, 2015 at 9:00 a.m. in Albany, New York. Presentence Report is ordered. Order setting conditions of release issued in court. Defendant is released on conditions. (Court Reporter Lisa Tennyson) Time: 9:30-10:00 a.m. (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | 4 | ORDER Setting Conditions of Release. Signed by Chief Judge Gary L. Sharpe on 5/11/2015. (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | 5 | UNIFORM PRESENTENCE/GUIDELINE ORDER as to Scott Valente : Sentencing set for 9/11/2015 at 09:00 AM in Albany before Chief Judge Gary L. Sharpe. Government Sentencing Memo Deadline 8/21/2015. Defendant Sentencing Memo Deadline 8/21/2015. Signed by Chief Judge Gary L. Sharpe on 5/11/2015. (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | 6 | MOTION for Limited Admission Pro Hac Vice of Russell D. Duncan Filing fee $ 100, receipt number ALB009168. (lah) (Entered: 05/11/2015) |
| 05/11/2015 | 7 | MOTION for Limited Admission Pro Hac Vice of Joel D. Schwartz Filing fee $ 100, receipt number ALB009167. (lah) (Entered: 05/11/2015) |
| 05/11/2015 | 8 | ORDER granting 6 Motion for Limited Admission Pro Hac Vice of Russell D. Duncan as to Scott Valente (1). Signed by Chief Judge Gary L. Sharpe on 5/11/2015. (lah) (Entered: 05/11/2015) |
| 05/11/2015 | 9 | ORDER granting 7 Motion for Limited Admission Pro Hac Vice of Joel D. Schwartz as to Scott Valente (1). Signed by Chief Judge Gary L. Sharpe on 5/11/2015. (lah,) (Entered: 05/11/2015) |
| 05/11/2015 | | TEXT ONLY NOTICE OF HEARING as to Scott Valente: Due to a conflict in the court's calendar, the Sentencing has been reset for 9/8/2015 at 11:00 AM in Albany before Chief Judge Gary L. Sharpe. (jel, ) (Entered: 05/11/2015) |
| 05/11/2015 | 10 | Receipt for Surrender of Passport as to Scott Valente Passport Number 499903892 issued by USA placed in vault in Albany. (see) (Entered: 05/13/2015) |
| 05/28/2015 | 11 | NOTICE OF ATTORNEY APPEARANCE: Sean K. O'Dowd appearing for USA as co-counsel with Attorney Richard Belliss *for the forfeiture aspect of the case* (O'Dowd, Sean) (Entered: 05/28/2015) |
| 07/07/2015 | 12 | Letter from Sean K. O'Dowd as to Scott Valente requesting the Court review and execute the Proposed Partial Dismissal of the Forfeiture Allegation (Attachments: # 1 Proposed Partial Dismissal of Forfeiture Allegation)(O'Dowd, Sean) (Entered: 07/07/2015) |

| | | |
|---|---|---|
| 07/07/2015 | 13 | Letter from Sean K. O'Dowd as to Scott Valente requesting the Court review and execute the proposed Preliminary Order of Forfieture (Attachments: # 1 Proposed Order/Judgment Preliminary Order of Forfeiture)(O'Dowd, Sean) (Entered: 07/07/2015) |
| 07/08/2015 | 14 | ORDER OF PARTIAL DISMISSAL OF FORFEITURE ALLEGATION as to Scott Valente. Signed by Chief Judge Gary L. Sharpe on 7/8/2015. (jel, ) (Entered: 07/08/2015) |
| 07/27/2015 | 15 | PRELIMINARY ORDER OF FORFEITURE as to Scott Valente. Signed by Chief Judge Gary L. Sharpe on 7/27/2015. (jel, ) (Entered: 07/27/2015) |
| 08/10/2015 | | TEXT ONLY NOTICE OF HEARING as to Scott Valente: At the request of Probation, Sentencing has been reset for 11/12/2015 at 09:00 AM in Albany before Chief Judge Gary L. Sharpe. (jel, ) (Entered: 08/10/2015) |
| 08/10/2015 | | Set/Reset Deadlines/Hearings as to Scott Valente: Defendant Sentencing Memo Deadline 10/22/2015. Government Sentencing Memo Deadline 10/22/2015. (jel, ) (Entered: 08/10/2015) |
| 08/12/2015 | 16 | PRESENTENCE INVESTIGATION REPORT - INITIAL DISCLOSURE [LODGED] as to Scott Valente. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.**[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (bam2, ) (Entered: 08/12/2015) |
| 08/25/2015 | 17 | Letter from Joel Schwartz as to Scott Valente requesting Extension to file objection to PSIR (Schwartz, Joel) (Entered: 08/25/2015) |
| 08/26/2015 | 18 | LETTER/ORDER as to Scott Valente granting defendant's 17 Letter from Joel Schwartz as to Scott Valente requesting Extension to file objection to PSIR. Signed by Chief Judge Gary L. Sharpe on 8/26/2015. (jel, ) (Entered: 08/26/2015) |
| 10/07/2015 | 19 | TEXT ONLY ORDER as to Scott Valente - Due to a conflict in the court's calendar with criminal trial 1:14-cr-412 USA v. Edward Leon, the Sentencing has been reset for 11/20/2015 at 11:00 AM in Albany before Judge Gary L. Sharpe. Defendant Sentencing Memo Deadline 10/30/2015, Government Sentencing Memo Deadline 10/30/2015. Issued by Judge Gary L. Sharpe on 10/7/2015. (jel, ) (Entered: 10/07/2015) |
| 10/27/2015 | 20 | PRESENTENCE INVESTIGATION REPORT - FINAL DISCLOSURE [LODGED] as to Scott Valente. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (bam2, ) (Entered: 10/27/2015) |
| 10/30/2015 | 21 | SENTENCING MEMORANDUM by USA as to Scott Valente (Belliss, Richard) (Entered: 10/30/2015) |

| | | |
|---|---|---|
| 10/30/2015 | 22 | MOTION for Leave to File Excess Pages *to Sentencing Memorandum* by Scott Valente. (Attachments: # 1 Proposed Order/Judgment Proposed Order)(Schwartz, Joel) (Entered: 10/30/2015) |
| 10/30/2015 | 23 | MOTION file under seal Sentencing Memorandum by Scott Valente. (Attachments: # 1 Combined Sentencing Memorandum and Motion for Downward Departure, # 2 Exhibit(s) A, # 3 Exhibit(s) B, # 4 Exhibit(s) C)(Schwartz, Joel) Modified on 11/2/2015 (see, ). (Attachment 1 replaced on 11/20/2015) (jel, ). (Entered: 10/30/2015) |
| 11/02/2015 | | CLERK'S CORRECTION OF DOCKET ENTRY re 23 Motion for Miscellaneous Relief. The motion to seal noted in the docket text that counsel wanted to seal the 20 Presentence Investigation Report. The motion to seal is actually requesting that the deft's sentencing memorandum be filed under seal. Docket text modified to correct the document to be filed under seal. (see) (Entered: 11/02/2015) |
| 11/03/2015 | 24 | TEXT ONLY ORDER granting 22 Motion for Leave to File Excess Pages as to Scott Valente (1). Issued by Judge Gary L. Sharpe on 11/3/2015. (jel, ) Modified on 11/3/2015 (jel, ). (Entered: 11/03/2015) |
| 11/03/2015 | 25 | TEXT ONLY ORDER denying 23 Motion MOTION file under seal Sentencing Memorandum as to Scott Valente (1). Issued by Judge Gary L. Sharpe on 11/3/2015. (jel, ) (Entered: 11/03/2015) |
| 11/13/2015 | 26 | Second SENTENCING MEMORANDUM by USA as to Scott Valente (Attachments: # 1 Exhibit(s) 1a-1h and 2a-2b)(Belliss, Richard) (Entered: 11/13/2015) |
| 11/13/2015 | 27 | Amended SENTENCING MEMORANDUM by USA as to Scott Valente (Attachments: # 1 Exhibit(s) 1a-1h and 2a-2b)(Belliss, Richard) (Entered: 11/13/2015) |
| 11/16/2015 | 28 | REDACTION/Motion to replace [23-1] with a redacted version by Scott Valente to 23 MOTION file under seal re 20 Presentence Investigation Report - Final Disclosure [LODGED],, filed by Scott Valente (Attachments: # 1 Exhibit(s) A)(Schwartz, Joel) Modified on 11/16/2015 (see, ). (Entered: 11/16/2015) |
| 11/16/2015 | | CLERK'S CORRECTION OF DOCKET ENTRY re 28 Motion for Miscellaneous Relief. This document was originally entered as a Redaction. Clerk changed the event to Motion so that it appears as pending and edited the docket text to reflect that it is a motion to replace [23-1] with a redacted version. (see) (Entered: 11/16/2015) |
| 11/17/2015 | 29 | Text Only Order - The defendant's motion to replace ECF 23-1 with a redacted version of that document, (Dkt. No. 28), is DENIED. Issued by Judge Gary L. Sharpe on 11/17/2015. (jel, ) (Entered: 11/17/2015) |
| 11/17/2015 | 30 | SEALED DOCUMENT - maintained in Clerk's Office and not available for electronic viewing (jel, ) (jel, ). (Entered: 11/17/2015) |
| 11/19/2015 | 31 | Third SENTENCING MEMORANDUM by USA as to Scott Valente (Belliss, Richard) (Entered: 11/19/2015) |
| 11/19/2015 | 32 | DEFT Scott Valente: CHARACTER LETTER(S) RE: SENTENCING (Schwartz, Joel) (Entered: 11/19/2015) |
| 11/20/2015 | 33 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Scott Valente. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version |

| | | |
|---|---|---|
| | | includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (bam2, ) (Entered: 11/20/2015) |
| 11/20/2015 | | Text Only Minute Entry for proceedings held before Judge Gary L. Sharpe: CRD: John Law. Sentencing held on 11/20/2015 for Scott Valente (1). Appearances Made: Richard Belliss, AUSA, for the USA, Joel Schwartz, Esq., for the defendant and Angela Bennett Rodriguez for Probation. Judge inquires regarding review of Presentence Report and Objections. The Court adopts the factual information and the guideline applications contained in the Presentence Investigation Report. Court turns to the motion to redact. Court cites Strevell to the parties. Court directs the footnote to be redacted with the unredacted version to be filed under seal. Victims speak to the court. Count(s) 1, 2, 3, The defendant is sentenced to a term of imprisonment of 240 months on Count 1 and 2 to run concurrently. The defendant is sentenced to a term of imprisonment of 36 months on Count 3 to turn concurrently with the sentence on Counts 1 and 2 for a total term of imprisonment of 240 months. Supervised Release for a term of 3 years on Counts 1, 2 and 3 to run concurrently for a total term of 3 years. Standard and Special Conditions of supervision. Special Assessment in the amount of $300.00 imposed and ordered remitted. The defendant shall consent to an entry of forfeiture to the items outlined in the Preliminary Order of Forfeiture. Resitution imposed in the amount of $8,200,579.69 with the language outlined in the government's submission. No fine imposed. Parties advised of appeal rights. Defendant is remanded to the custody of the U.S. Marshal. (Court Reporter Theresa Casal) Time: 11:00 a.m. - 1:00 p.m. (jel, ) Modified on 11/20/2015 (jel, ). (Entered: 11/20/2015) |
| 11/20/2015 | 34 | JUDGMENT as to Scott Valente (1), Count(s) 1, 2, 3, The defendant is sentenced to a term of imprisonment of 240 months on Count 1 and 2 to run concurrently. The defendant is sentenced to a term of imprisonment of 36 months on Count 3 to turn concurrently with the sentence on Counts 1 and 2 for a total term of imprisonment of 240 months. Supervised Release for a term of 3 years on Counts 1, 2 and 3 to run concurrently for a total term of 3 years. Standard and Special Conditions of supervision. Special Assessment in the amount of $300.00 imposed and ordered remitted. The defendant shall consent to an entry of forfeiture to the items outlined in the Preliminary Order of Forfeiture. Resitution imposed in the amount of $8,200,579.69 with the language outlined in the government's submission. No fine imposed. Parties advised of appeal rights. Defendant is remanded to the custody of the U.S. Marshal. Signed by Judge Gary L. Sharpe on 11/20/2015. (jel, ) (Main Document 34 replaced on 12/15/2015) (jel, ). (Additional attachment(s) added on 12/15/2015: # 1 Appendix) (jel, ). (Entered: 11/20/2015) |
| 11/20/2015 | 35 | STATEMENT OF REASONS [LODGED] as to Scott Valente **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dictplp, ) (Entered: 11/20/2015) |
| 11/20/2015 | 36 | VICTIM/RESTITUTION LIST [LODGED] as to Scott Valente **[This document has been electronically lodged with the Court. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is** |

| | | |
|---|---|---|
| | | **prohibited.]** (dictplp, ) (Entered: 11/20/2015) |
| 11/25/2015 | 37 | AMENDED VICTIM/RESTITUTION LIST [LODGED] as to Scott Valente **[This document has been electronically lodged with the Court. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dictamt) (Entered: 11/25/2015) |
| 12/02/2015 | 38 | MOTION for Leave to Appeal In Forma Pauperis by Scott Valente. Motion Hearing set for 12/3/2015 01:00 PM before Judge Gary L. Sharpe Response to Motion due by 11/16/2015 Reply to Response to Motion due by 11/23/2015. (Attachments: # 1 Exhibit(s) 1)(Schwartz, Joel) (Entered: 12/02/2015) |
| 12/02/2015 | 39 | STATUS REPORT *notifying the Court that the Preliminary Order of Forfeiture is now final as to the defendant and no separate final order will be presented* by USA as to Scott Valente (O'Dowd, Sean) (Entered: 12/02/2015) |
| 12/03/2015 | 40 | LETTER dated December 2, 2015 by Sean K. O'Dowd, AUSA, for the USA and ORDER as to Scott Valente that the Preliminary Order of Forfeiture has become fina as to the defendant, a money judgment in the amount of $10,555,954.27 shall be entered against the defendant, and no separate final order will be issued. Signed by Judge Gary L. Sharpe on 12/3/2015. (jel, ) (Entered: 12/03/2015) |
| 12/03/2015 | 41 | TEXT ONLY ORDER granting 38 Motion for Leave to Appeal In Forma Pauperis as to Scott Valente (1). Issued by Judge Gary L. Sharpe on 12/3/2015. (jel, ) (Entered: 12/03/2015) |
| 12/04/2015 | 42 | NOTICE OF APPEAL by Scott Valente re 34 Judgment. No fee paid. (Schwartz, Joel) (Entered: 12/04/2015) |
| 12/04/2015 | 43 | ELECTRONIC NOTICE AND CERTIFICATION as to Scott Valente sent to US Court of Appeals, re: 42 Notice of Appeal - Final Judgment. (Attachments: # 1 Criminal Appeals Packet)(see) (Entered: 12/04/2015) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 1:15-CR-124 (GLS) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **SCOTT VALENTE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **SCOTT VALENTE** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1) **<u>The Defendant's Obligations</u>**:

a) **Guilty Plea:** The defendant will waive indictment, and plead guilty to Counts One, Two and Three of the information in Case No. 1:15-CR-124 (GLS) charging him with (i) Securities Fraud (Count One), in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (ii) Mail Fraud (Count Two), in violation of 18 U.S.C. § 1341; and (iii) Obstructing and Impeding the Due Administration of the Internal Revenue Laws (Count Three), in violation of 26 U.S.C. § 7212(a).

b) **Waiver of Venue:** The defendant specifically agrees for purposes of this plea to waive any right to contest venue in the United States District Court for the Northern District of New York.

c) **Special Assessment:** The defendant will pay an assessment of $100.00 per count of conviction pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or

money order to the Clerk of the Court in the amount of $300.00, payable to the U.S. District Court, at the time of sentencing.

d) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

e) **Restitution:** The defendant will consent to entry of an order directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of the offenses of conviction under 18 U.S.C. § 3663 or § 3663A and the following offenses, whether or not encompassed in the offenses of conviction: wire, mail, and securities fraud charges resulting in any losses to any ELIV Group LLC investors regardless of whether they are named in the information. The defendant, who is presently subject to a June 16, 2014 Order freezing The ELIV Group, LLC's assets and providing for other relief, as modified by the Order entered September 25, 2014, in *SEC v. Valente, et al.*, 14 Civ. 3974 (VLB) (JCM) (S.D.N.Y.), (the "Asset Freeze Order"),will take all reasonable and lawful steps he can to liquidate the assets of The ELIV Group, LLC and to transfer the resulting monies to the Clerk of Court for the Northern District of New York to be used towards payment of any court-ordered restitution obligation of the defendant but only after first obtaining appropriate modification of the Asset Freeze Order.

f) **Forfeiture:** Pursuant to 18 U.S.C. §§ 981(a)(1)(C) & 28 U.S.C. § 2461 (Count Two), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the information described above, or to any substitute assets, or to a money judgment, all as more fully set out below:

(1) Regarding Count Two, a money judgment for the amount of $10,555,954.27;

(2) The real property commonly referred to as River Oaks Golf and Tennis Resort II, Unit 46F, 650 River Oaks Drive, Myrtle Beach, South Carolina; and

(3) The real property commonly referred to as Jackson Gore Road Adams House, Ludlow, Vermont. Parcel Identification Number: 363-112-13607.

The net proceeds from the sale of any and all property forfeited shall be credited towards the balance of the money judgment.

g) **Access to Records:** The defendant will provide any privacy waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the defendant's financial disclosures. The defendant authorizes the United States Attorney's Office to inspect and copy all financial documents and information provided by the defendant to the U.S. Probation Office.

h) **No Transfer of Assets:** The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this plea agreement and/or that may be imposed by the Court. In addition, the defendant promises not to make any such transfers in the future.

i) **Tax Offenses/Disclosure to IRS:** The defendant agrees to provide timely, full, complete, and accurate information to the Internal Revenue Service for the calendar years 2010 through 2014 and fully cooperate in the determination and payment of any income or withholding taxes, penalties, and interest that may be due and owing to the United States for those years by the defendant and the defendant's spouse. The defendant agrees that, within 90 days of the entry of the guilty plea, the defendant

will file legal and accurate amended income tax returns for calendar years 2010 through 2014 for the defendant and the defendant's spouse.

2) **The Government's Obligations**:

a) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the information in Case No 1:15-CR-124 (GLS) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct.

b) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3) **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offenses to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

**Count One (Securities Fraud)**

a) **Maximum term of imprisonment:** 20 years, pursuant to 15 U.S.C. § 78ff.

b) **Maximum fine:** $5,000,000, pursuant to 15 U.S.C. § 78ff.

**Count Two (Mail Fraud)**

c) **Maximum term of imprisonment**: 20 years, pursuant to 18 U.S.C. § 1341.

d) **Maximum fine**: $250,000, pursuant to 18 U.S.C. § 3571(b)(3).

**Count Three (Obstructing and Impeding the Internal Revenue Service)**

e) **Maximum term of imprisonment**: 3 years, pursuant to 26 U.S.C. § 7212(a).

f) **Maximum fine**: $5,000, pursuant to 26 U.S.C. 7212(a).

**All Counts**

g) **Supervised release term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to three years, to begin after imprisonment. *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to two years.

h) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4) **Elements of Offenses:** The defendant understands that the following are the elements of the offenses to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements, all as set out below:

Count One (Securities Fraud)

a) First, that in connection with the purchase and sale of any security, the defendant made an untrue statement of material fact;

b) Second, that the defendant acted willfully, knowingly, and with the intent to defraud; and

c) Third, that the defendant knowingly used, or caused to be used, the mails in furtherance of the fraudulent conduct.

Count Two (Mail Fraud)

d) First, that a scheme to defraud existed, the defendant had a conscious, knowing intent to defraud, and the materiality of a misrepresentation or omission,

e) Second, money or property as the object of the scheme, and

f) Third, use of the mails to further the scheme.

Count Three (Corruptly Obstructing and Impeding the Internal Revenue Service)

g) First, that the defendant corruptly;

h) Second, endeavored to; and

i) Third, obstruct or impede the due administration of the Internal Revenue Laws.

5) **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offenses to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to those offenses:

a) The ELIV Group, LLC (ELIV) was a limited liability company registered by VALENTE in November 2010. ELIV's main office was in Albany, New York, and it also had an office in Warwick, New York. VALENTE also used his Schenectady, New York home to conduct ELIV business. ELIV has never been registered with the Securities and Exchange Commission, Financial Industry Regulation Authority (FINRA), or any other self-regulatory organization. In April 2009, VALENTE was barred from having any association with FINRA members.

b) From December 2010 through June 16, 2014, VALENTE, through ELIV,[1] obtained more than $10.5 million from more than 100 investors. VALENTE operated ELIV until June 16, 2014 when the United States District Court for the Southern District of

[1] ELIV collected an annual management fee for VALENTE's advice about which securities ELIV should invest.

New York issued a preliminary injunction enjoining ELIV from operating and freezing its assets. Throughout ELIV's operational period, VALENTE was ELIV's *de facto* owner, manager and, apart from clerical staff, its only employee.

c) Specifically, VALENTE used ELIV to obtain money from people to be invested in "The ELIV Group Investment Fund" a/k/a "The ELIV Group, LLC Fund" ("the Fund"). The Fund is a security under Section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(1)). According to VALENTE, all investor investments would be pooled in the Fund and then be used to purchase stocks, options, and currency.

d) After a new investor's deposit cleared, VALENTE normally mailed the investor an investment contract stating that although future returns could not be guaranteed, the Fund had achieved specific annual returns during the prior two years. For example, the 2012 investment contracts stated that the total return for the Fund "for 2010 and 2011 was 36.383% and 48.27% respectively." The 2014 investment contracts stated that the "total returns for [the Fund] 2012 and 2013 were 44.56% and 45.11% respectively." VALENTE also touted the Fund's long term success on ELIV's website which stated, in the spring of 2014, that the Fund "has returned a five year average annual return of 34.5%." These statements were false because the Fund had lost money every year of its existence and had lost more than $1.2 million total by April 30, 2014. VALENTE made up these falsely inflated annual return figures to encourage investments and discourage withdrawals. Investors relied on these false representations when deciding whether and how much money to invest in the Fund.

e) For example, on March 1, 2014, C.K. invested $50,000 into the Fund. On April 1, 2014, VALENTE, from a location in Warwick, New York, used, and caused the use of, the U.S. Mail to mail C.K. an investment contract that falsely claimed that the Fund's "total returns for 2012 and 2013 were 44.56% and 45.11% respectively." This false statement was material to C.K.'s decision to invest with ELIV and to remain with ELIV as an investor.

f) VALENTE also mailed investors monthly reports about the Fund's performance entitled "The ELIV Group, LLC Fund Investment Report" a/k/a "The ELIV Group, LLC Investment Report" (hereinafter "monthly reports"). These monthly reports supposedly detailed "the monthly net return" for the Fund, and the return on each investor's investment which normally matched the Fund's monthly return. Like the annual return rates in the investment contracts, the monthly reports contained false statements. Although the Fund lost money for 31 out of 41 months from December 2010 through April 2014, VALENTE falsely reported positive returns to cause investors not to withdraw their investments and to make new investments in the Fund.

g) For example, in early May 2013, VALENTE mailed monthly reports to investors stating that in April 2013 the Fund "produced a monthly net return of 3.27%" and that investors had the same return on their investments when he knew that the Fund had actually lost over $134,000 that month. Investors relied on these false representations when deciding whether to remain invested in the Fund.

h) As another example, on December 17, 2012, investor M.M. invested $45,000 into the Fund. On May 1, 2013, VALENTE used the U.S. Mail to send M.M. (who lived and received mail in Kingston, New York) "The ELIV Group, LLC Fund Investment

Report [for the] Period beginning April 01, 2013 thru April 30, 2013" that falsely claimed that the Fund "produced a monthly net return of 3.27%" for April 2013 when in reality the Fund lost over $134,000.

i) VALENTE also made false representations to investors about his ability to accept and manage Individual Retirement Accounts ("IRAs") so that he could charge a 1.0% annual management fee on any IRA investments. Internal Revenue Service rules and regulations govern the acceptance, holding and management of IRA accounts and allow the rollover of IRA accounts from one authorized financial institution to another without incurring any taxes under specific circumstances. Neither VALENTE nor his businesses was authorized to accept, establish, or maintain IRA accounts as required, but VALENTE nevertheless told investors that he/ELIV/the Fund could accept, hold, and manage their IRA accounts. Based on those false representations, approximately 30 investors transferred money from IRA accounts at authorized financial institutions to what they believed were IRA accounts at the Fund/ELIV. VALENTE also sent them "Investment Contracts" and monthly reports stating that these funds were "IRA" accounts. Based on these false representations, investors believed that they had completed valid "rollovers" and did not report the transfers as taxable distributions to the IRS. The IRS learned about the transfers and, because neither ELIV nor the Fund were authorized to accept, establish, or maintain IRA accounts, took the position that the investors had taken distributions and owed taxes on those distributions. VALENTE then tried to conceal what he had done by offering to communicate with the IRS for investors and by preparing and issuing altered documents that purported to show he/ELIV were lawfully holding investors'

IRA accounts. In addition, when accountants for ELIV IRA investors asked questions, VALENTE told those accountants that he would communicate with the IRS and began preparing tax returns for those clients to conceal what he had done.

j) For example, in the Fall of 2011, ELIV investor M.F. (who lived in Schenectady, New York) took a $154,800.00 distribution from an IRA account at a non-ELIV authorized financial institution and transferred this amount into a purported ELIV IRA account. This transfer was done within sixty days of the distribution and M.F. believed that he/she had rolled over his/her IRA into the ELIV IRA account without triggering any tax consequences.

k) On or about May 6, 2013, the IRS issued a notice to M.F. advising that the 2011 distribution he/she took from his/her IRA appeared to be taxable. M.F. immediately contacted his/her Certified Professional Accountant (CPA) (based in Albany, New York), who had prepared M.F.'s 2011 income tax return, and asked for assistance. The CPA quickly contacted VALENTE and asked VALENTE if he/ELIV would be generating an IRS Form 5498 that would show that M.F. had successfully and timely rolled over his/her $154,800 IRA account into an ELIV IRA account.

l) VALENTE knew that he could not legitimately issue an IRS Form 5498 because neither he nor ELIV was authorized to accept, establish or maintain IRA accounts. Instead, in or about mid-May 2013, VALENTE used a legitimate quarterly investment statement issued by tradeMONSTER for a general account held by The ELIV Group, LLC, and altered the statement to make it appear as though ELIV had, in 2011, received M.F.'s IRA rollover investment, that ELIV was holding the investment as an IRA, and that there should be no taxable distribution. Also in mid-

May 2013, VALENTE sent the altered tradeMONSTER statement to M.F.'s CPA knowing that the CPA would provide the statement to the IRS in an effort to show the IRS that no tax was due and owing from M.F.'s 2011 rollover of his/her $154,800 IRA investment.

m) On May 16, 2013, M.F.'s CPA wrote a letter to the IRS, arguing that M.F. owed no taxes to the IRS as pertained to M.F.'s 2011 purported rollover of $154,800 into the ELIV IRA and provided the altered tradeMONSTER statement in support of that argument. The IRS received that altered statement and was deceived into believing that M.F.'s $154,800 IRA investment had been rolled over into an ELIV IRA account. On July 29, 2013, the IRS sent M.F. a notice advising that he/she owed no taxes in connection with M.F.'s 2011 rollover of his/her $154,800 IRA account into the ELIV IRA account.

n) At the time that ELIV ceased operations pursuant to the court-ordered preliminary injunction and asset freeze, approximately $2.4 million of the more than $10 million dollars of investor principal that VALENTE had received from investors during ELIV's operational period had been returned to investors with the false representations that these payments were a return of principal or a distribution of profits. VALENTE knew that the very small profits earned were far less than those payments.

o) In addition, despite the frequent and substantial trading losses, VALENTE, as of June 2014, improperly enriched himself by taking more than $2.2 million in unauthorized "annual management fee[s]" from ELIV investors. VALENTE spent the unauthorized fees on a variety of goods and services that benefitted he and his wife,

to include approximately $230,000 in cash withdrawals, $443,000 on credit cards, $117,000 on a condominium in Vermont, $35,000 on jewelry, $424,000 on house-related improvements and maintenance for his Schenectady home, $29,000 on mortgage payments for his Schenectady home, and $20,000 on liquor.

p) The actual loss amount to investors due to VALENTE's criminal conduct is at least $2.2 million.

6) **<u>Sentencing Stipulations:</u>** The following sentencing stipulations are agreed to by the parties:

a) The parties agree that for purposes of Count One and Count Two, the total loss to ELIV victims/investors is at least $2.2 million in accordance with U.S.S.G. § 2B1.1(b)(1)(I). It is the government's position that the loss amount is more than $2.2 million, and the government will advocate for a higher loss amount. The defendant disagrees and will argue that it is no more than $2.2 million.

b) It is the government's position that for purposes of Count One and Count Two, the defendant's criminal conduct involved more than 50 victims/investors resulting in a four level increase under U.S.S.G. § 2B1.1(b)(2)(B). The defendant does not agree.

c) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or

engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. §3C1.1.

d) The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. §3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 before receipt of any acceptance of responsibility adjustment under U.S.S.G. §3E1.1(a).

7) **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

a) The convictions resulting from the defendant's guilty plea;

b) Any sentence to a term of imprisonment of 210 months or less;

c) Any sentence to a fine within the maximum permitted by law;

d) Any sentence to a term of supervised release within the maximum permitted by law;

e) Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

---

A. **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right. Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **<u>Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:</u>** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E. **<u>Sentencing:</u>**

a. **Maximum terms of imprisonment:** The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement. If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other. Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

b. **Mandatory minimum terms of imprisonment:** If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may require imposition of a mandatory minimum term of imprisonment. In such cases, the court must impose a term of imprisonment no less than the required mandatory minimum term unless an exception to that requirement applies. Such exception may be dependent on a motion by the government.

c. **Section 851 Enhancements**: The defendant understands that if the government has filed an information against the defendant as provided 21 U.S.C. § 851, alleging that the defendant has one or more final convictions for a felony drug offense, and, as part of this agreement, the defendant has admitted and/or affirmed that he was so convicted, then, by pleading guilty, the defendant will lose the right to attack any sentence the court imposes by challenging any such prior conviction.

d. **Sentencing guidelines:**

   i. The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

ii. Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court. Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

iii. Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

e. **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

f. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

g. **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable

guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

h. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

i. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

j. Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

k. If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship. Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud. Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court, can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

l. A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court. The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

m. The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including

substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

n. The defendant consents to the entry of an order of forfeiture of the assets described above.

o. The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

p. Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture. Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

q. In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party. The defendant agrees that

forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

r. The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

s. The defendant waives the right to a jury trial on the forfeiture of assets. The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

t. The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

u. The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

v. The defendant acknowledges joint and several liability for the amount of any money judgment set forth above.

w. In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

**I. <u>Determination of Financial Condition and Payment of Interest and Penalties:</u>**

x. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

y. The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

z. The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

aa. Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

**J. Remedies for Breach:**

bb. Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

cc. If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

i. To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement,

notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

ii. In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

iii. To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

iv. To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

v. To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

vi. To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K. **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

RICHARD S. HARTUNIAN
United States Attorney

RICHARD BELLISS
Assistant United States Attorney
Bar Roll No. 515295

May 11, 2015
Date

SCOTT VALENTE
Defendant

May 11, 2015
Date

Joel D. Schwartz
Attorney for Defendant
Bar Roll No. pro hac vice

5/11/2015
Date

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

United States of America
v.
Scott Valente
*Defendant*

Case No. 1:15-CR-124 (GLS)

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: 05/11/2015

*Defendant's signature*

*Signature of defendant's attorney*

Joel Schwartz
*Printed name of defendant's attorney*

*Judge's signature*

Hon. Gary L. Sharpe, Chief Judge, NDNY
*Judge's printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

***************************************************

UNITED STATES OF AMERICA, *

Plaintiff, *

-v- 15-CR-124 *

SCOTT VALENTE, *

Defendant. *

***************************************************

Transcript of Change of Plea Hearing regarding the above-referenced matter, held before the Honorable Gary L. Sharpe, United States District Court Judge, at the James T. Foley United States Courthouse, 445 Broadway, Albany, New York, on May 11, 2015.

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
445 Broadway
Albany, New York 12207
By: Richard Belliss, AUSA

FOR THE DEFENDANT:

WILLIAM J. DREYER, ESQ.
75 Columbia Street
Albany, New York 12210

JOEL D. SCHWARTZ, ESQ.
Attorney for Defendant
12505 Park Potomac Avenue
Potomac, Maryland 20854

COURT CLERK: The date is Monday, May 11th, 2015, at 9:30 A.M., in the matter of the United States of America versus Scott Valente, case No. 15-CR-124. We are here for a waiver and plea hearing. May we have appearances for the record, please.

MR. BELLISS: Good morning, your Honor. Rick Belliss on behalf of the United States, accompanied by FBI Special Agent Jeff Alford.

THE COURT: Good morning.

MR. DREYER: Good morning, your Honor. I'm here to move the admission of Mr. Joel Schwartz who will then make his appearance, together with his co-counsel who is not here, Russel Duncan of the same firm. So with the Court's permission, I can do that.

THE COURT: Please.

MR. DREYER: Your Honor, I'd like to introduce to the Court Joel Schwartz.

MR. SCHWARTZ: Good morning, your Honor.

MR. DREYER: Who's with the firm Shulman and Rogers in Maryland. I've submitted motion papers to the Court, they have not yet been filed yet because we don't have a case number but I believe we provided copies to the Court. Very briefly, Mr. Schwartz has experience as a federal prosecutor, having spent nine years in main justice and also various positions as a public defender.

I told him the Court would not hold main justice --

THE COURT: Disneyland on the Potomac. Sorry.

MR. DREYER: And in addition to that, he's a member of the District Court of Maryland and the District Court, District of Columbia. So without further ado, I move his admission. Mr. Duncan also has vast experience as a member of the United States Attorney's Office in the District of Columbia and the FCC and, again, his motion papers set forth his qualifications and they meet the requisite, the requirements of the statute. So without further ado, I also move for Mr. Duncan's admission.

THE COURT: We received and reviewed the papers. They are all in order and I'm happy to grant both motions.

MR. DREYER: Thank you, your Honor.

MR. SCHWARTZ: Thank you, your Honor.

THE COURT: All right. As I understand it, it's Mr. Valente's intention to waive indictment and enter a plea to an information, two counts -- three counts, charging him with securities fraud, mail fraud and obstructing and impeding due administration of the Internal Revenue Laws which is in fact count three of the information.

In addition, it's his intention to waive any venue issues and to enter a plea in the Northern

District. Am I correct?

MR. SCHWARTZ: Yes, your Honor, you are.

THE COURT: All right. Mr. Valente, in order for me to accept your waiver of indictment and your plea to the information, I have to be satisfied of essentially three things. Number one, that you understand the consequences of waiving indictment and of entering a plea to this three-count information, that it's your free choice to do those two things, and insofar as the plea of guilty is concerned, that there are facts that would support your admission to this charge.

In order for me to be satisfied of those things, you and I need to talk, the conversation is under oath and subject to the penalties of perjury, you're obligated to tell me the truth to the questions I ask. Do you understand?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Law, would you administer an oath, please.

COURT CLERK: Mr. Valente, please stand and raise your right hand.

(Whereupon, Defendant placed under oath)

THE COURT: How old are you, Mr. Valente?

THE DEFENDANT: I'm sorry?

THE COURT: How old are you?

THE DEFENDANT: 58, your Honor.

THE COURT: How far did you get in school?

THE DEFENDANT: Two and a half years of college.

THE COURT: I presume you can read English?

THE DEFENDANT: Yes, sir.

THE COURT: We have an information and a plea agreement in this case. Did you read both of those documents?

THE DEFENDANT: I did.

THE COURT: Did you get a chance to discuss them with your attorney?

THE DEFENDANT: I did, your Honor.

THE COURT: Insofar as the plea agreement in particular is concerned, did you have an opportunity to discuss the details of that with your attorney?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Did you get to ask him all of the questions you wanted to about the various provisions in that plea agreement?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Was he able to answer the questions in a way so that you feel you understand the content of that plea agreement?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you feel you understand the nature of the charges that are contained in the information?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Are you on -- I know you are. You are on medication.

THE DEFENDANT: Yes, your Honor.

THE COURT: I reviewed the bail report in that regard. What medication are you on?

THE DEFENDANT: I'm on five different types of high blood pressure medication and I'm -- Lexapro and Nexium, and sometimes I'm on Clindamycin if my infection acts up.

THE COURT: Is there anything about your ingestion of those medications that would prevent you from understanding this conversation with me?

THE DEFENDANT: No, your Honor.

THE COURT: I also know there are alcohol issues. Any alcohol in the last 24 hours?

THE DEFENDANT: No, your Honor.

THE COURT: Any reason I wouldn't know about as to why you would not understand this conversation with me?

THE DEFENDANT: No, sir.

THE COURT: All right. Let's take up, then,

the three issues that I said we needed to discuss, beginning with the consequences of waiving indictment and of pleading guilty.

As you know from your review of the plea agreement and, by the way, since you have read it and you discussed it with your attorney and you indicated to me that you understand it, I will incorporate the content of the plea agreement into the record of these proceedings. I reviewed each of the provisions. I'm not going through everything that's in the plea agreement but I am going to speak about some of those things that have to do with the issues I said we needed to discuss.

So let's take up the first one, waiver of indictment. As you know, under the United States Constitution, the Sixth Amendment, everybody who is facing a felony charge has a right to have that charge submitted to a grand jury. A grand jury is not a trial jury. It requires the grand jury to review the evidence that's presented to them, typically, by the government alone, and from that evidence they must decide whether there is reason to believe that a felony or felonies were committed and that a particular person committed them. If 12 of their number agree, they then authorize the return of an indictment, which is typically the piece of paper that brings a defendant into court before a judge

like me.

Since that right is founded in the Constitution, a person can give it up as long as it's their free choice to do so and proceed instead on the basis of an information instead of an indictment and that's what you have indicated that you wish to do. Is that so?

THE DEFENDANT: Yes. Yes, your Honor.

THE COURT: I explain to people that, in reality, the information is not much different than an indictment, other than the fact that it's labeled "information" instead of "indictment" and it doesn't bear the signature of the foreperson of the grand jury since there was no grand jury.

Let's talk, then, about the consequences of pleading guilty. The first consequence, again, as it's discussed in your plea agreement, is that you will be giving up at least two rights that you have under the Constitution. One is the right to a jury trial, the other is the right to remain silent under the Fifth Amendment.

If you wanted, we would conduct a jury trial. We would bring in about 35 in number, people drawn randomly from the community, from their midst we would select 12 to sit as the trial jury. You, your attorney,

the government and I would all have some say in who those 12 folks were. They would listen to the evidence in this case, my instructions on the law, and at the end of the case, they would have to be unanimously satisfied, beyond a reasonable doubt, that the government proved your guilt of these charges.

Because of the Fifth Amendment, you would be under no obligation to do anything, much less prove your innocence. The government has to prove your guilt, not you your innocence. Therefore, you could remain silent if you chose to.

I also like to say you could put some duct tape over your attorney's mouth and keep him silent as well. In other words, it means total silence. If that's the choice you made, I would tell the jury they could not consider your silence as any evidence of your guilt. Naturally, you would have the right to do the opposite, testify if you wished, use my powers to subpoena witnesses and evidence on your behalf and certainly you would want to cut your attorney loose to contest the government's evidence and cross-examine its witnesses.

It wouldn't make any difference which choice you made, under the Fifth Amendment, the burden would always remain on the government to prove your guilt to the unanimous satisfaction of the jury beyond a

reasonable doubt.

If I accept your plea of guilty here this morning, you're giving up those rights you have under the Constitution. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Let's talk about the consequences of pleading guilty and in terms of the sentence to be imposed. Under federal law, no one can have any conversation with me before a plea about what I might do at the time of sentencing. So I have had no conversations with your attorney, I have had no conversations with the government nor anyone about this case and, frankly, I don't know about the details of this case other than what's in the plea agreement. So I'm in no position to know what I would do at the time of sentencing.

I can explain the process to you. If I accept your plea here this morning, I'm going to ask the Department of Probation to prepare a pre-sentence report. They're going to sit down and chat with you, they're going to put the results of that conversation in writing. You, your attorney, the government and I are all going to see that before the date of sentencing. Everybody is going to get a chance to submit anything to me in writing that they think I should consider for purposes of

sentencing, and on the day of sentencing everybody gets a right to speak to me. Once I have read everything, once I've heard from everybody, it will be my obligation to impose a sentence that I think is reasonable and is consistent with any statutory restrictions that Congress has placed on me in light of the crimes that are charged in the information.

So that's the process. Now, that doesn't mean that there aren't things we can say about sentencing as we sit here today and those things are outlined in your plea agreement.

You understand that every crime or crimes have different penalties associated with them. The crime for murder -- the sentence for murder is not the same possible sentence for speeding, they are different, depending on what the crime is that's charged. So, in your plea agreement there is a special assessment or processing fee of $100 per count of conviction, three counts, $300 in this case.

As you recognize from your plea agreement, restitution is an issue in this case, which you are agreeing to. There's a provision that deals with forfeiture as a possible consequence of this particular offense. In that regard and in relation to the forfeiture provision, there is a money judgment of

$10,555,954.27 regarding count two and then real property that's also listed in the forfeiture allegations.

With respect to the actual penalties, with respect to count one the maximum term of imprisonment on the securities fraud is 20 years, the maximum possible fine is $5 million. In connection with count two, the mail fraud, the maximum term of imprisonment is 20 years, maximum fine is $250,000. With respect to count three, the tax count, the maximum term of imprisonment is three years, the maximum fine is $5,000. On all counts, there is the possibility of a term of supervised release of three years, up to three years to begin after imprisonment.

Supervised release is federal jargon for what most people know as parole. If I were to impose a term of supervised release, it would be under conditions. If you were to violate those conditions, then you could be returned to prison to serve an additional period of incarceration.

And then there are other adverse consequences of pleading guilty. Now, by other adverse consequences, that means certain things that flow from a felony conviction that really have nothing to do with any sentence I would impose but they're consequences of a guilty plea. Two principal ones are under the

Constitution. So under the First Amendment, it is likely, unless your civil liberties are restored, that you would lose your right to vote. Under the Second Amendment you will lose your right to bear firearms and then there are other consequences. The Court can't anticipate what all of them might be. There are certain things, like licensing restrictions, that a state may impose that are impacted by a felony plea and those kinds of things.

Do you understand those are all the possible consequences of pleading guilty?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Let me turn to a provision that's contained in your plea agreement that I'm sure you discussed with counsel; it's over in paragraph 7 on page 13, it's called "Waiver of Right to Appeal and Collateral Attack." I like to explain it in my own way and basically as follows: Even though somebody elects to plead guilty, once I have sentenced them on the sentencing day that we schedule, they would ordinarily have a right to appeal the circumstances of their plea or whatever sentence I impose to the Second Circuit Court of Appeals, which sits in Manhattan. Another way in which they could challenge their plea or their sentence would be to file a motion with me within

one year of the date of sentence. That motion's got a fancy legal name, like a lot of things, habeas corpus and, again, it would be challenging the circumstances of the plea or any sentence I impose.

In this case you have agreed in this provision in the plea agreement that when I impose sentence, and as I've said, I don't know what that sentence will be until that process works its way out that I described, but you have agreed that if I impose a sentence of 210 months or less, you will not appeal or later challenge either your plea or your sentence. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: There's a little flip to that and it's this. If for any reason my sentence should exceed 210 months, you can appeal or later challenge the sentence but not the circumstances of your plea. Do you understand that?

THE DEFENDANT: Yes, your Honor. Yes.

THE COURT: Let me turn to the second issue I said we needed to chat about. Law calls it the voluntariness of the plea, I call it free choice.

Here's what it means. Under the Constitution, as I have discussed it with you, you have a right to have your case presented to a grand jury, and you have a right to continue your plea of not guilty and therefore to a

jury trial.

Both of those rights belong to you and exclusively you. There's no doubt in my mind that you have discussed what you intend to do here this morning with your attorney, but you've also discussed it with family and friends and while their advice is important to you, in the end those rights belong to you and only you. I can allow you to waive indictment, I can allow you to plead guilty, but only if it's your free choice to do that and what that means is, nobody's threatened you in order to get you to waive indictment or plead guilty, pressured you somehow to do those two things, or made you some promise they should not have made and I'm not including any of the things that are in the plea agreement, there's nothing untoward about those.

Have any of those things happened?

THE DEFENDANT: No. No, your Honor.

THE COURT: Is it your free choice to waive indictment?

THE DEFENDANT: Yes, your Honor.

THE COURT: Is it your free choice to plead guilty?

THE DEFENDANT: Yes, it is, your Honor.

THE COURT: In terms of the third issue I said we needed to talk about, I have to be satisfied that

there are facts that would support your admission to the three counts of the information that's before me. In that regard, your plea agreement contains a recitation of facts beginning on page 6 and paragraph 5.

As I do in every case where there is a plea agreement, before I come out here I read and, in particular, I look at the whole agreement but in particular, I look at paragraph 5 with the notion in mind that I have to be satisfied that there are facts that would support a defendant's admission to the charge.

So I read the facts that are contained in paragraph 5. I'm already satisfied that if those facts are true, they will support your admission to these three counts that are contained in the information.

I know that you have told me you went over the plea agreement with your attorney. I know you have signed the agreement and it has been prepared for filing, but I like to make doubly certain at this point, are the facts that are contained in the plea agreement true?

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you admitting them to me?

THE DEFENDANT: Yes, your Honor, I am.

THE COURT: As to the three counts that are contained in the information as I have described them, how do you plead? Guilty or not guilty?

THE DEFENDANT: Guilty, your Honor.

THE COURT: As I always do, I have watched Mr. Valente as he and I have talked here this morning. I have no reason to believe that he disregarded the oath that he took, and I therefore believe he's told me the truth to the questions I have asked.

It is, therefore, my opinion that he understands the consequences of waiving indictment, he understands the consequences of pleading guilty, including the appellate waiver that he executed as a part of his plea agreement. It's clear to me that it is his free choice to waive indictment and enter the plea and that there are no threats or duress that have impeded that free choice, it's therefore voluntary and, as I've said, I read the facts that are contained in the plea agreement, they support his admission to the three charges he has now pled guilty to.

So for all of those reasons, I will accept the waiver of indictment, I will accept the plea of guilty to the information, and we will set sentencing for when, Mr. Law?

COURT CLERK: Sentencing is scheduled for September 11th, 2015, at 9 A.M. in Albany.

THE COURT: This is Mr. Valente's first appearance. What's the government's position on bail?

MR. BELLISS: We seek detention, your Honor.

THE COURT: Based on what?

MR. BELLISS: Economic danger to the community, your Honor.

THE COURT: Are you seeking a hearing in that regard?

MR. BELLISS: We are relying on the information in the plea agreement to support our basis, your Honor.

THE COURT: What's the defendant's position?

MR. SCHWARTZ: Your Honor, we would ask for recognizance bond and any restrictions on his travel, there are exceptional circumstances here that satisfy the requirements of Section 3143 which shows he's not a risk of flight. He's not likely to flee. He's not a danger to the community, either physical or economic harm. He also has substantial therapeutic and medical needs that are best served in the community for the time between now and sentencing and, in fact, preparing better for sentencing and, in fact, as the Court knows, set forth in the plea agreement, there are ongoing work with Securities and Exchange employers and SEC case in Manhattan that requires Mr. Valente's continued cooperation in order to comply with the assets that were taken in this case.

This morning I gave Mr. Belliss a document that

we have received last week that provides for settlement, liquidation of assets and the Court and community is best served by Mr. Valente remaining out to assist in that in particular, your Honor. With regard to the risk of flight --

THE COURT: The government hasn't moved on the basis of risk of flight and I reviewed the presentence report; I'm satisfied that's not an issue.

MR. SCHWARTZ: Very well.

THE COURT: It's economic harm.

MR. SCHWARTZ: Your Honor, Mr. Valente has been aware of this situation and there's no likelihood of re-perpetration in this case and he's not doing any investing advising. His reputation, frankly, is in shreds in this community. I don't think there's anyone near or far who would go near Mr. Valente with regard to seeking investment assistance. There's been widespread press about this event so I think anyone could easily Google or look up Mr. Valente and understand his situation, and also in June the FBI took everything that he has. All his assets, all his office equipment. There's no way he could set up an office to -- to set up work and advising people with regard to investments.

With regard to his -- the Court like to be heard on -- like me to provide information about his

medical and mental health situation?

THE COURT: Only if there's something in addition you want to add to the bail report which I read and reviewed.

MR. SCHWARTZ: That information is -- outlines the -- the medical conditions and mental health issues and that's sufficient. He's actively receiving both medical and mental health treatment. It's the opinion of the psychiatrist that we're working with that the best way he will be ready to serve what may very well be a long prison sentence is that he continue in his therapeutic -- that he's receiving right now for as long as possible prior to sentence.

THE COURT: What's the government's view of the bail report in light of the employability of the defendant as to why he poses a continued risk of danger from economic harm?

MR. BELLISS: Your Honor, we believe that Mr. Valente actually had a very good reputation within the community prior to these crimes coming to light and that he exploited that relationship with many close family members and friend. We are concerned that could happen again, despite what counsel has said about his reputation being tattered. That's probably is true but we're just concerned, your Honor, that this defendant is

in a lot of debt and may take steps to again perpetrate that economic fraud.

THE COURT: All right. I understand the argument. There's no question in my mind that, given the facts that are in the bail report upon which both parties rely, not seeking a hearing to supplement those in any way, that the standards of the Bail Reform Act 3142 of Title 18 have not been met, and I intend to release the defendant on bail.

As the parties are aware and, Mr. Valente, you need to understand this. In the mid to late '80s, Congress passed a Bail Reform Act. Their concern in passing the Bail Reform Act is that there was a revolving door of justice. People would appear in connection with criminal charges, be released on bail, only to be freed and continue to commit crimes and so they passed the Bail Reform Act. There are certain kinds of crimes that immediately caused presumption that somebody is either a risk of danger to the community or risk of flight.

Risk of flight is not an issue in this case in light of the facts that are contained in the bail report. The issue here is whether you're a continued danger to the community if I were to release you on bail. Some of the crimes where Congress has said that's absolutely so and I must take that into consideration, the nature of

the crime, include things like crimes of violence, crimes involving drug charges with respect to possible penalty is ten years or more, crimes involving child pornography, those are all crimes in which, absent a defendant's proof to the contrary, Congress has ordered me to remand because those people are dangerous to the community.

When it comes to economic crime, that is a crime that I can consider as to whether or not I should or should not impose bail, but that requires a recitation of facts that would suggest to me you are a continued potential harm economically to the public at large and then I have to weigh against that whether there are conditions of release that I could impose that even if you were some risk of economic harm, I would be satisfied that those conditions would preclude you from engaging in that kind of risky behavior.

So what we're dealing with here is not a situation where Congress has mandated that I remand you, absent proof, it has mandated, instead, I take into consideration the balance between those conditions and the future harm that you pose.

I'm satisfied, from my review of the bail report, that you are in no economic position to continue employment in light of the restrictions that have been imposed upon you both by this investigation, by the SEC

and otherwise. I don't see how you could in any way engage in that kind of business while out on bail. But, naturally, if you were to do anything in that regard while under the supervision of pretrial services under the conditions that I'm about to impose, I can tell you what's going to happen.

What's happened as a result of today's proceeding is you have entered a plea of guilty and we have set a date for sentencing. If you were to violate any of the conditions I'm about to impose, I can promise I'm going to revoke bail immediately, I'm going to remand you to the custody of the marshals and you're going to sit until that sentencing day and whatever it is you did to violate the conditions of bail, I'm going to take into consideration in deciding what sentence to impose.

So it wouldn't make any sense whatsoever for you to violate any of the conditions I set. Would it?

THE DEFENDANT: No. No, your Honor.

THE COURT: All right. Let me explain to you what those conditions are. There are two that are mandated by statute. The first is, do not violate the law: federal, state, or local. Federal, state or local.

You climb behind the wheel of a car, you're drinking, that's a violation of law and it's a violation of the conditions of release that I set. Do you

understand?

THE DEFENDANT: Yes, your Honor.

THE COURT: I understand you're currently under supervision by a state probation department. Any violations of any kind and I'm going to issue a warrant for your arrest and you're going to sit.

The second condition mandated by statute is that you are to appear for any future court proceedings. Should you fail to appear, that's a violation of my bail release. In addition, I am imposing the following special conditions of release. John, for your purposes, subdivision A. You are to report to pretrial services within 24 hours of your release and as directed thereafter.

You shall allow a probation officer to visit anytime at your home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer. You shall refrain from possessing a firearm, destructive device or other dangerous weapon.

Subdivision E: You are to maintain or actively seek employment. Subdivision G: If you have any passport, you must surrender it to the clerk of the court immediately. Subdivision A: You are to obtain -- H, excuse me, obtain no passport. Subdivision I: I am restricting your travel to the Northern District of New

York unless approved by pretrial services or by me. I'm mindful of what your attorney told me about the ongoing cooperation with the SEC and dealing with matters involving them. Pretrial services will authorize travel for those purposes. You're to remain -- subdivision J -- at an address authorized by the Court or by pretrial services. Subdivision M: You are to submit to a mental health evaluation and/or treatment as approved by pretrial services or the Court.

You shall contribute to the cost of services rendered in an amount to be determined by the probation officer based on your ability to pay or the availability of third-party payments.

Subdivision P: You are to refrain from any use of alcohol. Subdivision Q: You're to refrain from the possession, use, distribution, importation or manufacture of any and all controlled substances and their analogs, except the possession and use of a controlled substance properly prescribed by a licensed medical practitioner as permitted.

Subdivision R: You are to submit to any method of testing required by pretrial services or the supervising officer for determining whether you used a prohibited substance. Such methods may be used with random frequency and include urine testing, a wearing of

a sweat patch and/or a remote alcohol testing system.

Subdivision S: You are to permit -- well, let me say -- first of all, yeah, S, participate in and successfully complete a program of inpatient or outpatient substance abuse therapy and counseling approved by pretrial services or the Court.

Again, you shall contribute to the cost of such services rendered in an amount to be determined by probation based on your financial ability or the availability of third-party payments. Subdivision T: You're to refrain from obstructing or attempting to obstruct or tamper in any fashion with the efficiency and accuracy of any prohibited substance or electronic monitoring which is required as a condition of your release.

Subdivision Y: You are to report within 72 hours to pretrial services or the Court any contact with any law enforcement personnel, including, but not limited to, any arrests, questioning or traffic stop.

Do you understand each of those conditions I have explained to you?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand the consequences of violating any of those conditions?

THE DEFENDANT: Yes, your Honor.

THE COURT: I take it that the defendant has not been processed by the marshals?

MR. SCHWARTZ: No, your Honor, he has not and if I could at some point, I'd like to be heard through subdivision I.

THE COURT: All right. Mr. Belliss.

MR. BELLISS: I don't believe he's been processed by the marshals.

THE COURT: All right. Subdivision I.

MR. SCHWARTZ: Ms. Fahey has arranged for his processing after the proceedings this morning.

With regards to subdivision I, there's a forensic psychiatrist who is working with the defense team to evaluate Mr. Valente, his name is Dr. Douglas Anderson, his office is in Manhattan. Mr. Valente has an appointment to meet with Dr. Anderson on Saturday, the 16th of May. We would ask the Court to permit that travel without having to make additional arrangements with pretrial services in light of the close proximity of time.

THE COURT: Done.

MR. SCHWARTZ: Thank you, your Honor.

THE COURT: Anything further?

MR. BELLISS: No, your Honor.

THE COURT: Anything further?

MR. SCHWARTZ: No, sir.
THE COURT: All right. Thank you.
(Whereupon, proceeding concluded)
* * * * * * * * * *

C E R T I F I C A T I O N

I, Lisa L. Tennyson, RMR, CSR, CRR, Official Court Reporter in and for the United States District Court for the Northern District of New York, hereby certify that the foregoing 27 pages taken by me to be a true and complete computer-aided transcript to the best of my ability.

Lisa L. Tennyson

Lisa L. Tennyson, R.M.R., C.S.R., C.R.R.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

************************************

Case No. 15-CR-124 (GLS)

UNITED STATES OF AMERICA

v.

SCOTT VALENTE,

Defendant.

************************************

GOVERNMENT'S SENTENCING MEMORANDUM

This is a case about broken trust. The defendant broke the trust placed in him by new investors when he lied to them about The ELIV Group, LLC Fund's (hereinafter "Fund") overall past performance. The defendant broke the trust placed in him by existing investors when he repeatedly lied to them about the Fund's monthly, quarterly, and annual performance. The defendant broke the trust placed in him by existing investors when he took/stole more than $2 million in unauthorized Fund management fees. And, for those unfortunate ELIV investors who believed that they had rolled over retirement savings accounts into purported ELIV Individual Retirement Accounts (IRAs), the defendant broke the trust placed in him by these investors when he lied to them about ELIV's ability to accept, hold and manage IRA accounts.

The defendant was successful in getting both new and existing investors to believe in his lies because they trusted him on a personal level. Most of the defendant's investors were friends with either the defendant or his parents. Because of the defendant's close personal relationships with his investors, he could make statements such as:

- ELIV was "an accredited investment and consulting firm specializing in wealth creation and preservation;"
- that he was dedicated to "developing effective, personalized financial strategies;" and
- that he was "dedicated to the highest standards of service"

and the investors believed these statements to be true. Sadly, the defendant's statements to both new and existing investors were a series of lies made so that the defendant could personally enrich himself with the hard earned monies of his investors.

As a result of the defendant's lies and deceit, and the financial and emotional harm he has caused his investors, the defendant should be sentenced to a 240 month term of imprisonment,[1] to be followed by three years of supervision, and be ordered to pay $8,200,579.69[2] to the more than 100 investors whose trust the defendant has broken.

1 The government recommends that the court impose 240 month prison terms on Count 1 and Count 2, and a 36 month prison term on Count 3, with all terms running concurrently.

2 The government requests that the Court include the following language in its judgment:

1. The defendant, SCOTT VALENTE, shall pay restitution in the amount of $8,200,579.69, which is due and enforceable by the U.S. Attorney's Office against assets discovered during the case, including assets subject to a June 16, 2014 Order freezing The ELIV Group, LLC's assets, as modified, in *SEC v. Valente, et al.*, 14 Civ. 3974 (VLB)(JCM)(S.D.N.Y.), (the "Asset Freeze Order"), but only after first obtaining appropriate modification of the Asset Freeze Order, with any remaining restitution payable in monthly installments of $25.00 or 10% of his gross monthly income while incarcerated, and upon his release in minimum monthly installments of 25% of his gross monthly income, whichever is greater, until restitution is fully paid;

2. Until restitution is fully paid, the defendant is restrained from transferring any asset with a value of $2,500 or more, unless it is necessary to liquidate and apply the proceeds of such property to his restitution;

3. If at any time the defendant has the ability to make full or substantial payment toward restitution he shall do so immediately; and

4. Restitution is to be made payable to the "U.S. District Court" and forwarded to: Clerk, U.S. District Court, P.O. Box 7367, 100 S. Clinton Street, Syracuse, NY 13261, for transfer to the victims.

## I

## INTRODUCTION

On May 11, 2015, pursuant to a written plea agreement, the defendant entered guilty pleas to all three counts of Information 15-CR-124. Count 1 of the Information alleges that the defendant committed Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff. Count 2 of the Information alleges that the defendant committed Mail Fraud, in violation of 18 U.S.C. § 1341. Count 3 alleges that the defendant Obstructed and Impeded the Internal Revenue Laws, in violation of 26 U.S.C. § 7212(a). The defendant is scheduled to be sentenced on November 20, 2015.

## II

## APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

### 1. Statutory Maximum Sentences

The defendant's conviction for Securities Fraud (Count 1) subjects him to a statutory maximum term of imprisonment of twenty years, *see* 15 U.S.C. § 78ff; a term of supervised release of up to three years, *see* 18 U.S.C. § 3583(b)(2); and a fine of $5,000,000, *see* 15 U.S.C. § 78ff. The defendant's conviction for Mail Fraud (Count 2) subjects him to a statutory maximum term of imprisonment of twenty years, *see* 18 U.S.C. § 1341; a term of supervised release of up to three years, *see* 18 U.S.C. § 3583(b)(2); and a fine of $250,000, *see* 18 U.S.C. § 3571(b)(3). The defendant's conviction for Obstructing and Impeding the Internal Revenue Laws (Count 3) subjects him to a statutory maximum term of imprisonment of three years, *see* 26 U.S.C. § 7212(a); a term of supervised release of up to one year, *see* 18 U.S.C. § 3583(b)(3); and a fine of $5,000, *see* 26 U.S.C. § 7212(a).

**2. Guidelines Provisions**

**a. Plea Agreement**

Pursuant to paragraph 6(a) in the plea agreement, the parties have stipulated to the following Guidelines Provisions:

> That for purposes of Counts 1 and 2, the total loss to ELIV victims/investors is at least $2.2 million per U.S.S.G. § 2B1.1(b)(1)(I).

**b. Offense Level**

Under the federal sentencing guidelines, Counts 1, 2, and 3 are grouped for guideline calculation purposes. PSR ¶ 102. Per U.S.S.G. §§ 3D1.3(a) & (b), Count 1 is the controlling offense for guideline scoring purposes. *Id.* The base offense level for the defendant's conviction for Securities Fraud (Count 1) is 7. *See* U.S.S.G. § 2B1.1(a)(1). That level should be increased by 30 levels as a result of the following Chapter Two specific offense characteristics and the following Chapter Three obstruction adjustment: the loss to victims/investors is more than $2.5 million but less than $7 million (18 levels) (*see* U.S.S.G. § 2B1.1(b)(1)(J)); the offense involved 50 or more victims (4 levels) (*see* U.S.S.G. § 2B1.1(b)(2)(B)); the offense involved sophisticated means (2 levels) (*see* U.S.S.G. § 2B1.1(b)(10)); the offense involved a violation of securities laws and at the time of the offense the defendant was acting as an investment adviser (4 levels) (*see* U.S.S.G. § 2B1.1(b)(19)(A)(iii)); and the defendant willfully obstructed justice and/or impeded the SEC's investigation (2 levels) (*see* U.S.S.G. § 3C1.1).

**c. Acceptance of Responsibility**

The defendant is entitled to a two-level downward adjustment to his offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). The government moves for an additional one-level downward adjustment pursuant to U.S.S.G. § 3E1.1(b) to credit the defendant

for having "assisted authorities in the investigation and/or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."

**d. Criminal History Category**

According to the presentence report, the defendant's criminal history category is IV. The government agrees with the Probation Office's determination of the defendant's criminal history category.

**e. Guidelines Range and Sentence**

As described above, the total offense level is 34 and the criminal history category is IV. This is consistent with the calculations in the presentence report.

As a result of the above-described calculations, the federal sentencing guidelines sections advise that the defendant receive a sentence of 210 to 262 months imprisonment; a term of supervised release between one and three years; and a fine between $17,500.00 and $5,000,000.00.

## III

## GOVERNMENT'S SENTENCING RECOMMENDATION

Based on all of the information before the Court, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 240 months, to be followed by a term of supervision of three years, and order the defendant to pay restitution[3] in the amount of $8,200,579.69.[4] The sentence that the government recommends here is sufficient, but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2) for the following

3 To the individual victims as set forth in the PSR's Appendix A.
4 The United States also seeks forfeiture of the real properties as set forth in the Information's forfeiture allegation, as well as the imposition of a money judgment consistent with that alleged in the Information.

reasons. First, the defendant, as described above, exploited numerous personal relationships of trust for his own financial gain. Second, the defendant's victims are, almost exclusively, regular citizens, and the monies they entrusted to the defendant represented most, if not all, of their life savings. Third, the harm inflicted by the defendant on his victims is not only economic, but includes emotional and psychological harm (e.g., anger, anxiety and depression). Fourth, the defendant has a demonstrated history (*see* PSR ¶ 33) of deceit in the management of investments for individual investors.[5]

The numerous victim impact statements in this case are compelling. They describe the devastating impacts that the defendant's financial frauds have had on the very people for whom he was supposed to be safely and skillfully protecting and growing their financial nest eggs. A review of the victim impact statements reveals, sadly, some common impacts and includes (1) victims who are likely to have to push back their anticipated dates of retirement; (2) victims who are retired, but who are having to adjust their lifestyles; (3) victims who have experienced levels of stress that have caused physical ailments; and (4) victims who have, and will continue to have, complicated tax penalties and situations with the IRS as a result of the victims moving their tax-deferred retirement accounts (e.g. IRAs, 401(k)s, etc.) into ELIV IRA accounts that they were duped into believing were legitimate tax shelters. Below are excerpts from some of the victim impact statements:

(1) <u>Victims who are likely to have to push back their anticipated dates of retirement</u>:

- Victim A.O. writes in part, "[i]f my IRA is gone I'll be working till I die." (PSR p. 68 of 194).
- Victim D.H. writes in part, "I was planning on retiring in a couple of years and was

5 The United States respectfully moves the Court for an order directing that the defendant be remanded immediately after sentence. See 18 U.S.C. § 3143(b). The defendant has long been aware of the impending sentencing hearing and faces a significant term of imprisonment under the applicable guidelines. Moreover, the defendant's attorney has not identified any substantial question of law or fact likely to form a viable basis for an appeal.

planning on using that invested money for my retirement. I trusted Scott and I feel betrayed." (PSR p. 90 of 194).

- Victim E.K-L. writes in part, "Scott Valente stole my future, & that of my children. He came into my home, met my family, earned our trust, & then proceeded to steal every penny of my retirement & my children's college funds...Because of his blatant deception, I will have to work until I die in order to pay bills & make ends meet. I can no longer dream of a retirement home down south or traveling w/my spouse because I can no longer afford this dream – a dream I worked toward for 33 years." (PSR p. 94 of 194).
- Victim J.C. writes in part, "[h]e [the defendant] stole the money that was to be used for our son's college tuition and our retirement. We are now taking out loans to get J---- through college and instead of retiring at the end of 2014, I must continue to work. I am 62 years old and work for a Building Supply Company – it is hard, heavy and exhausting work – especially at this age." (PSR p. 112 of 194).
- Victim R.Q. writes in part, "[o]ur retirement nest egg needs to be completely rebuilt. In seeing the situation some of the other victims are in, I suppose we are lucky in that we have 8 years until our expected retirement date. I do not believe that we can rebuild by that time. By our calculations we will need to work several years past our expected retirement date to have even a shot at being able to live day to day." (PSR p. 173 of 194).

(2) <u>Victims who are retired, but who are having to adjust their lifestyles</u>:

- Victim C.C. writes in part, "[t]he impact of Scott Valente's crimes will affect me forever. He has stolen from my past, present and future. He has destroyed the value of the sacrifices I made while building my retirement. Presently I have to deal with the stress and anxiety of worrying if my future will be financially sound. The future as I had planned is now totally ruined. I no longer have the certainty that my home will be paid for. Will I be able to meet any medical needs that may occur? What vehicle will I be able to afford and maintain? What lifestyle will I have...certainly not the one I planned and worked so hard to obtain." (PSR p. 83 of 194).
- Victims J.G. & P.G. write in part, "[w]e are married 47 years and have fully retired in 2011. The money we invested with Scott was our entire retirement savings for emergencies, house repairs and vacations that we were going to enjoy now that we finally have the time. Now we live paycheck to paycheck and rely on credit cards. We need a new roof in the near future. Scott has changed our future and taken our hopes, dreams and goals from us for the rest of our lives; including our children's and grandchildren's. We are devastated!!" (PSR p. 128 of 194).
- Victim J.O. writes in part, "[m]yself and my family have been affected by this crime in that my financial stability that my husband and I worked for our whole lives is in jeopardy. At 96 years old I wanted to be able to help towards my children and grandchildren's future. I worry everyday what is going to happen. I feel very violated that this man would take advantage of me this way. The crime has affected my household [and] because of what happened I have to try to keep my expenses as low as possible." (PSR p. 137 of 194).
- Victims P.A. & E.A. write in part, "[w]e had built this money up over a period of 18

years, careful not to touch it for that big emergency or our retirement. We are now retired and we have no money. Every month is now a struggle. We would have been able to go on vacation but now we can't. We are holding our breath that the furnace doesn't break or our car will break down. Our cars are 10 yrs. old. If anything happens to one of us, this money was for the other spouse to live on. We're not rich, but $--,---.00 made us feel like we had something. This is very depressing. It is our first time ever trusting anyone except the bank with our money. We will never trust anyone again." (PSR p. 167 of 194).

(3) <u>Victims who have experienced great levels of stress over their financial losses</u>:

- Victim T.O. writes in part, "My husband was permanently disabled five years ago. We have seven people in our home to try to make ends meet [sic]. Since all of Scott's money has been frozen my husband has had to increase his blood pressure medicine because of all of the stress." (PSR p. 180 of 194).
- Victim B.D. writes in part, "The STRESS I have had over this situation is giving me medical problems. (high blood pressure and intestinal issues)[,] I have had many sleepless nights, waking and worrying about this case." (PSR p. 82 of 194).
- Victims M.C & M.F. write in part, "Our lives are forever changed. We don't sleep, we are afraid of our future and feel tremendous loss, anger and utter disbelief at the deception." (PSR p. 147 of 194).
- Victim D.H. writes in part, "I have stomach issues daily over this." (PSR p. 88 of 194).

(4) <u>Victims who have experienced IRS tax issues with purported ELIV IRA accounts</u>:

- Victim A.O. writes in part, "I'm currently being made to pay the IRS $42,000 in the next couple of years for taxes + penalties on IRA money I never withdrew." (PSR pp. 68, 70 of 194).
- Victims J.S. & D.S. write in part, "[b]eing betrayed and lied to has caused a lot of stress and a wide range of emotions that goes through our heads each and every day. The worst part is the annuity and IRA money Scott Valente said was being rolled over which we now know was a lie. We are now dealing with the IRS with a tax notice stating we owe $18,000 we thought Scott had handled this correctly. Now we have to prove we are not the criminals which is extremely annoying and agitating." (PSR p. 119 of 194).
- Victim J.H. writes that in addition to the pain of having lost his IRA money he has had to endure "countless faxing of documents to [the IRS] Taxpayer Advocate to handle IRS tax issues due to this fraud." (PSR p. 135 of 194).
- Victim S.O. writes in part, "Scott moved $---,--- from my Fidelity acct to ELIV...$---,--- was in my 2 IRA accts. He did not roll them over to another IRA acct. Therefore the IRS started taxing me for it. I gave the tax bills to Scott (who said he would pay it out [of] my acct with him). However, he never paid them[,] so many fines have been placed on this bill. Now it is up to $--,---.--. The IRS is now taking $300/month out of my social security check each month. I don't want to pay for something I did not receive! I never received the IRA money!" (PSR pp. 177, 179 of 194).

The victim impact statements also make it clear that the defendant stole from whomever had money - he stole from younger couples saving for their retirements or their children's college educations; he stole from older couples who were living off of their retirement savings; and he stole from community organizations like (i) the Warwick Community Ambulance Service, Inc. who entrusted its Warwick Valley High School scholarship fund money to the defendant, and (ii) Engine Company #3 who entrusted the defendant with the money that they were saving (raised from community coin drops and donations) for items to equip their new firehouse. (*See e.g.* PSR pp. 94, 167, 194 & 97 of 194). Moreover, the victim impact statements are replete with stories of betrayal and how the defendant first built a level of trust with the victims, and then often exploited that trust to convince the victims to give him their hard earned money: victims R.V and A.V. wrote in part, "[w]e placed our trust in Scott Valente" and "[t]his was my 401k plan that I worked very hard for, for 28 years;" victims V.R and J.R. wrote in part, "Scott Valente had us 100% completely fooled . . . It mystifies us how someone could look you in the eye and completely lie to you;" and victims M.C. & M.F. wrote in part, "[w]e feel betrayed and preyed upon. We entrusted Valente with our entire future . . . [h]e used my husband's friendship and my love for his parents to keep us engaged and trusting . . . [w]e simply will never understand how someone can steal from family and friends, face you and look you in the eye and tell you, yes you have the money to retire, to live the way you worked so hard to live." (PSR pp. 170, 186, 147-48 of 194).

The defendant exploited those who trusted him in order to enrich himself – to enrich himself with luxurious home improvements, a Vermont condominium, jewelry, and liquor, etc. (*See* Dkt. No. 3, ¶5(o)). While the defendant may have battled problems with alcohol, anxiety and depression over the years, these conditions did not cause him to steal from those who trusted

him. The defendant was driven by his desire to have material goods, and to live a lifestyle that he otherwise could not afford but for the hard earned monies he stole from his investors. The defendant's crimes are very serious and for those crimes the defendant should be punished severely.

Finally, "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see, e.g., Gall v. United States*, 552 U.S. 38, 46 (2007) (Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Moreover, within-guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act – "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007).[6]

Respectfully submitted this 30th day of October, 2015.

RICHARD S. HARTUNIAN
United States Attorney

By: /s/ *Richard D. Belliss*
Richard D. Belliss
Assistant United States Attorney
Bar Roll No. 515295

---

[6] The government reserves the right to respond to defense arguments raised for the first time after filing of this memorandum. Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond. *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

Further, the United States respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendations submitted by the United States Probation Office.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

Case No.: 1:15-cr-124 (GLS)

SCOTT VALENTE.

**DEFENDANT'S COMBINED SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**

As set forth in the thorough Presentence Investigation Report ("PSIR" – ECF 20), there is much pitiable about Scott Valente, but little to pity with regard to the conduct that has brought him before this Court. The challenge, then, is for the Court to craft a sentence appropriately individualized from these circumstances, in the context of the Sentencing Reform Act, particularly its Guidelines and the dictates of 18 U.S.C. § 3553.

Mr. Valente will appear before this Honorable Court for sentencing on November 20, 2015, following his conviction by guilty plea of to: one count of securities fraud, in violation of 15 U.S.C. §§78j(b), 78ff; one count of mail fraud, in violation of 18 U.S.C. §1341: and one count of obstructing and impeding the Internal Revenue Laws, in violation of 26 U.S.C. §7212(a). The PSIR calculates Mr. Valente's advisory United States Sentencing Guidelines ("USSG" or "Guidelines") range at 210 to 262 months of incarceration, based on a Criminal History Category of IV and a net Total Offense Level of 34. PSIR, ¶ 164 (at 54).

That said, no presumption of reasonableness may apply to this Guidelines range, *see Rita v. United States*, 551 U.S. 338, 351 (2008). Nor should one, for such a sentence would not

accomplish the goals and requirements set forth in *United States v. Booker*, 543 U.S. 220 (2005), that this Court shall impose a sentence that is "sufficient but not greater than necessary to comply with" the goals of federal sentencing. In short, a sentence less than that which is stated in the PSIR is justified by each step of the three-step sentencing process required by the Supreme Court in *Gall v. United States*, 552 U.S. 38 (2007), because:

- Unresolved objections to the PSIR's Guidelines calculation should be resolved in Mr. Valente's favor;
- Grounds are present a downward departure due to a Criminal History categorization that over-represents the seriousness of his past acts, when compiled, as well as due to his mental and emotional conditions; and
- Even if the Guidelines calculation were corrected, the dictates of 18 U.S.C. § 3553(a)(6) that the Court "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," requires a below-Guidelines sentence. Such a sentence would be consistent with, and not offend the purposes of, sentencing as set forth in 18 U.S.C. § 3553(a)(2).

Taken together, a sentence in the range of 59 to 108 months will more appropriately accommodate the Court's necessary weighing of all these considerations.

**I. The History and Characteristics of Mr. Valente Place the Nature and Circumstances of the Offense in Their Proper Context – 18 U.S.C. §3553(a)(1).**

Scott Valente's biography is marred by instances of abuse by loved ones, diagnosed mental illness, persistent (and perhaps genetically predisposed[redacted]) alcoholism, compulsive behavior and incredibly bad judgment. It is against this context that his crime – and his sentence – should be assessed.

---

[redacted]

Three failed marriages, abused by a pastoral figure as a teen, and later physically and emotionally abused by his second and third wives (whom he also permitted to be abusive toward his children)[2] - it can be little surprise that Mr. Valente has been diagnosed with severe anxiety, major depression disorder, insomnia, bulimia, and alcohol dependence[3] – all of which he has been struggling to cope with since the 1980s. His bulimia, infinitesimally infrequent among middle-aged, heterosexual males,[4] has been so severe at times that his doctors conclude that his acts of purging are related to his suffering a detached retina in 2006, which required four surgeries to correct. He has a history of suicidal ideations; most recently he was hospitalized and placed under observation in the psychiatric unit at the Samaritan Hospital from August 29 through September 2, 2015.

It is not that Mr. Valente has failed to seek treatment for his challenges. He began mental health treatment in 2000. He regularly saw a psychiatrist from 2004 to 2010, and has again done so for the past 13 months. Mr. Valente is also seeing a licensed clinical social worker monthly, who concurs with and is treating him for a diagnosis of bulimia, alcohol abuse, and anxiety disorder. To treat his alcohol addiction, which he initially had trouble acknowledging, Mr. Valente has attended intensive individual and group sessions at St. Peter's Addiction Recovery Center from March 2010 through August 2015. During that time, he would successfully complete a program and be well for several months, then unfortunately fell back. On February 20, 2015, he was admitted into inpatient treatment at St. Mary's Hospital and was

---

[2] *See* PSIR ¶¶ 130, 132.

[3] In May 2013, the American Psychiatric Association issued the 5th edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM–5). DSM-5 integrated the two DSM–IV disorders, alcohol abuse and alcohol dependence, into a single disorder called alcohol use disorder (AUD).

[4] *See, e.g.*, Carlat, D.J., Camargo. Review of Bulimia Nervosa in Males. American Journal of Psychiatry, 154 (1997).

discharged on February 25, 2015. He has been receiving counseling for alcohol addiction at Hudson Mohawk Recovery Center since August 2015.

In addition to resorting to alcohol, it appears that Mr. Valente's coping mechanisms include avoidance and dissembling. The treatment records from his long-time, Latham-area psychiatrist, report that Scott "cannot take confrontation[;] I sometimes brush aside, or lie, in order to avoid confrontation." PSIR, ¶ 145.[5] This, in turn, can be an alcohol trigger when those mechanisms fail. As a recent counseling session (February 17, 2015), the therapist concluded Scott previously turned to drinking because he "believes it lessens the emotional pain he is in."

Despite these challenges, and through all this, Scott has been fortunate enough to maintain the love, support and respect of his children and family members. Letter of support are attached as *Exhibit A*.

## II. Unresolved Objections (and One "Placeholder") to the Preliminary PSIR Leave Six Offense Levels in Play, All of Which Should Be Resolved in Favor of Mr. Valente.

The parties and US Probation held a conference on September 21, 2015, to discuss the objections Mr. Valente raised to the preliminary PSIR (ECF 16). After a robust but respectful conversation, as well as some follow-up correspondence, some objections remained. The Final PSIR, in its Addendum, summarizes the defense objections, ECF 20 at 61-64, and then provides the response by Probation, *id.*, at 64-66. The defense will address the most salient of the

---

[5] Beyond his mental health history, Mr. Valente suffers from a multitude of health issues, including cellulitis, MRSA, sarcoidosis (which contributes greatly to his difficulty in walking), vascular disease, inflammation of the esophagus, hypertension, hyperlipidemia, coronary atherosclerosis, degenerative disc disease in lower back, chronic headaches, and arthralgia. Aas a result, he has been prescribed numerous medications including etodolac 500 mg (one pill twice a day), hydrocholorothiazide 12.5 mg (one pill daily), metoprolol 50 mg (one pill three times a day), nifedipine 30 mg (one pill twice a day), aspirin 81 mg (one pill daily), hydralazine 25 mg (one pill three times a day), lisinopril 40 mg (one pill daily), nexium 40 mg (one pill daily), lexapro 20 mg (one pill daily), Daypro 600 mg (one pill twice a day), Nabumetone 750 mg (one pill twice a day), prednisone and clindamycin (both as needed for eczema and cellulitis).

remaining objections, below, in summary fashion, with the exception of the loss amount issue, which is addressed in full. In the event that the Court wishes to review Mr. Valente's unabridged objections, they are attached as presented in *Exhibit B*.

1. An "Obstruction of Justice" Adjustment Is Not Applicable to Mr. Valente.

   a. *Mr. Valente's Conduct Does Not Qualify for an "Obstruction of Justice" Adjustment Under USSG § 3C1.1*

As set forth in detail in his Objections (*Exhibit B*, at 4-6) Mr. Valente opposes the PSIR ¶ 110 imposition of a two-level upward adjustment for Obstruction of Justice. The Report's basis for the adjustment is an act Mr. Valente undertook in response to the SEC, during that agency's (necessarily) civil investigation, rather than in response to – and without any awareness of the existence of – a criminal investigation. Therefore, there was no obstruction of – or knowing intent to obstruct – the "investigation of ... *the instant offense*," as the language of the Guideline requires. *See* USSG § 3C1.1.

The Amendments to the PSIR respond by asserting that if the conduct occurs during *any* official investigation, even if it is not the criminal investigation – *i.e.*, one pertaining to the "*instant*" offense – since the Guidelines commentary does not say that "official" investigation must equal "criminal" investigation, the pre-dating SEC civil investigation may be bootstrapped into the definition. ECF 20, at 65. First, common sense says that it cannot be bootstrapped, minimally, unless there is a showing that it was all part of the same investigation (and if it was, it very well may raise *Stringer*/Rule 6(e) issues).[6] There is no such evidence presented. Second, the rule of lenity, as applied to the Guidelines, instructs that an ambiguous provision be

[6] For instance, if Mr. Valente were, at that time, the target of a criminal investigation, he needed to be informed of as much when a non-criminal agency starts asking him questions and gathering information.

construed in favor of the defense. *E.g.*, *United States v. Simpson,* 319 F.3d 81 (2d Cir. 2003) ("We join several of our sister circuits in applying the rule of lenity to the Guidelines.)[7]

*b. Even if his Conduct Were to Qualify for "Obstruction of Justice," the PSIR Cannot be Re-Written to Avoid the Prophylactic Measures Explicitly Written Into the Guidelines.*

Mr. Valente also initially objected on the grounds that the Obstruction adjustment could not apply because the basis for the adjustment was also a basis for the PSIR's ¶ 106 imposition of "Sophisticated Means" adjustment, in violation of the provision set forth in USSG § 2B1.1, Commentary 9(C), that the two may not overlap. In other words, the Guidelines said that you cannot have it both ways. Undeterred, the Amendments to the PSIR responded by removing the Obstruction-related facts from the Sophisticated Means bases. ECF 20, at 65. If the PSIR believed the allegedly-obstructive acts were "sophisticated means" in the first place, the facts cannot, essentially, be changed, to avoid the prohibitions in the Guidelines. More, allowing a double-dip such as this seems to undermine the Supreme Court's principle of finding a sentence that is that this Court to impose a sentence that is "sufficient but not greater than necessary."

2. A "Sophisticated Means" Enhancement Is Not Applicable to Mr. Valente.

Mr. Valente's objection to this adjustment was grounded in the plain facts that the bases asserted by the PSIR in PSIR ¶ 106 did not reflect execution or concealment conduct that is "especially" complex or "especially" intricate – therefore not satisfying the standard set forth in the USSG § 2B1.1(b)(10), Commentary 9(B). Now, as noted, the Amendments to the PSIR remove one of the grounds for Sophisticated Means in order to try to save the Obstruction

[7] *Accord, United States v. Inclema*, 363 F.3d 1177, 1182 (11th Cir.2004); *United States v. Fenton*, 309 F.3d 825, 828 n. 3 (3d Cir.2002); *United States v. Boucha*, 236 F.3d 768, 776 (6th Cir.2001); *United States v. Gay*, 240 F.3d 1222, 1232 (10th Cir.2001); *United States v. Bowen*, 127 F.3d 9, 13–15 (1st Cir.1997); *United States v. Fuentes–Barahona*, 111 F.3d 651, 653 (9th Cir.1997); *United States v. Lazaro–Guadarrama*, 71 F.3d 1419, 1421 (8th Cir.1995); *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir.1994); *United States v. Burke*, 888 F.2d 862, 866 (D.C.Cir.1989)

adjustment. If Mr. Valente's scheme was not complex with this additional fact, it certainly is less so without it. *See United States v. Bryson*, --- F.Supp.3d ----2015 WL 1509241, *9 (D. Conn. April 1, 2015) ("A sophisticated means enhancement is appropriate [only] where the offense conduct, viewed as a whole, is notably more intricate than that of a garden-variety fraud scheme.") (relying on *United States. v. Jackson,* 346 F.3d 22, 25 (2d Cir.2003)).

3. "Placeholder" Objection With Regard to Loss Amount.

PSIR ¶ 104 increases the offense level by 18 as a result of a conclusion that the loss amount is "approximately $4,716,479.69 (amended to $4,724,579.69 -- *see* ECF 20, at 67), which represents the loss of principal to investors, including excess management fees collected." The 18 levels increase is pursuant to USSG § 2B1.1(b)(1)(J), as falling between $2,500,000 and $7,000,000. Because circumstances were likely to change with regard to this determination, because the loss amount calculation was still a "work-in-progress" at the time of the PSIR, and because the § 2B1.1(b)(1) Guideline table is slated to change on November 1, 2015, rather than object, Mr. Valente notified US Probation and the Government that he wished to reserve a "placeholder," pending further developments.

*a. The Loss Amount Guidelines Table is Changing on November 1, 2015.*

According to the "one-book rule," the Court should use the Guidelines in effect on the date of sentencing. USSG § 1B1.11(b)(2). So, while the $2,500,000-$7,000,000 range is applicable today, pending Congressional (non)intervention, as of November 1, the new USSG § 2B1.1(b)(1)(J) range in effect will be between $3,500,000 and $9,500,000.[8] Accordingly, should a revised assessment of the actual loss dip below $3,500,000, the offense level impact, using this methodology, decreases to "+16."

[8] *See http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf*, at 13.

*b. The Court Should Use an "Intended Loss" Amount of $2.2 Million Rather Than the Roughly-Estimated "Actual Loss" Amount of $4.724 Million.*

In the Plea Agreement, the parties reserved the right to advocate over whether the loss amount is in the range of $2.2 million (says the defense) or greater (says the Government). ECF 3, at 12.

i. "Intended Loss" is a figure more obtainable by the Court than "Actual Loss" in this case.

The Court is not required to calculate actual loss before relying on intended loss when, for instance, it may be easier "as a matter of proof" to show intended loss. *United States v. Thurston*, 358 F.3d 51, 68 (1st Cir. 2004), *vacated on other grounds*, 534 U.S. 1097 (2005); *see also United States v. Parris*, 573 F.Supp.2d 744, 748 (because of "difficulties inherent in calculating loss to the market" in securities fraud case, use of alternatives measures is appropriate).

In this case, a firm determination of actual loss has been a matter that both the Justice Department and before it, the Securities and Exchange Commission ("SEC"), have struggled to get their arms around. That is, on June 3, 2014, the SEC sued Scott for the same conduct and acts at issue in his present criminal case.[9] That same day, all assets – including the investments of ELIV's clients – were frozen.[10] A third party accountant was engaged to estimate the value of the remaining ELIV investments, but because of disputes over how her fee was to be paid, the work never was completed.[11] After he consented to judgment, [12] the SEC then deferred to the

[9] *See Securities and Exchange Commission v. Scott Valente and the ELIV Group, LLC*, Case No. 7:14-cv-03974-VB (SDNY) (Complaint, at ECF 1).
[10] Id., ECF 4.
[11] *See Id.*, ECFs 43-50.
[12] Id., ECF 32.

negotiations in the criminal case rather than complete the work it was doing to assess and return money to the complainants through that process.[13]

The Justice Department has worked hard – with the assistance of Mr. Valente – to get its arms around what the value is of the remaining assets, but; (a) since much of them are pre-IPO securities, their value is hard to fix; and (b) because of the SEC-caused delay in any effort to liquidate these assets (or ask the investors if they want to keep or liquidate them), the current value may not reflect what they were at the time of the offense.

ii. "Intended Loss" is not only more easily assessed, it also more accurately reflects the offense that the impaired Mr. Valente sought to commit.

By contrast, "intended loss" here is more easily assessed. On November 1, the Guidelines formally will be adopting a standard for intended loss that is "subjective" in nature – *i.e.*, one that focuses on the loss that Mr. Valente "purposely sought to inflict," rather than an objective view that measures intended loss in terms of what he "merely knew would result from his scheme or … [loss] he might have possibly and potentially contemplated." *See* United States Sentencing Commission, *Primer [on] Loss Calculations Under § 2B1.1(b)(1)* (June 2015) (citing, among others, *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011); *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008)).

The $2.2 million the defense avers is based on a calculation focusing on excessive fees collected and the tax consequences of Mr. Valente telling some of his clients that he was rolling their investments over into IRAs. These losses fit more squarely with what Mr. Valente

[13] Id., ECF 39 (April 13, 2015) ("The Commission now understands that the United States Attorney's Office … expects that it will know within two weeks whether it will have reached a resolution of possible criminal charges[.] … It is likely that the relief the Commission seeks in a motion for disgorgement and penalties will be substantially affected by a resolution of these criminal charges. … For these reasons, the Commission … requests that it be permitted to update the Court regarding the necessity and or timing of [its own motion for relief] … within ninety days.") *See also* ECF 51 (July 13, 2015) (same).

intended. Scott's lack of intent to otherwise harm investors beyond those acts is reflected in the fact that his family members – sister, brother-in-law, nephew, parents – were among his ELIV clients. The PSIR reflects that he did not treat or advise his relatives differently from other ELIV clients in order to shield them from the risks or harms to which he might "knowingly" have been exposing his non-relative clients. *See* PSIR, ¶ 98.

Further, his diagnosed mental illness comports with this reading of Scott's mind. As noted, it was part of Scott's modus operandi to avoid confrontation and disappointments. As a result, Scott was willing to be uncritical in assessing overly-rosy reports from people such as Frank Mazzola (at Felix Advisors – *see* PSIR ¶¶ 31, 94), and believed he was going to benefit his investors.[14] Similarly, he was willing to convince himself that, although he did not yet have approval to rollover IRAs, he would have it in the near future. *See United States v. James Marquez*, 08-08Civ.4773 (S.D.N.Y. 2008) ($10+ million loss in conspiracy to commit investment advisor fraud and mail fraud results in 51 month sentence because the defendant was diagnosed with bipolar disorder and the psychiatrist found that the disorder "at times significantly impair[ed] his ability to reason" and "aspects of his behavior appear to have been influenced by his mental disorder.")

Hence, both from a pragmatic and logical standpoint, the Court will more accurately assess loss if the $2.2 million figure is employed.

4. <u>The Sum Total of Adjusting the Offense Level</u>.

As noted, some of the disputes over the Guidelines calculation were resolved during a conference among the parties and correspondence thereafter – all running contrary to Mr. Valente's position. Should the Court resolve the above, remaining disputes, the net Total

[14] Exhibit C, attached, reflects emails from Frank Mazzola of Felix Advisors, identified in the PSIR (¶94) as the investment fund into which Scott poured much of his clients' money. They show the source of many of the unrealistically "rosy" earnings reports Scott passed on to his ELIV clients.

Offense Score would be reduced from 34 to 28. Combined with a Criminal History Category IV, this would adjust the Guidelines range down to 110-137 months.

### III. A Departure Downward From the Guidelines is Warranted for Mr. Valente, and he So-Moves.

1. Mr. Valente's Level IV Criminal History Categorization Over-Represents the Seriousness of his Criminal History and the Likelihood He Will Commit Other Crimes – per USSG § 4A1.3(b).

Mr. Valente's Category IV criminal history is a series of misdemeanors and violations[15] that derive from his alcoholism, for which he has served no jail time. Taking nothing away from the wrongfulness of his conduct, district courts have found § 4A1.3(b) departures in circumstances where a "defendant's criminal record is not comparable to other offenders typically found in [that] Criminal History Category[.]" *United States v. Nelson*, 166 F.Supp.2d 1091, 1096 (E.D. Va. 2001) (prior record reflects a series of traffic offenses, which significantly overstates criminal history, reducing him from Category VI to Category III); *see also United States v. Francis*, 129 F.Supp.2d 612, 620 (S.D.N.Y. 2001)("this Court agrees that the addition of one point for a minor offense for which Defendant received a sentence of time served may overstate the seriousness of Defendant's criminal history"); *United States v. Williams*, 78 F.Supp.2d 189 (S.D.N.Y. 1999); *United States v. Maksimenko*, 2007 WL 1834708, at *3 (E.D. Mich. 2007)(reduction from Category II due to history of minor crimes).

The Second Circuit has indicated that a "horizontal departure" may be warranted when the Criminal History Category overstates the "likelihood that the defendant will commit further crimes," and should consider whether or not imposing "an especially long sentence upon those who have committed prior offenses ... [will] achieve a deterrent effect that the prior punishments

[15] A "violation" under New York penal law means an offense, other than a traffic infraction, for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed.

failed to achieve." *United States v. Mishoe,* 241 F.3d 214, 220 (2000). In Mr. Valente's case, there is no reason to believe that because he received no prison time from his alcoholism-related minor offenses of the past, it emboldened him to commit the securities fraud in the present matter. His criminal history is not indicative of an increased likelihood of recidivism when his prior crimes are the result of his DSM-V identifiable illness – alcohol dependence. Therefore sentencing him at a Category IV level rather than a lower one will not act as a greater deterrent.

2. Departure Considerations Also Should Derive from Mr. Valente's Mental and Emotional Conditions – Per Policy Statement USSG §5H1.3.

U.S.S.G. §5H1.3 states, in relevant part:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

Discussed above, Mr. Valente's mental and emotional conditions have at times comprimised his judgment, and he has allowed himself to avoid difficult situations where he cannot please people by dissembling. USSG §5H1.3 provides a vehicle for the Court to consider this factor in reaching an individualized sentencing determination.

**IV. Variance to Avoid a Sentencing Disparities: An 18 U.S.C. § 3553(a)(6) Analysis – Will Prevent The Kind of Sentence Other Courts Have Called "Patently Absurd On Their Face" – and Recommends the Court Impose a Sentence in the Range of 59 to 105 Months for Mr. Valente.**

Even when correctly calculated, the district courts must not place undue weight on the Guideline calculation. 18 U.S.C. § 3553(a)(6) instructs the Court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" This directive is consistent with the general goals of the Sentencing Reform Act in establishing the U.S. Sentencing Commission, including the provision of "certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted disparities among

defendants with similar records who have been found guilty of similar criminal conduct . . . ." 28 U.S.C. § 991(b)(1)(B). And permitting a variance from the Guidelines recommendation to accomplish that goal satisfies the adjustment the Supreme Court made to the application of the Guidelines in *United States v. Booker*, "helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." 543 U.S. 220, 264-65 (2005).

A § 3553(a)(6) analysis is to be applied from the perspective of "reduc[ing] unwarranted sentence disparities *nationwide.*" *United States v. Wills,* 476 F.3d 103, 109 (2007) (this is § 3553(a)(6)'s "primary purpose", rather than resolving disparities between co-defendants in the same case). (Emphasis added); *accord United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (section to address "national disparities between defendants with similar records who have been found guilty of similar conduct.") This is precisely the perspective from which Mr. Valente urges this Court to act.

In the last decade, the district courts within the Second Circuit have been among the leading voices (understandably, given the locus of Wall Street) for a reconsideration of the effect of the Guidelines on sentences of white collar criminals such as Mr. Valente. For instance, in his 2006 opinion in *United States v. Adelson*, Southern District Judge Rakoff explained that his decision to impose a sentence of 42 months rather than 85 years was because,

> this is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law.

441 F.Supp.2d 506 (S.D.N.Y.). In particular the *Adelson* court looked at how the myriad offense characteristics enhancement factors in § 2B1.1 (including, just like with Mr. Valente, loss amount, number of victims, "sophisticated means" and "obstruction of justice") resulted in "the

kind of 'piling-on' of points for which the guidelines have frequently been criticized" which had the effect of "an absurd guideline result." *Id.*, at 510, 512. Turning to 18 U.S.C. 3553(a)(2), the Court determined that the sentence must be reduced to reflect better "the broad general purposes of sentencing." *Id.*, at 514. It did this to avoid

> the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.

*Id.*, at 512.

In 2008, in *United States v. Parris,* Eastern District Judge Block followed the *Adelson* reasoning, and joined with "the Government ... and defense counsel in a collaborative effort to search for an effective means" of punishing the perpetrators of a "pump and dump" scheme to impose a 60-months sentence rather than the 360 months the Guidelines score recommended. 573 F.Supp.2d 744, 751 (E.D.N.Y.). In doing so, he looked to the instructions of *Willis, supra,* to conclude that § 3553(a)(6) was to counter skewed Guidelines scoring in order, essentially, to rationalize or rank cases and then place defendants in their appropriate spot on the continuum of sentences. In the course of these efforts, the Court worked with the Government to gather data and scaled his sentence of the defendants in *Parris* against a survey of sentences imposed in white collar cases within the Second Circuit, the results of which he summarized as:

> Those who were not cooperators and were responsible for enormous losses were sentenced to double digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms. Thus, on the double-digit side, amongst the non-cooperators, there are, as representative, the following:

| **Name** | **Amount of Loss** | **Sentence** |
|---|---|---|
| *Bennett* | $100 million | 14 years |
| *Ebbers* | over $100 million | 25 years |
| *Rigas (John)* | over $200 million | 15 years |
| *Rigas (Timothy)* | over $200 million | 20 years |
| *Skilling* | over $1 billion | 24 years |
| *Forbes* | approx. $14 billion | 10 years |

| | | |
|---|---|---|
| *Kumar* | $2.2 billion | 12 years |
| *Ferrarini* | $25 million | 145 months |

And on the single-digit, non-cooperator side of the Government's compendium:

| **Name** | **Amount of Loss** | **Sentence** |
|---|---|---|
| *Hotte* | $67 million | 108 months |
| *Formisano* | $9.8 million | 78 months |
| *Smirlock* | $12.6 million | 48 months |
| *Adelson* | $50–$100 million | 42 months |
| *Betts* | $1.3 million | 366 days |
| *Chavrat* | $1.1 million | 6 months |
| *Tursi* | $1.1 million | 41 months |
| *Scuteri* | $2.5 million | 21 months |
| *Kearney* | $1.3 million | 51 months |
| *Rutkoske* | $12 million | 108 months |
| *Cushing* | $24 million | 97 months |

*Id.*, at 753. Other cases and courts began to follow the lead. In *United States v. Corsey*, for instance, citing *Parris* (in part) the Second Circuit remanded a 20 year sentence to white collar fraud defendants when the district court's blind adherence to the guidelines, ignoring § 3553(a) factors, caused it to treat "a clumsy, almost comical, conspiracy to defraud" as if it were "one of the most serious frauds in the history of the federal courts." 723 F.3d 366 (2d Cir. 2013).

As a result, comprehensive analyses of data and a re-conceptualization of how white collar criminals such as Mr. Valente, should be treated point to a conclusion that – even accepting the PSIR's loss calculation of $4.7 million, coupled with 103 victims - the net sentence for someone who pleads guilty to a crime, nationally, is substantially lower than the 210-262 months identified in the PSIR.[16] Rather, such findings indicate that a sentence within the range of 59 to105 months would place Mr. Valente in the heartland of punishment under § 3553(a)(6) for similarly situated defendants.

[16] Mr. Valente recognizes that part of the reason for his heightened recommended guidelines range is attributable to the PSIR placing him in a Criminal History category of IV. Were he slated in Criminal History category I, the guidelines range for an offense level of 34 is 151-188 months.

Specifically, in 2013, the United States Sentencing Commission held a Symposium on Economic Crime, part of which included a presentation of data, *Sentencing and Guideline Application Information for § 2B1.1 Offenders.*[17] It reported that in 2012 (the then-most-recently-available data), 426 offenders were sentenced for economic crimes with a loss figure of between $2.5 million and $7 million.[18] The average sentence imposed for those offenders was 59 months – despite the average guideline minimum being 81 months.[19] According to those same 2012 data, in order to reach a sentence in the 210 months range which Mr. Valente's PSIR recommends, the offender's loss amount would have to be in the "greater than $100 million" category – more than 20 times the averred actual loss in Mr. Valente's case.[20]

Likewise, the American Bar Association made a formal effort to re-characterize the approach to sentencing white collar criminals. In November 2014, the ABA issued its Final Draft of "*A Report on Behalf of the ... Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes*."[21] It replaces the current USSG § 2B1.1 Specific Offense Characteristics schema with a more simplified, yet equally behavior-encompassing, three-factor analysis: loss, culpability,[22] and victim impact. The goal of this approach was to rank white collar criminals in relative order of punishment severity more accurately. Using that

[17] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Sentencing_Guideline_Application_Info.pdf
[18] Id., at Figure 6.
[19] Id., at Figure 7. The average sentence imposed for the next-higher loss category – between $7m and $20m – was 75 months, compared to an average recommended guidelines range minimum sentence of 105 months. And the average sentence imposed for the lower loss category – the one in which Mr. Valente's urged $2.2m loss figure falls – was 40 months, compared to an average recommended guidelines range minimum sentence of 59 months.
[20] Id., at Figure 7.
[21] http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.authcheckdam.pdf
[22] Explaining the "culpability" category, the Report explains: "The guideline has 5 levels of culpability that range from lowest to highest. The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense and the defendant's participation in it; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense."

scoring schema, but the same Sentencing Table, Mr. Valente's base offense level would be enhanced upward by 19 points[23], rather than the 28 points the PSIR adds (ECF 16, at 37-38) – resulting in a net guidelines score of 25 rather than 34 and a recommended sentencing range (including Criminal History of IV) of 84-105 months, rather than the PSIR recommended range of 210-262 months.

**V. A Below-Guidelines Sentence Will Not Denigrate or Undermine the Primary Purposes of Sentencing Identified in 18 U.S.C. § 3553(a)(2).**

1. Seriousness of the Offense/Just Punishment -- § 3553(a)(2)(A)

We acknowledge that many people who invested with Scott Valente, in the hopes of improving their financial lot, were harmed and, of course, wish him to be severely punished by the Court. The substantial majority of those who returned a Victim Impact Statement responded that they wanted Scott to go "to jail." However, with good reason, the Court must serve as a filter for these demands – as evidenced by the fact that two of the four individuals returning a Victim Impact Statement reporting that they enjoyed a "net gain" from investing with Scott – in amounts ranging from $15,000 to $28,000 – nonetheless recommended jail time for him. *See* PSIR at pages 104, 112. Similarly, many people who invested with ELIV had invested with Scott in the past, as well. Even some of those people, who arguably did not rely on Scott's misrepresentations at ELIV, but more likely on his success for them prior to ELIV, nonetheless believe Scott should be incarcerated. *E.g.*, PSIR at 60-61 (invested with Scott for 28 years, but wants to "put him in jail for as long as possible.")

We acknowledge that Scott will be incarcerated; the question is for how long. There is no evidence that the people filling out the Victim Impact Statement were told either what the recommended Guidelines range, or the statutory maximums, were for his charges. So their input

[23] This score is derived from adding 8 points for loss amount between $1m and $5m, adding 5 points for "high" but not "highest" level of culpability, and adding 6 points for "high" (the highest level of) victim impact.

for duration of sentence is generally lacking. Therefore, the best guide for the Court in determining a punishment to reflect the seriousness of the offense is addressed in the analysis to be conducted pursuant to § 3553(a)(6).

2. Deterrence & Incapacitation – §§ 3553(a)(2)(B) and (C)

These sections essentially call for a sentence that responds to the needs for general and specific deterrence. With regard to § 3553(a)(2)(B) – general deterrence – comprehensive, data-driven analyses has revealed that there is no difference between a 108 month sentence and a 262 month sentence for Mr. Valente from that perspective. Specifically, for better or worse, the literature is consistent in concluding that deterrence is not accomplished through longer sentencing.

Research consistently has established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).[24] And in the white collar crime area, it is not just certainty of being caught, but the certainty of being punished that matters for general deterrence purposes – as "certainty of punishment is empirically known to be a far better deterrent than its severity." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007). Indeed, this is what the

[24] *See also* Michael J. Lynch, *Beating a Dead Horse. Is there any basic empirical evidence for the deterrent effect of imprisonment*, Crime, Law & Social Change 31, 347, 359 (1999) ("[a]n examination of the incarceration and crime data from 1972-1993 reveals no evidence of deterrence at the aggregate level for the U.S. Additional analysis of cross-sectional crime and imprisonment trends for 1980 through 1991 also failed to provide any basic support for the deterrence hypothesis. ... [and t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*, at 359 (emphasis supplied).

creators of the Guidelines envisioned, and evidence has borne it out. In its 2004 report, *Fifteen Years of Guidelines Sentencing,*[25] the Commission concludes that

> The most striking trend in economic offenses is a shift away from simple probation and toward intermediate sentences that include some type of confinement. .... These data demonstrate some success in achieving the Commission's goal of assuring a "short but definite period of confinement" for white collar offenders.[26]

As to specific deterrence – "to protect the public from further crimes" by the 58 year old Mr. Valente, coming out of federal prison at 67 years of age, rather than at 82, is not significant. Sadly, because the people who invested with Mr. Valente are from his community, it seems virtually certain from the tenor of their Victim Impact Statements that he will be an outcast should he ever return. They will never do business with him again. Should he turn to another community upon release, it will be one of made up of strangers who, in the internet age, will easily be able to determine who he is.

3. Rehabilitation -- § 3553(a)(2)(D)

As outlined above, Mr. Valente requires substantial medical attention as well as ongoing mental health treatment. Incarcerating Mr. Valente until he is 82 years old (rather than 67) will be done at substantial cost, and will decrease rather than increase the chances of his successful rehabilitation. For the Justice Department has found that

> aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates.

[25] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf
[26] *Id*, at vii.

Office of Inspector General, U.S. Department of Justice, *The Impact of An Aging Inmate Population on the Federal Bureau of Prisons* (May 2015). If part of Mr. Valente's criminality is attributable to his mental health issues, the inability to adequately treat those needs means that prolonged incarceration will be ineffectual. This should be balanced against a sharp increase in the need for care – and corresponding costs – when a prisoner reaches age 70. *See id.*, at 5 (Figures 1 and 2).[27]

4. Cooperation Without Promise of Reward Indicates a Lower Likelihood of Recidivism

While there is no § 5K1.1 motion for a downward departure by the government, and there is no explicit provision for it in his plea agreement, Mr. Valente has taken steps to reduce the harmful impact of his acts by both expediting the possibility of recovering the remaining funds, and aiding the government in its efforts to do so.

As one pair of complaining witnesses said in their Victim Impact Statement, even though they were "depressed and mad" about these events – "Scott Valente seemed to be a very nice man. He really acted like he cared and wanted to do what was best for us. Scott is plea bargaining so we can get our money sooner. Again, he is thinking of us." PSIR, at 169. Mr. Valente's efforts in that respect are, of course, taken into consideration through his "acceptance of responsibility" reduction set forth in ¶ 114 of the PSIR.

Even before that, however, Scott acted to accelerate the remuneration process by choosing not to fight his SEC case. That is, within six months of the SEC suing Scott for the same conduct and acts at issue in his present criminal case, rather than engage in a lengthy civil litigation process that could have tied up the client investments along with it, Scott consented to

[27] The cost of incarcerating prisoners age 50 and older has been estimated to be two to four times that of the general inmate population. U.S. Dep't of Justice, National Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, at 11 (2004).

judgment.[28] His purpose was to accelerate the process of return of control over the remaining assets to ELIV investors.

And after the guilty plea, Scott met with the prosecutor and the experts working for the U.S. Attorney's Office to assist in both identifying all possible assets that still remained and could be liquidated, as well as advising alternative routes for doing so. For instance, Scott provided information about as many as four accounts containing as much as $743,000 worth of funds about which it appears the government had, at most, incomplete information. More, he identified an individual who may be involved in a nationwide effort espousing the sort of over-promoting of investments that Scott has been convicted of – perhaps aiding the government in additional law enforcement endeavors.

Such steps are available to the Court as a basis for sentencing Mr. Valente below the Guidelines, as an indication that he is less likely to re-offend, and can be construed as a true indication of contrition. *E.g. United States v. Fernandez*, 443 F.3d 19, 34 (2d Cir. 2006) (a judge must consider "the history and characteristics of the defendant" and should consider that a defendant made efforts to cooperate, even if those efforts did not yield a government motion for a departure).[29]

---

[28] *See Securities and Exchange Commission v. Scott Valente and the ELIV Group, LLC*, Case No. 7:14-cv-03974-VB (SDNY) (ECF 32).

[29] *Accord, United States v. Murray*, 2005 WL 1200185 (S.D.N.Y. May 20, 2005) (unpub.); *United States v. Doe*, 213 Fed.Appx. 660, 663 (10 Cir. Jan. 12, th 2007)(unpub.)(holding that district court should address cooperation as part of its §3553(a) analysis even in absence of a 5K1.1 motion when raised by the defendant); *United States v. Ochoa-Ramos*, 2008 WL 2062341, at *3 (E.D.Wis. 2008)(noting the ability to consider cooperation with the government as evidence of defendant's character under §3553(a) beyond a reduction under §3E1.1, even in the absence of a §5K motion from the prosecution).

## VI. Conclusion

The factors identified above militate in favor of an individualized sentence below the Guideline level established in this case. Mr. Valente caused (and acknowledges that he caused) significant harm, and does not seek to avoid a just punishment. However, the Guidelines assessment, even when corrected, proffers a sentence that far exceeds that which is sufficient but not greater than what is necessary to comply with the goals of federal sentencing.

Dated: October 30, 2015

Respectfully submitted,

Shulman, Rogers, Gandal, Pordy, Ecker, P.A.

Joel D. Schwartz, Esq.
*admitted pro hac vice*
Russell D. Duncan, Esq.
*Admitted pro hac vice*

*Attorneys for Defendant Scott Valente*
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
jschwartz@shulmanrogers.com
rduncan@shulmanrogers.com
(301)-945-9240

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on the 30th day of October, 2015, a copy of the foregoing *Defendant's Combined Sentencing Memorandum and Motion for Downward Departure* was served by CM/ECF.

/s/
Joel D. Schwartz

# EXHIBIT A

| Exhibit Description | Date | Exhibit Number |
|---|---|---|
| Email from Carlos and Lisa DeSousa | October 29, 2015 | A-1 |
| Email from Christy Campbell, indicating willingness to speak at sentencing hearing | October 29, 2015 | A-2 |
| Letter from Christy Campbell | October 28, 2015 | A-3 |
| Letter from Valarie Valente | | A-4 |
| Letter from Hanna Valente | October 29, 2015 | A-5 |
| Letter from Elaine Valente | | A-6 |
| Letter from Anne Valente | October 30, 2015 | A-7 |

**Joel D. Schwartz**

**From:** Lisa DeSousa [redacted]@gmail.com]
**Sent:** Thursday, October 29, 2015 5:30 PM
**To:** Joel D. Schwartz
**Subject:** Scott Valente

Honorable Judge Gary Sharpe
Date: October 29, 2015
Defendant: Scott Valente

Dear Honorable Jude Gary Sharpe,

Our names are Carlos and Lisa DeSousa and we are both family and neighbors of Scott. We have known him as boyfriend, husband and neighbor. We are honored to call him a family member and friend.

When Elaine first started dating Scott and we were introduced to him at family functions we liked him immediately. He was warm, engaging, likable and treated Elaine with respect.

It was not until we became neighbors (2010) that we saw his qualities as a person.

Everyone in the neighborhood loved Scott. He was kind, outgoing, helpful, and generous. He lived there a matter of months and knew most of the neighbors. He was the type neighbor everyone wants to have next door to them.

Since he moved into the neighborhood we enjoyed his and Elaine's company. Listening to him talk about his children and grandchildren, you felt his love and pride for them.

We feel the same way about our family and children. It starts with family and ends with family.

Scott is a devoted husband, father, grandfather, son, friend and neighbor. We have witnessed the effect this has done to him and his family. He is not the same vibrant man he once was and it breaks our hearts to see him this way.

Sometimes in life as human beings we make mistakes. It is our hope and prayer that a chance for redemption is given to Scott. He has demonstrated such great qualities as love, devotion, hard-work, caring, respectfulness, and at one point a joy for life.

Honorable Judge Gary Sharpe, we only hope that through this letter we were able to convey what a great family man, neighbor and person Scott is.

Sincerely,

Carlos and Lisa DeSousa

Sent from my iPad

EXHIBIT
A-1

October 28, 2015

To Whom It May Concern,

My name is Christine Campbell and I have known Scott Valente as my friend and brother-in-law for over 10 years. It is my sincere intention to provide you with a very candid and reflective perspective on the Scott Valente that I have gotten to know and love throughout this past decade.

These things I know for certain;

I know Scott loves his wife, my sister, Elaine Valente. I know he loves her with a humility that is evident whenever you see them together. Scott and Elaine hold true an unwavering commitment to each other. They will continue to trust the strength of their marriage and know that their love will endure through the most difficult of times.

I know Scott loves dearly his children, Scottie and Valerie. I know Scott loves his granddaughters', Brianna and Haley, with complete abandon. When he speaks of them, it's with such adoration, pride and gratitude for having them in his life.

I know Scott loves his mother and father, Ginny and Thomas Valente. These are parents he immensely respects and is indebted to for all their sacrifices and support throughout his lifetime. Scott loves all his in-laws, siblings, nieces, nephews and cousins. At any given opportunity, Scott would gather those he loves to spend time together.

I must also mention that Scott loves his four cats (Sam, Squeeks, Slick and Bella). Scott loves all animals, even my rescue dog, William. This is important to note, simply because, not many appreciate William. Who volunteers to walk William every Thanksgiving...?? Who argues that William should join the party at all family functions...?? Scott Valente. Literally, the only one.

Another very important thought that I repeatedly had during this process was the relationship Scott had with my father, Anthony DeFrias. Anthony was a rather complicated, at times ornery, yet very endearing 87 year old man when he passed in July, 2013. My dad had compromised hearing with limited vision and communication abilities, as Portuguese was his primary language. However, my father was astute enough to know when someone took a genuine interest in his life and well-being. Scott was very patient and kind, always wanting to spend some time with him. Scott would include my father in any activity that he believed my father may enjoy. My dad loved Scott so very much. He would laugh and smile and often tell stories around Scott (not exactly understood all the time :). After my mother passed in 2006, this unfortunately occurred less and less. My sisters, brother and I always acknowledged the kindness Scott consistently offered to my father and we love Scott ourselves because of it. It always seemed so effortless to him...

Scott Valente is a person who makes himself available to anyone in need. Scott will offer assistance with any task, at any time, for anybody. Scott embraces a kindness and an integrity that allows him to relate

EXHIBIT
A-2

and respect ***all*** people, from a homeless person to the president of a country. I believe that Scott goes through great lengths to make others feel happy, comfortable, welcomed, always making efforts to ease the burdens from those he loves. It's important to note that Scott's intentions are never to deliberately harm anyone.

I mention all these positive attributes of Scott Valente because it is the right and fair thing to do. In a time of great scrutiny, criticism, judgment, conflict and adversity, Scott continues to show a strong commitment in making what has been done wrong...right. He has demonstrated a significant diligence in complying with all current court orders and expectations. Scott Valente's life has already dramatically changed these last 18 months including; a change in residence, the loss of a driver's license, and an abstinence from all substances. Scott has also been volunteering and assisting people in need; he maintains his own intensive counseling services and now attends church regularly. My sister, Elaine, has also made sacrifices, including postponing her own plans for retirement.

For those who don't know me well, I am at times known for being somewhat abrasive in holding people accountable and taking responsibility. With this being said, it is with an honest heart and mind to write about Scott Valente's character. Scott is a good man. A good man who has made some mistakes, but is accepting the necessary consequences with dignity and respect for those who have been impacted by these circumstances.

Thank you for your time,

Christine Campbell

Dear Honorable Judge:

Thank you for taking the time to read what is most important to me. Scott Valente is my father. He has always inspired me to be a loving and passionate person and I am grateful to have a father who loves me so much. Please don't take that away. Please understand that my father's choices have been corrupted by his mental illness and obsessive, addictive behavior. My father has spent limited time away from sadness and disappointment throughout his life due to his untreated sickness; however, he was able to hide much of this from others. I see it necessary to inform you and others that from the day of my father's hearing, he has struggled more than I imagined he would. I saw him fight with his demons and for his life every day, but he is still with us. During this period of time, my father was diligent with attending mental health counseling and substance abuse treatment. My father found his faith again and allowed it to pull him through. He has become more honest with himself and his family.

It is imperative that my father remain in close proximity to his family so we are able to support him and help him heal during this tragic situation. I beg you to take my needs into consideration when choosing the location of the prison because being without my father is going to be the hardest thing I have ever had to deal with. I also want to ask for you to try and not place my father in county jail with the general population as I feel he will be unable to endure this environment.

My father is a wonderful person and strives every day to love and care for those in his life. He has always been there for his family and I feel that he has now learned to love and care for himself as well. We have so many life experiences left to accomplish together. I need him to be present in my life. Please realize that he is the most important man in my world.

I appreciate you taking your time to acknowledge my feelings. Thank you.

Sincerely,
Valarie Valente

EXHIBIT A-3

10.29.15

To the Honorable Judge Gary Sharpe,

Deep down, Scott Valente is a fun, good hearted, generous, family oriented, loving man. I know that the events leading to the composition of this letter may not support this opinion, but it is true. Let me elaborate on this by giving a bit of a back story.

I was adopted into the Valente family in 1989. I was 8 years old at the time, and up to this point I have always gratefully considered Scott as my Uncle as if he was from the day I was born, and will continue to do so. He is one of the only people in that family who has always made it known that he is there for me and my own little family, has never made small comments over the years that I am not technically a Valente (as others have), has always been genuine when asking about myself and my family, and has offered endless help even though I never accepted those offers. He has made it a point to check in on us through various life events, injuries, etc. He and his wife were the only ones from that family who went out of their way to visit me in the hospital when I gave birth to my daughter two years ago. He has always supported my son in his interests and sports, again going out of his way to come to his games or at the very least had taken time to find out how things were going with the team and my son personally.

Scott has two grandchildren and a third on the way. He has always been such a loving and supportive grandfather. I cannot put into words the amount of love that pours out of that man when those kids are around or even just speaking of them. It seems to me that he sees all of these children, mine included, as a breath of fresh air and a new lease on life. Even when it comes to his "grandpuppy", his daughter's dog, he's just as attentive and caring.

These few points may not say much to anyone else, but they say a lot to me. I am a very opinionated, judgmental person who has an extremely low tolerance and not much sympathy for people who put themselves in self inflicted, preventable situations, such as the one Scott has landed himself in. It has been very hard for me to write this letter as I am currently torn between the man I know and love as my Uncle, and the man who has caused such havoc in other peoples' lives. I do believe that whatever has been done and however it was accomplished was not an act that can or should be chalked up to the description of your typical greedy, self absorbed, manipulative person. He would give the shirt off his back if it meant making someone's day a little brighter. He has always been willing to share anything he has ever had whether it was time, knowledge, man power, or a spare bed. I wish I had the time to provide every specific example I have as "supporting evidence" to this statement, but it would take months and result in a novel of epic proportions.

EXHIBIT
A-4

10.29.15

I know, without a doubt, that Scott has already and continues to suffer from the allegations made against him. Scott, until recently, always had a smile on his face and a joke or a funny story to tell. He was definitely a light in the room, and always great to be around. Currently he is just downright miserable to the point of barely speaking and stressed to the point of making himself sick. Normally after hearing the implications and other information in a matter such as this I would say, "Good. He deserves it", but seeing as I know another side of this man, I cannot come to that sole opinion.

Now, even though I do not know every last detail of this situation, and Yes- I am a caring family member, I am by no means naive. It is quite apparent that there were some major wrong doings here. Do I believe that there should be repercussions for these wrong doings? Absolutely. I don't care who you are or what you do. If someone does something wrong, they need to deal with consequences. Period. Do I believe the consequences that Scott is facing need to meet the duration and severity proposed? No, I do not. I am not saying this as his niece. I am saying this as a –by choice- third party person, who has greatly considered the many angles that make up the big picture before writing this letter.

The bottom line is that the decisions and actions Scott has made over the years have ended with adverse affects for many people and he needs to take whatever end result that brings. BUT- I do not believe those decades in prison will really provide anyone with any type of real closure to this matter. The 'victims' in this situation surely want to see justice served, and knowing this man has been incarcerated may bring relief to a few, but I am almost certain that once the anger and frustration have subsided, and the situation has been resolved, no one really wants to see Scott in prison for the rest of his life. Anyone who says they do is obviously fueled by much resentment, and rightfully so. But realistically, I do not believe it would be that long once all is said and done. As much as I hate to think it, and hate even more to say it, I really do not believe that Scott will be able to bear the mental and emotional stress brought on by an excessive sentencing. He may make it a day, he may make it a few years, but I really think the embarrassment, the shame, and the guilt, will get the best of him. (It pretty much already has) He won't make it to the point of being released and being able to see his family again if the proposed sentence I have heard is accurate. As I have mentioned before, he is continuously beating himself up and suffering with this, but at least he has constant contact with people who, whether they believe he is wrong or not, are providing the mental and emotional support he needs in order to keep going. Cutting him off from those life lines for any prolonged period of time will not add to the resolution of the problem at hand. I strongly believe that it will only add to it, creating more pain and suffering throughout. If Scott has, beyond reasonable doubt, committed the proposed crimes, then there does need to be some sort of consequence(s), but maybe with a different approach. Perhaps a much shorter sentence with a longer parole term and/or weekends, coupled with mandatory psychiatric therapy to help get to the roots of the

10.29.15

reasons this happened (I have my own theory on this), and some sort of community service? Or maybe join, contribute to, and/or run a support group for people who have gone down the wrong paths in life and would really like to get back on track, but are sucked into something they can't seem to get out of. (It seems to me that this behavior may have been a contributing factor leading to the current situation). Obviously these are just random suggestions, but I would assume you can understand the thought process. I think being given the opportunity to be out in the world and actually seeing that he himself can help make a difference for people, it might be a better addition to a sentence and much more productive on a higher level, rather than letting him waste away in a penitentiary. I do understand the severity of the crime(s) that may have been committed, but I also know that letting a person who made some bad decisions like these, has visible remorse and guilt as a result, and has a good portion of life left to change and make a positive impact from here on out, sit in prison resolves nothing. There are more careless, heartless murderers, child molesters, and rapists who only serve a handful of years "behind bars", and Scott is facing multiple decades. This seems a bit excessive for the crime(s) he is being accused of.

I am hoping that, in spite of the scrambled thought process, I have gotten my basic point across. It was very hard to write this, but knowing how many times my Uncle has taken the time and put in the effort to help other people, made it a bit easier. I also hope that there is some serious consideration for Scott's physical, emotional, and mental wellbeing, and also that of his family and friends as the final decision is being made.

Hanna Valente

To: The Honorable Judge Gary Sharpe

I am writing this letter on behalf of my husband Scott Thomas Valente. I haven't known Scott for as long as some of the people who will be present on the day of his sentencing. Certainly not as long as his family, his parents (Tom and Virginia), his children (Valarie and Scott), and his siblings (Steven and Cindi) have known him. And certainly not his clients, some of whom he has known and worked with for fifteen years or so. I have known Scott for almost 10 years now and we have been married for four of them.

I believe, Your Honor, that Scott is a good man. I know his family thinks so, and I believe that at one point, so did many of his clients.

Scott is a devoted family man. His children and his grandchildren (Brianna-age 18, and Hailey-age 2) mean the world to him. He treats his siblings' children like his own, and completely embraced my family, helping care for my father. Scott would help anyone. I share this with you because I want you to know what kind of person he is.

Scott heeded your words, Sir, from the May hearing and has continued to focus on his sobriety. He volunteers at the Albany Mission 3 days a week, and I believe this has helped him as helping others was something that he always actively sought to do. Scott attends Mass at St Mary's Church weekly, again volunteering to help out in any way he can. He has even participated in cleaning up the church's lawn and gardens. His faith and religion have always been an important part of his life as long as I have known him. Even through these troubles his faith has not faltered.

This past year and a half has been very difficult for me, Scott and our family. His physical, mental, and emotional health, already jeopardized, have been impacted even further. He is devastated and remorseful. He feels that he has failed as a son, brother, parent, and husband. He has lost friends and a sister, relationships forever severed. And I'm afraid that he will never forgive himself for what has happened.

I do feel that his sentence has already started since Scott and I have lost so much in this year and a half. Our life has changed on all levels and in many ways. We lost our home and will be in serious debt for the years to come, maybe the rest of our lives. I am very concerned for Scott's health, knowing how much it has been compromised especially in this last year and a half.

While Scott is prepared to accept the consequences of his actions, I am requesting that Your Honor consider the kind of person I know Scott to be and the price he and his family have already paid and grant Scott leniency in his sentence. Even though I don't expect forgiveness, I ask that Your Honor be forgiving in passing judgment on my husband. Any compassion you could find in your heart would bring much needed peace to our family.

Thank you for taking into consideration my request for leniency.

Elaine Valente

Elaine Valente

EXHIBIT
A-5

EXHIBIT
A-6

**Joel D. Schwartz**

| | |
|---|---|
| **From:** | Owner @msn.com] |
| **Sent:** | Friday, October 30, 2015 10:46 AM |
| **To:** | Joel D. Schwartz |
| **Subject:** | Scott Valente |

Anne Valente

10/30/15

To Whom it May Concern,

This letter comes to you on behalf of Scott Valente.

I have know Scott for 26 years. He is my husband's brother. Throughout all of the years that I have known Scott, I have found him to be a devoted brother, son, father, husband and friend. He has always been a generous donor of his time and assets and has always been willing to offer help to those members of his family that were in need of his assistance.

The facts of the case against him remain, to me, somewhat of a mystery (I am not classified as a "victim" and therefore have not been made aware of what may be considered privileged information?). Though seemingly unaffected by the financial disaster that is the plight of many, the emotional toll on the members of his extended family increases with each passing day. It is the hope of his brother Steven and myself that all of the facts in the case will come to light and that somehow, this case can be laid to rest so that everyone involved can begin the healing process and move forward.

That being said, (as this letter can not be written without that being said) it is also my hope that whatever the outcome is for Scott, that it will be the beginning of a new journey for him. One of clarity, honesty and hope for a man who always wanted the best for his family and for those around him. His generosity of spirit may have been the cause of his downfall, but I do believe he has a good heart. It is my personal opinion that the desire for money and the lure of things it affords, is truly, the root of all evil, and that his spirit was taken up and away with the prospects of all good things for himself and those around him.

Since his arrest (can I call it that? Im not really sure in what terms this procedure is referred…) I can tell you that there seems to be some relief in his overall demeanor. He looks physically better than I have ever seen him look and though the stress over what lies ahead is written all over him, I think he seems relieved at not having to march through the daily operations of what he used to do. I believe that having to "disgorge" himself of his possessions was one of the most difficult things he has ever had to do, but I think the process has forced him to focus on those things which are most important. I think that watching the deterioration of the relationships that he once enjoyed has been even more difficult than losing his "things". I believe that his volunteer work has put him in a position of understanding that even without his things, he has always been a man who is richer than so many.

I believe that the damage caused by the events that comprise the accusations against him and the procedures that have taken place as a result of those accusations have upended the relationships and the former dynamic of his entire extended family. I cannot speak for those outside of the family, but I would like to ask on behalf of his family; that the facts be made clear, that the proceedings end quickly and fairly, and that for the sake of his parents, siblings, wife, his children and grandchildren, that his future can be one where he

is afforded the ability to maintain what is left of those relationships in the most "normal" way possible. I can only pray that the ability for him and his family to move forward is considered as he is sentenced.

I have always maintained the belief that everyone has a story. Not all stories are the kind that we want to be told. His story and that of those affected by this entire event have been put on display for all to see, but to many, the facts remain obscured. For the benefit of all involved, please bring out the truth, remember that lessons are often only learned by making the biggest mistakes, and that the manner in which everyone involved is able to move forward rests in the hands of the judicial system. I ask that the wisdom of the law, the sympathy of your souls and the best intent for those involved be used to make a decision that (as much as that decision is able) is in the best interest of all of the individuals that were affected by this series of events.

Thank you for your consideration,

Anne Valente

# EXHIBIT B

SHULMAN ROGERS | GANDAL PORDY ECKER

JOEL D. SCHWARTZ | SHAREHOLDER
T 301.945.9240 E jschwartz@shulmanrogers.com

September 10, 2015

***Via e-mail:*** *Angela_Bennett_Rodriguez@nynp.uscourts.gov*

Angela Bennett Rodriguez
Senior United States Probation Officer, ND/NY
Albany, NY

*Re:* *United States v. Scott Valente*
*Case No. DNYN 1:15CR00124*
*Objections to Presentence Investigation Report*

Dear Ms. Bennett Rodriguez:

Thank you for preparing the Presentence Investigation Report ("PSIR") for our client, Scott Valente. It certainly reflects a great deal of work and diligence.

After a review of your factual investigation and application of the United States Sentencing Guidelines ("USSG" or "Guidelines"), and pursuant to the Order of the Court (ECF 5), as well as Rule 32(f) of the Federal Rules of Criminal Procedure, Mr. Valente respectfully raises the following objections.

1. **Mr. Valente's Criminal History Should Be Scored as Four, Which Would Place Him in a Criminal History Category III.**

a. *PSIR Paragraph 120 Should Be Reduced From One Point to Zero Points*

PSIR ¶ 120 assigns one criminal history point to Mr. Valente's 2006 conviction for the misdemeanor of Facilitating Aggravated Unlicensed Operation of a Motor Vehicle, and for the traffic infraction[1] of Driving While Ability Impaired ("DWAI") – for which Mr. Valente received no term of probation or imprisonment.

[1] *See* NY VATC § 1193(1)(a).

SHULMAN ROGERS | GANDAL PORDY ECKER



USSG § 4A1.2(c)(1) does not count convictions without jail or probation attached for certain misdemeanor offenses, including those that are "similar to ... driving with a revoked or suspended license[.]" According to the PSIR, the "Facilitating" part of the conviction stems from Mr. Valente being caught driving with a suspended license. So this part of the conviction should not form the basis for a criminal history point.

Nor should the DWAI part of the conviction add a criminal history point, either. The United States Court of Appeals for the Second Circuit has deemed that a New York State DWAI conviction is neither categorically excluded from nor included in a criminal history calculation under USSG § 4A1.2. *United States v. Potes-Castillo*, 638 F.3d 106, 110 (2d Cir. 2011). Rather the determination should be made by following, more generally, the USSG § 4A1.2(c) factors. *Id.* The Southern District of New York conducted such an analysis and found that a first or second DWAI conviction is not "categorically more serious" than a reckless driving conviction, and therefore should be excluded. *United States v. Gonzalez-Rivera*, 2011 WL 4916395, at *1 (SDNY, October 17, 2011). Hence no criminal history points should be attributed to this conviction.

b. *PSIR Paragraph 121 Should Be Reduced From One Point to Zero Points*

PSIR ¶ 121 assigns one criminal history point to Mr. Valente's 2009 conviction for a traffic infraction DWAI, along with a speeding infraction – resulting in a fine. Since this was Mr. Valente's second DWAI, the reasoning of the *Potes-Castillo* and *Gonzales-Rivera* cases (discussed above) should apply, and equate this with a reckless driving offense in terms of gravity, which is excluded because there was no probation or imprisonment, per USSG § 4A1.2(c)(1). And as to the speeding, which is ranked as a "minor traffic infraction," such a crime is never counted, per USSG § 4A1.2(c)(2). Hence no criminal history points should be attributed to this conviction.

SHULMAN ROGERS | GANDAL PORDY ECKER

Angela Bennett Rodriguez
September 10, 2015
Page 3

c. *PSIR Paragraph 122 Should Be Reduced From Two Points to One Point*

PSIR ¶ 122 invokes USSG § 4A1.1(b) to assign two criminal history points to Mr. Valente's 2013 conviction for his 2009 DWAI traffic infraction. The gravity of the fact that this was Mr. Valente's third DWAI incurred over a four year period justifiably demands more serious treatment under the Guidelines than his prior ones.

However, two points are not appropriate, because USSG § 4A1.1(b) does not apply here, for a number of reasons. For, in order to count as a "sentence of imprisonment" for the purposes of USSG § 4A1.1(b), Mr. Valente had to have "actually served [some] period of imprisonment on ... [this] sentence[.]" USSG § 4A1.2, Commentary 2. And although Mr. Valente was *sentenced to* a term of imprisonment of sixty days, he has not *served any* time incarcerated for this conviction.

Nor is Mr. Valente likely to do so. Specifically, he was given a sentence of 60 days in jail and three years of probation, and instead of serving jail time *and then* serving his period of probation, he went straight to probation. This circumstance strongly suggests that he was sentenced to a "revocable disposition" in which his term of 60 days imprisonment was combined with his "sentence of probation or conditional discharge" such that "[t]he sentence of imprisonment shall be a condition of and run concurrently with the sentence of probation or conditional discharge." *See* NYPL § 60.01(2)(d). Under such a circumstance, he will not serve any of his sentence of imprisonment unless his probation is revoked. *See* NYPL § 60.01(4). Hence, his sentence, essentially, has been suspended, providing an additional, separate grounds for not counting under USSG § 4A1.1(b). *See* USSG § 4A1.2(b)(1) (do not count that portion of a sentence that was suspended); *see also* USSG § 4A1.2, Commentary 4 (sentences which specify a non-incarcerative disposition as an alternative to a term of imprisonment is to be treated as a non-imprisonment sentence).

Accordingly, Mr. Valente should receive one criminal history point – not two points – for this conviction, pursuant to USSG § 4A1.1(c).

d. *PSIR Paragraph 124 Should Be Reduced From One Point to Zero Points*

PSIR ¶ 124 invokes USSG § 4A1.1(c) to assign one criminal history point to Mr. Valente's 2014 conviction for his 2013 misdemeanor, Use of a ... Loaned Vehicle Not Equipped with Interlock Device, which resulted in a fine. It appears from the description in the PSIR that this was a violation of NY VATL § 1198(7)(a).

There is no such precise crime listed in USSG § 4A1.2(c), but the Guidelines also exclude offenses "similar to" those enumerated as excludible under USSG § 4A1.1(c)(1). And both the legal definition of the offense, as well as the factual scenario, suggest this is best treated as an excludible offense. Specifically, the New York statute says you cannot get around an interlock requirement by using a different vehicle, and the facts set forth in the PSIR aver that Mr. Valente was pulled over for a traffic stop, and he then tried to deceive the officers from finding out that he was prohibited from driving, let alone without an interlock device. His wife knowingly gave him the car to drive. These descriptors square up with a crime that is a cross between the §4A1.1(c)(1)-enumerated crimes of: (a) driving without a license; and (b) giving false information to a police officer. Each of these crimes is excludible if there is no probation or imprisonment imposed, as was the case here. Hence no criminal history points should accrue as a result of this conviction.

2. **<u>An "Obstruction of Justice" Adjustment Is Not Applicable to Mr. Valente.</u>**

a. *Mr. Valente's Conduct Does Not Qualify for an "Obstruction of Justice" Adjustment Under USSG § 3C1.1*

PSIR ¶ 110 imposes a two-level upward adjustment for Obstruction of Justice, pursuant to USSG § 3C1.1, and it tracks the language of the Guideline, saying that Mr. Valente,

> obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of

SHULMAN ROGERS | GANDAL PORDY ECKER

Angela Bennett Rodriguez
September 10, 2015
Page 5

> conviction and any relevant conduct; or (B) a closely related offense[.]

PSIR ¶ 110 goes on to incorporate by reference the conduct that was obstructive by citing to PSIR ¶ 93. PSIR ¶ 93, however, refers to actions undertaken by Mr. Valente *not* with regard to the investigation or prosecution of *his criminal case* – *i.e.*, "the instant offense of conviction" – but rather with regard to a *civil* case investigated and brought by an entirely different entity – the Securities and Exchange Commission:

> The defendant obstructed or impeded … when [he] falsified a Felix Advisors spreadsheet which *was sent to the SEC in conjunction with an official investigation* being *conducted by that agency*, and procured another person to conceal evidence that was *material to the SEC investigation* by directing Catherine Giaquinto to change a figure in that same spreadsheet … .

PSIR ¶ 93 (emph. added). That paragraph goes on to reference two other paragraphs – PSIR ¶¶ 61, 70 – and those paragraphs also make clear that this spreadsheet falsification was not done with respect to the investigation of Mr. Valente's criminal case, *viz.*:

> On the spreadsheet Valente *sent to the SEC in conjunction with their investigation*, Valente had altered, and directed the alteration of information[.]

PSIR ¶ 61 (emph. added).

b. *Even if his Conduct Did Qualify for "Obstruction of Justice," Its Application is Blocked by the Allegations Made in the PSIR's "Sophisticated Means" Enhancement*

PSIR ¶ 106 imposes a two-level enhancement based on the conclusion that Mr. Valente's offense involved "sophisticated means," relying on USSG § 2B1.1(b)(10). It identifies as the basis for the enhancement a series of acts of

SHULMAN ROGERS | GANDAL PORDY ECKER

Angela Bennett Rodriguez
September 10, 2015
Page 6

concealment and falsification, one of which is "falsification of a spreadsheet outlining the total assets under management which was ultimately sent to the SEC[.]" PSIR ¶ 106.

The Commentary to the Sophisticated Means enhancement, however, states,

> If the conduct that forms the basis for an enhancement under subsection (b)(10) is the only conduct that forms the basis for an adjustment under § 3C1.1, do not apply that adjustment under § 3C1.1.

USSG § 2B1.1, Commentary 9(C). The reference to "§ 3C1.1" pertains, of course, to an Obstruction of Justice enhancement. In our case, the sole conduct cited for Mr. Valente's Obstruction of Justice enhancement is his alleged falsification of the Felix Advisors spreadsheet he sent to the SEC, which is discussed in PSIR ¶¶ 61, 70 and 93. *See* PSIR ¶ 110. Accordingly, since the bases for the Sophisticated Means enhancement subsumes the entirety of the factual basis for the Obstruction of Justice adjustment, for this additional reason, the Obstruction of Justice adjustment is expressly prohibited from being applied.

3. **A "Sophisticated Means" Enhancement Is Not Applicable to Mr. Valente.**

As noted in PSIR ¶ 110, this enhancement applies only to execution or concealment conduct that is "especially" complex or "especially" intricate – echoing the standard set forth in the USSG § 2B1.1(b)(10), Commentary 9(B). Yet, stated simply, the conduct identified in PSIR ¶ 110 is too ordinary to qualify for this enhancement. Specifically, the conduct identified as the bases for the enhancement refers, on the one hand, to the falsifying of the monthly statements investors received and the falsifying of documents investors received showing IRAs were created and, on the other hand, a series of acts of concealment to further the original falsifications.

Taking these groups of conduct one at a time, there is nothing "especially" complex or intricate about the original falsifications. All Mr. Valente was doing was using these documents to commit the fraud by lying to the investors about how well

their investments were doing and lying to them that he had rolled over their pre-tax investment accounts into IRAs. This is how he defrauded the investors (Count One) by use of the mail (Count Two), and how his actions had the effect of obstructing or impeding the due administration of the IRS (Count Three). In essence, Mr. Valente had to continue to send these reports to induce his clients to – as complaining witnesses repeatedly state in the PSIR – invest more and more of their savings with him. If he did not send these reports, he would not get any new or repeat investors, and his clients would leave him. There is nothing fancy about this; it is simply how he maintained his fraud. *See United States v. Bryson*, --- F.Supp.3d ----2015 WL 1509241, *9 (D. Conn. April 1, 2015) ("A sophisticated means enhancement is appropriate [only] where the offense conduct, viewed as a whole, is notably more intricate than that of a garden-variety fraud scheme.") (relying on *United Staes. v. Jackson,* 346 F.3d 22, 25 (2d Cir.2003)).

Accordingly, at least with regard to these supposed "sophisticated" acts, imposing the enhancement will have the effect of impermissible double counting because, under these circumstances, "one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." *United States v. Volpe,* 224 F.3d 72, 76 (2d Cir. 2000). Such double counting is not permitted because the enhancement does not have the effect of using punishment for the purpose of "aim[ing] at different harms." *See Volpe*, 224 F.3d at 76. The fact that Mr. Valente used written reports to commit his fraud is no different a harm than the times when he orally told his clients, *e.g.*, "your investment increased by 6% last month," or "your retirement account has been rolled into a new IRA." There is no harm that is additional to, or different from, the fraud that gives way to his base offense level of 7. So no additional levels are merited.

And with regard to the subsequent acts of concealment identified in PSIR ¶ 106, these, too, are "ordinary" – *i.e.*, there is nothing "especially" about them, either. The Guidelines do not provide any instruction about whether something is a "normal" act of concealment, as opposed to an "especially" intricate or complex one. There is little sophistication in mocking up documents to hide or continue the perpetration of a fraud. Since the Guideline does not say that *any* act or acts of concealment rise to the

SHULMAN ROGERS | GANDAL PORDY ECKER



level of "sophisticated," then these acts, on their face, should not support a two level enhancement.

4. **"Placeholder" Objection With Regard to Loss Amount.**

PSIR ¶ 104 increases the offense level by 18 as a result of a conclusion that the loss amount is "approximately $4,716,479.69, which represents the loss of principal to investors, including excess management fees collected." The 18 levels increase is pursuant to USSG § 2B1.1(b)(1)(J), as falling between $2,500,000 and $7,000,000.

We agree that, at present, the best we can do is to estimate this loss amount calculation because of the ongoing assessment of the value of the investments. Therefore, there is nothing presently objectionable about the $4.7 million actual loss figure that is calculated. Accordingly, rather than affirmatively object, we would like to insert a "placeholder" pending the ultimate determination of these figures, as well as an anticipated forthcoming change in the applicable Guidelines.

Specifically, we note that while the $2,500,000-$7,000,000 range is applicable today, given that Mr. Valente's sentencing is scheduled for after November 1, 2015, pending Congressional (non)intervention, the new USSG § 2B1.1(b)(1)(J) range in effect will be between $3,500,000 and $9,500,000.[2] Accordingly, should a revised assessment of the actual loss dip below $3,500,000, the offense level impact, using this methodology, decreases to "+16."

Further, also (presumptively) effective November 1 is another pertinent change in the Guidelines with regard to loss amount. In the Plea Agreement, the parties reserved the right to advocate over whether the loss amount is in the range of $2.2 million (says the defense) or greater (says the Government). ECF 3, at 12. The defense position is predicated on two premises. First is the assertion that the actual and the intended loss is limited to that which was the product of Mr. Valente's fraudulent behavior, *i.e.*, focusing on excessive fees collected and the tax consequences of Mr. Valente telling some of his clients that he was rolling their

[2] *See* http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf, at 13.

investments over into IRAs. *E.g.*, *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006); *United States v. Rothwell*, 387 F.3d 579, 584 (6th Cir. 2004). And second, the Court is not required to calculate actual loss before relying on intended loss as, for instance, it may be easier "as a matter of proof" to show intended loss. *United States v. Thurston*, 358 F.3d 51, 68 (1st Cir. 2004), *vacated on other grounds*, 534 U.S. 1097 (2005).

On November 1, the Guidelines formally will be adopting a standard for intended loss that is "subjective" in nature – *i.e.*, one that focuses on the loss that Mr. Valente "purposely sought to inflict," rather than an objective view that measures intended loss in terms of what he "merely knew would result from his scheme or ... [loss] he might have possibly and potentially contemplated." *See* United States Sentencing Commission, *Primer [on] Loss Calculations Under § 2B1.1(b)(1)* (June 2015) (citing, among others, *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011); *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008)).

Therefore, given: (a) the convergence of the ongoing challenge in measuring the value of actual loss; (b) the availability of an approach that prefers using intended loss under these circumstances; and (c) the likely adopting of the "subjective view" of intended loss on November 1, Mr. Valente seeks to defer this determination to a discussion by the Court, and insert this "placeholder" so as not to be viewed as waiving a future challenge to it, pending the Congressional deadline for action.

**5. Conclusion**

In sum, if agreed to, the Objections set forth above pertaining to Criminal History would bring Mr. Valente's subtotal criminal history score based on convictions from six to two, and in light of the § 4A1.1(d) circumstances, his total criminal history score should be four, not eight.[3] This would place Mr. Valente at the

[3] As required by the Court's Uniform Presentence Order (ECF 5), Mr. Valente is herein providing notice of his intent to move the Court for downward departure pursuant to USSG § 4A1.3(b). Other downward departure motions Mr. Valente presently is contemplating involve Specific Offender Characteristics (USSG § 5H1.3 (Mental and Emotional Conditions), individually or in combination with USSG § 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence)) and Diminished Capacity (§ 5K2.13).

SHULMAN ROGERS | GANDAL PORDY ECKER



bottom of Criminal History Category III. With regard to Total Offense Level, setting aside the issue of loss calculation for the moment, removing either the Obstruction of Justice adjustment or the Sophisticated Means enhancement would bring his Total Offense Level to 32. Removing both would bring it to 30. Hence Mr. Valente's advisory Guidelines range would be changed from 210-262 months to either 151-188 months or 121-151 months.[4] Hence PSIR ¶ 164 should be adjusted accordingly.

Respectfully submitted,

Joel D. Schwartz

cc: AUSA Richard D. Belliss (richard.belliss@usdoj.gov)
William J. Dreyer (wdreyer@dreyerboyajian.com)

[4] If the loss figure the Court settles on turns out to be less than $3.5 million, the Total Offense Level could reduce further, possibly to a 28, bringing the advisory range to 97-121 months.

# EXHIBIT C

**From:** Mazzola Frank <frank@felixadvisors.com>
**Date:** February 28, 2014 at 3:45:55 PM EST
**To:** undisclosed-recipients:;
**Subject: If you want to know why I am so excited about Jawbone and Candi Controls just look at this chart!**




Source: BI Intelligence Estimates

http://www.businessinsider.com/the-internet-of-everything-2014-slide-deck-sai-2014-2?op=1&utm_source=Triggermail&utm_medium=email&utm_term=Master%20411&utm_campaign=BI%20Intelligence%2020140228

**Frank G. Mazzola**

**40 Wall St.**
**New York, NY 10005**
**Tel: 646-597-4301**
**Mobile: 917-921-9249**
**frank@felixadvisors.com**

Personal and confidential. You are receiving this email because you either have invested in one of our private placements or have expressed an interest in investing and we have verified that you are either an accredited or qualified investor. If your status has changed or you no longer are interested in receiving our communications please let us know ASAP. This email is not to be forwarded or distributed in anyway.

Please Note Disclosure:

Please do not transmit investment instructions regarding your Felix Advisors LLC investment by e-mail. Felix reserves the right to monitor and review the contents of all e-mail communications, including emails sent to and/or received by its employees. This material has been prepared for informational purposes only. While it is based on information generally available to the public from sources we believe to be reliable, no representation is made that the subject information is accurate or complete. Past performance is not a guarantee of future results. Prices, rates, yields and company conditions are subject to change without notice. Felix is not a tax advisor; transactions requiring tax consideration should be reviewed carefully with your tax advisor. Similarly, Felix is not a law firm and provides no legal opinions or legal advice. *Felix and/or its officers or employees may have positions in any of the securities of this (these) issuer(s).

IMPORTANT INFORMATION

This does not constitute an offer to sell or a solicitation of an offer to buy any securities or investment product and may not be relied upon in connection with any offer or sale of securities. Any such offer or solicitation may only be made by means of delivery of an approved offering memorandum (the "Memorandum"). The Memorandum must be received and reviewed prior to any investment decision. Any person subscribing for an investment must be able to bear the risks involved and must meet the suitability requirements relating to such investments.

This may not be distributed to other than the intended recipient. Unauthorized reproduction or distribution of all or any this is strictly prohibited.

Saddle River Advisors, LLC D.B.A. FelixAdvisors, LLC.

**From:** Mazzola Frank <frank@felixadvisors.com>
**Date:** February 24, 2014 at 6:42:52 PM EST
**To:** undisclosed-recipients:;
**Subject: Why palantir could be a massive winner.**

Splunk is the publically traded Palantir and today Splunk surpassed Palantir in Valuation based on the valuation of Palantir's latest round of funding which was $9 billion and the closing valuation of Splunk which was $9.7 Billion. The reason I am so excited about this is Splunk is estimated to do $292 million in revenue this year and $397 million in 2015. Palantir we believe will do about $1.7 billion in revenue this year and $3.5 billion in 2015. Applying the same multiple to Palantir that has been awarded to Splunk Palantir would be a $56 .4 billion publically traded company today. Splunk could not even carry Palantir's jock and Palantir we believe is at profitability. So now you see why I am so excited about Palantir – especially at $6.50 per share!!!

Frank

Splunk, Inc. (SPLK) -NasdaqGS • Follow
90.75 Up 1.73(1.94%) 4:00PM EST|After Hours : 90.75 0.00 (0.00%) 4:58PM EST

Add to Portfolio
Prev Close: 89.02
Open: 89.83
Bid: 90.50 x 300
Ask: 90.75 x 100
1y Target Est: 81.23
Beta: N/A
Next Earnings Date: 27-Feb-14SPLK Earnings announcement

Day's Range: 88.60 - 91.12
52wk Range: 35.00 - 91.12
Volume: 1,284,553
Avg Vol (3m): 1,486,280
Market Cap: 9.73B
P/E (ttm): N/A
EPS (ttm): -0.51
Div & Yield: N/A (N/A)
People viewing SPLK also viewed:

Splunk, Inc. (SPLK) -NasdaqGS · Follow
90.75 Up 1.73(1.94%) 4:00PM EST|After Hours : 90.75 0.00 (0.00%) 4:58PM EST
http://finance.yahoo.com/q/ae?s=SPLK+Analyst+Estimates

**Frank G. Mazzola**

**40 Wall St.**
**New York, NY 10005**
**Tel: 646-597-4301**
**Mobile: 917-921-9249**
**frank@felixadvisors.com**

Personal and confidential. You are receiving this email because you either have invested in one of our private placements or have expressed an interest in investing and we have verified that you are either an accredited or qualified investor. If your status has changed or you no longer are interested in receiving our communications please let us know ASAP. This email is not to be forwarded or distributed in anyway.

Please Note Disclosure:

Please do not transmit investment instructions regarding your Felix Advisors LLC investment by e-mail. Felix reserves the right to monitor and review the contents of all e-mail communications, including emails sent to and/or received by its employees. This material has been prepared for informational purposes only. While it is based on information generally available to the public from sources we believe to be reliable, no representation is made that the subject information is accurate or complete. Past performance is not a guarantee of future results. Prices, rates, yields and company conditions are subject to change without notice. Felix is not a tax advisor; transactions requiring tax consideration should be reviewed carefully with your tax advisor. Similarly, Felix is not a law firm and provides no legal opinions or legal advice. *Felix and/or its officers or employees may have positions in any of the securities of this (these) issuer(s).

IMPORTANT INFORMATION

This does not constitute an offer to sell or a solicitation of an offer to buy any securities or investment product and may not be relied upon in connection with any offer or sale of securities. Any such offer or solicitation may only be made by means of delivery of an approved offering memorandum (the "Memorandum"). The Memorandum must be received and reviewed prior to any investment decision. Any person subscribing for an investment must be able to bear the risks involved and must meet the suitability requirements relating to such investments.

This may not be distributed to other than the intended recipient. Unauthorized reproduction or distribution of all or any this is strictly prohibited.

Saddle River Advisors, LLC D.B.A. FelixAdvisors, LLC.

**From:** Mazzola Frank <frank@felixadvisors.com>
**Date:** February 28, 2014 at 9:46:05 AM EST
**To:** undisclosed-recipients:;
**Subject: I cannot wait until Palantir is publically traded.**

It seems like every day the publically traded Palantir – Splunk - sets a new high and every day I have to control my excitement when I think about the day Palantir IPO's. Fortunes will be made that day!

No question about it – Palantir in my mind is a must own and my number one investment. You cannot own enough of this company!

Applying the same multiple on revenue for 2014 to Palantir it would be a $64 stock – I do not make this up I just draw big circles around it!

Splunk, Inc. (SPLK) -NasdaqGS · Follow
103.22 Up 7.72(8.08%) 9:32AM EST - Nasdaq Real Time Price

Frank

**Frank G. Mazzola**

**40 Wall St.**
**New York, NY 10005**
**Tel: 646-597-4301**
**Mobile: 917-921-9249**
**frank@felixadvisors.com**

Personal and confidential. You are receiving this email because you either have invested in one of our private placements or have expressed an interest in investing and we have verified that you are either an accredited or qualified investor. If your status has changed or you no longer are interested in receiving our communications please let us know ASAP. This email is not to be forwarded or distributed in anyway.

Please Note Disclosure:

**From:** Mazzola Frank <frank@felixadvisors.com>
**Date:** February 25, 2014 at 9:10:23 AM EST
**To:** undisclosed-recipients:;
**Subject: Jawbone is ascending into the top echelon of tech startups, joining the likes of Uber, Dropbox, and Square.**

Jawbone has the potential of being a MASSIVE winner for us and if we are wrong I think we are looking at a really nice winner. I do not believe we are wrong but it is a high class problem to have if I am! We are certainly off to a good start – up 2x+!

Jawbone Is Now the Startup Apple Should Fear Most
http://www.wired.com/business/2014/02/jawbone-now-startup-apple-fear/

**Frank G. Mazzola**

**40 Wall St.**
**New York, NY 10005**
**Tel: 646-597-4301**
**Mobile: 917-921-9249**
**frank@felixadvisors.com**

Personal and confidential. You are receiving this email because you either have invested in one of our private placements or have expressed an interest in investing and we have verified that you are either an accredited or qualified investor. If your status has changed or you no longer are interested in receiving our communications please let us know ASAP. This email is not to be forwarded or distributed in anyway.

Please Note Disclosure:

Please do not transmit investment instructions regarding your Felix Advisors LLC investment by e-mail. Felix reserves the right to monitor and review the contents of all e-mail communications, including emails sent to and/or received by its employees. This material has been prepared for informational purposes only. While it is based on information generally available to the public from sources we believe to be reliable, no representation is made that the subject information is accurate or complete. Past performance is not a guarantee of future results. Prices, rates, yields and company conditions are subject to change without notice. Felix is not a tax advisor; transactions requiring tax consideration should be reviewed carefully with your tax advisor. Similarly, Felix is not a law firm and provides no legal opinions or legal advice. *Felix and/or its officers or employees may have positions in any of the securities of this (these) issuer(s).

**From:** Frank Mazzola <frank@felixinvestments.com>
**Date:** December 12, 2012 at 12:42:47 PM EST
**To:** Scott Valente <valentescott@ymail.com>
**Subject: RE: Jumio!**

We have stock at $16.50. The stock in the secondary market is effectively trading at $20. Best Frank

**Frank G. Mazzola**

FelixInvestments LLC
Member FINRA/SIPC

**17 State Street 26th Fl.**
**New York, NY 10004**
**Tel: 646-597-4301**
**Mobile: 917-921-9249**
**fmazzola@felixinvestments.com**

**Personal and confidential. You are receiving this email because you either have invested in one of our private placements or have expressed an interest in investing and we have verified that you are either an accredited or qualified investor. If your status has changed or you no longer are interested in receiving our communications please let us know ASAP. This email is not to be forwarded or distributed in anyway.**

Please Note Disclosure:
Please do not transmit orders and/or instructions regarding your Felix Investment LLC account(s) by e-mail. Felix reserves the right to monitor and review the contents of all e-mail communications, including emails sent to and/or received by its employees. This material has been prepared for informational purposes only. While it is based on information generally available to the public from sources we believe to be reliable, no representation is made that the subject information is accurate or complete. Past performance is not a guarantee of future results. Prices, rates, yields and company conditions are subject to change without notice. This report is not the official record of your account. It has, however been prepared to assist you with your investment planning and is for informational purposes only. Felix is not a tax advisor; transactions requiring tax consideration should be

**From:** Sharereg <sharereg@meridian.bm>
**Date:** May 16, 2014 at 10:42:40 AM EDT
**To:** "'valentescott@ymail.com'" <valentescott@ymail.com>
**Subject: Redwood Fund II LLC - LP Statement - Account Number: 1015704 - December 31, 2013**

To: The ELIV Group, LLC

Please find attached your December 2013 month end statement for Redwood Fund II LLC. If you have any questions, or are in need of any assistance, please contact us at investorrelations@mfsadmin.com.

Regards,

Investor Relations

Meridian Fund Services (USA) LLC
370 Lexington Avenue, Suite 1806
New York, NY 10017
United States
Telephone: (212) 792-6490
Fax: (212) 792-6499
Web: www.meridianfundservices.com

MERIDIAN
FUND SERVICES

The ELIV Group, LLC
4033 Ryan Place
Schenectady NY
12303

| | |
|---|---|
| Statement From: | 01-Oct-2013 |
| Statement To: | 31-Dec-2013 |
| Account Number: | 1015704 |
| Currency: | USD |

## Redwood Fund II LLC

**SUMMARY OF ACTIVITY**

| | Date | Value |
|---|---|---|
| Partner's Capital - Beginning of period | 01-Oct-13 | $0.00 |
| Add: Contribution | Various | $319,865.82 |
| Add: Allocated appreciation from Partnership | | 61,466.48 |
| Partner's Capital - End of period | 31-Dec-13 | $381,332.30 |

**FUND NET PERFORMANCE**

| | |
|---|---|
| **Quarter-to-Date Net Performance** | **19.22%** |
| **Year-to-Date Net Performance** | **19.22%** |

**From:** Sharereg <sharereg@meridian.bm>
**Date:** September 11, 2014 at 11:10:51 AM EDT
**To:** "valentescott@ymail.com" <valentescott@ymail.com>
**Subject: Redwood Fund II LLC - LP Statement - Account Number: 1015704 - March 31, 2014**

To: The ELIV Group, LLC

Please find attached your March 2014 month end statement for Redwood Fund II LLC. If you have any questions, or are in need of any assistance, please contact us at investorrelations@mfsadmin.com.

Regards,

Investor Relations

Meridian Fund Services (USA) LLC
1114 Avenue of the Americas, Suite 2630
New York, NY 10036
United States
Telephone: (212) 792-6490
Fax: (212) 792-6499
Web: www.meridianfundservices.com

MERIDIAN
FUND SERVICES

The ELIV Group, LLC
4033 Ryan Place
Schenectady NY
12303

**Statement From:** 01-Jan-2014
**Statement To:** 31-Mar-2014
**Account Number:** 1015704
**Currency:** USD

## Redwood Fund II LLC

**SUMMARY OF ACTIVITY**

| | Date | Value |
|---|---|---|
| Partner's Capital - Beginning of period | 01-Jan-14 | $381,332.30 |
| Add: Contribution | 01-Jan-14 | $100,000.00 |
| Add: Allocated appreciation from Partnership | | 160,114.09 |
| Partner's Capital - End of period | 31-Mar-14 | $641,446.39 |

**FUND NET PERFORMANCE**

| | |
|---|---|
| **Quarter-to-Date Net Performance** | **33.26%** |
| **Year-to-Date Net Performance** | **33.26%** |

**From:** Mazzola Frank <frank@saddleriveradv.com>
**Date:** August 27, 2014 at 2:35:11 PM EDT
**To:** undisclosed-recipients:;
**Subject: Badgeville, the global leader in gamification...**

This opportunity was not even on our radar screen last week. It fell into our laps over the weekend and we pounced on it. The Seller is in distress so we were able to negotiate an incredible price. We know this company very well - we led the series A round of funding of which Eduardo Saverin - co-founder of Facebook - did the majority of! Another Palantir Mafia company Relate IQ which is also in the CRM space just sold to Salesforce.com for $385 million. RelateIQ did $1.5 mil in rev so you can only imagine what Badgeville would fetch in a take out. We are buying Badgeville for $5 per share which is about a $225 million valuation or about 2x revenue – there is only about 45 million shares outstanding. They will do about $100 mil this year - they have more than doubled revenue every year since 2010 (see the articles below). I think Badgeville will IPO or be sold for $1 billion + in the next 12 months!

These are the types of opportunities that you must take advantage of when they present themselves.
Best,

Frank

Badgeville 6.0 Offers Greater Social Depth, Deeper Insights and Faster Deployment
http://www.prnewswire.com/news-releases/badgeville-60-offers-greater-social-depth-deeper-insights-and-faster-deployment-270155731.html

**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

*445 Broadway, Room 218*
*James T. Foley U.S. Courthouse*
*Albany, New York 12207-2924*

*Tel.: (518) 431-0247*
*Fax: (518) 431-0249*

November 13, 2015

Honorable Gary L. Sharpe
Senior United States District Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207

Re: *United States v. Scott Valente*
15-CR-124 (GLS)

Dear Judge Sharpe:

This letter is submitted in response to the defendant's objections to the PSR and his motions for downward departures / variance. For the reasons set forth below and in the government's initial sentencing memorandum, the government (i) believes that the offense conduct and criminal history category are correctly scored in the PSR, (ii) opposes the defendant's request for downward departures / variance, and (iii) maintains that a sentence that includes 240 months of imprisonment is appropriate.[1]

I. Response to the Defendant's Argument Against the Two-Level Obstruction of Justice Enhancement Under U.S.S.G. § 3C1.1.

The defendant argues that the conduct described in paragraphs 61, 70, 93 & 110 of the PSR (the altering of a spreadsheet to inflate, by $10 million, the amount of investments the defendant purported to have under advisement) is devoid of evidence indicating that the defendant, at the time that he caused the spreadsheet to be altered, had an intent to obstruct the investigation of the "instant" offenses of conviction and, consequently, that the two level obstruction of justice enhancement should not apply. (*See* Dkt. No. 23-1, p. 5).

The defendant takes too narrow a reading of U.S.S.G. § 3C1.1. The defendant was notified of the SEC investigation in March, 2014, and the altered spreadsheet at issue was submitted to the SEC in May, 2014. (PSR ¶¶ 61, 83). On August 6, 2014, the IRS and FBI

[1] With respect to forfeiture, the government does not currently seek forfeiture of the real properties alleged in the Information, but does seek imposition of a money judgment in the amount of $10,555,954.27.

executed search warrants, in connection with the criminal investigation, at the defendant's residence and his two office locations. (PSR ¶ 86). At the time that the defendant learned of the SEC's investigation, the SEC was clearly concerned with misrepresentations that the defendant was making to investors, including the amount of money he had under advisement. Counts 1 and 2 of the Information relate to other misrepresentations that the defendant made to his investors. Application Note #1 to § 3C1.1 indicates that "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." By altering the spreadsheet at issue, the defendant hoped that the SEC would drop its query, thereby significantly lowering the chances that a criminal investigation surrounding other alleged misrepresentations to investors would be commenced. As such, the two level enhancement should apply.

II. <u>Response to the Defendant's Argument Against the Two-Level Sophisticated Means Enhancement Under U.S.S.G. § 2B1.1(b)(10)(C)</u>.

The defendant argues that the conduct described in paragraph 106 of the PSR is not particularly complex or intricate and, consequently, that the two level sophisticated means enhancement should not apply. (*See* Dkt. No. 23-1, p. 6).

The totality of the actions taken by the defendant to execute and conceal his fraudulent activities warrants application of the sophisticated means enhancement. Under Application Note 9(B) to § 2B1.1(b)(10)(C), "sophisticated means" "means especially complex to especially intricate offense conduct pertaining to the execution or concealment of an offense." While fraudulent investment schemes almost always involve a perpetrator who inflates an investment's past performance, this defendant went further than other charlatans by (i) slyly and repeatedly making misrepresentations to investors that everything was okay with their investments; and (ii) taking steps to cover up his frauds.

In the case at bar, the defendant's fraudulent actions towards both his regular and IRA investors included issuing written monthly, quarterly, and annual investor account statements that contained a myriad of misrepresentations including the rate of ELIV's investment returns, the relative safety of the investments, and the existence of an auditor, etc. (PSR ¶¶ 26(d)-(h), 39 & 41).[2] The defendant's IRA investors were further deceived by the defendant's misrepresentations and acts of concealment which included lies about his ability to accept, hold and manage IRA accounts, as well as the altering and submission of legitimate tradeMONSTER account statements in an effort to deceive the IRS into believing that certain investors had properly rolled over their non-ELIV retirement accounts (IRAs, 401(k)s, etc.) into authorized

[2] The defendant also maintained an ELIV website that contained falsehoods, including the Fund's past rates of return.

ELIV IRA accounts. (PSR ¶¶ 26(i)-(m)). The defendant's actions, particularly his altering of legitimate tradeMONSTER statements which were sent to the IRS, made his crimes more successful and made them "harder to detect," all of which warrants imposition of the two level enhancement. *See generally United States v. Lewis*, 93 F.3d 1075, 1081 (2d Cir. 1996).

III. Response to the Defendant's Argument that the Loss Amount Should be an Intended Loss Amount Limited to $2.2 million Under U.S.S.G. § 2B1.1(b)(1)(I).

The defendant argues that the uncertainty over the actual loss amount to investors, when combined with the offense that the "impaired" defendant sought to commit, warrant the Court adopting an intended loss amount of $2.2 million. (*See* Dkt. No. 23-1, p. 7).

A sentencing Court "need only make a reasonable estimate of the loss, given the available information, and the calculation of loss amount is made under the preponderance of the evidence standard." *United States v. Nachamie*, 28 Fed. Appx. 13, 25 (2d Cir. 2001) (internal quotations / citations omitted). The method of calculation used by Probation in coming up with an actual loss of $4,724,579.69 is a reasonable methodology which yields a *conservative* loss estimate. (*See* PSR ¶¶ 89, 104). Limiting loss to the $2.2 million that the defendant stole in unauthorized management fees unreasonably limits the harm that the defendant's investors have experienced at the hands of the defendant.

IV. Response to the Defendant's Motion for a Downward Departure Under U.S.S.G. § 4A1.3(b).

The defendant moves for a downward departure on the grounds that his criminal history IV categorization over-represents the seriousness of his criminal history. The gist of the defendant's argument is that his criminal history is comprised of alcohol related offenses that have nothing to do with the conduct of which he stands convicted. (*See* Dkt. No. 23-1, p. 11).

The government believes that the defendant's criminal history and category are properly scored. Recognizing that a "defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment," the government will defer to the Court as to whether it believes that category IV over-represents the seriousness of the defendant's criminal history. U.S.S.G. Ch. 4, Pt. A, *intro. comment.* Should the Court agree to depart downward, any such departure should be minimal and result in a guideline prison sentence as if the defendant's criminal history category was no less severe than either III or II.

V. <u>Response to the Defendant's Motion for a Downward Departure Under U.S.S.G. § 5H1.3</u>.

The defendant moves for a downward departure on the grounds that his severe mental and emotional conditions distinguish this case from typical cases involving investment fraud. (*See* Dkt. No. 23-1, p. 12).

The government opposes the defendant's motion as any physical or emotional abuse endured by the defendant over the years (and any resulting anxiety, depression, alcoholism, etc.) were not the driving force behind the defendant's frauds. The defendant was driven to commit his crimes because of greed and a desire to life a lifestyle that he could not otherwise afford. A survey of the victim impact statements does not offer any evidence that the defendant deceived his victims and stole their money because he could not somehow control his anxiety, depression, or alcoholism. Rather, a number of the victim impact statements describe how comfortably, yet slyly, the defendant spoke with prospective investors, looked them in the eye, and convinced them to entrust their savings to the defendant. *See e.g.*, victims V.R. and J.R. who wrote in part, "Scott Valente had us 100% completely fooled . . . It mystifies us how someone could look you in the eye and completely lie to you." PSR p. 186 of 194; and victims M.C. and M.F. wrote in part, "We simply will never understand how someone can steal from family and friends, face you and look you in the eye and tell you, yes you have the money to retire, to live the way you worked so hard to live." PSR pp. 147-48 of 194.

VI. <u>Response to the Defendant's Motion for a Variance in Order to Avoid Sentencing Disparities</u>.

The defendant moves for a variance and generally argues that the average prison sentence in cases with loss amounts similar to the loss in this case is significantly less than the advisory guideline prison term of 210-262 months as set forth in the PSR. (*See* Dkt. No. 23-1, p. 12).

The government opposes the defendant's motion. A prison term of 240 months, as previously recommended by the government, is a just prison term in light of the sentencing factors set forth in 18 U.S.C. § 3553(a). This defendant not only broke the trust of his victims through his lies and misrepresentations at almost every level of the advisor – investor relationship, but he made them to all of his 100+ investors, and he made them over a more than 42 month period of time. When the SEC began to detect the defendant's fraud, and when the IRS started issuing notices to investors that they would have to start paying penalties for IRA and 401(k) distributions that were not properly rolled over into ELIV IRA accounts, the defendant's responses were not to come clean. Rather, the defendant directed one of his employees to alter a spreadsheet to make it look as though the defendant had significantly more investments under management than he actually did, and the defendant altered numerous tradeMONSTER statements to try and trick the IRS into believing that certain investors had rolled over their retirement accounts into legitimate ELIV IRA accounts. The effects of these additional frauds

were to allow the defendant to continue to operate for additional months and steal more monies from unsuspecting investors.

In addition, this defendant is not some rookie stock broker fresh out of college. The defendant is in his late 50's, has been working in the securities industry since 1989, and worked for a local brokerage firm for several years – all prior to forming ELIV. In 2009 the defendant was barred from the broker-dealer industry by FINRA after making numerous unauthorized, excessive, and unsuitable trades for his former clients. Recognizing that he could not open an investment firm in his name, the defendant used his wife as a nominee to establish ELIV, and often used his wife's bank account to funnel deposits by ELIV investors – all in a likely effort to avoid detection.

Finally, attached as GE-1(a)-(h) are photographs of the defendant's former Capital District residence in which he used stolen investor monies to transform what was a pleasant, middle class home into a home of luxury and excess. Attached as GE-2(a)&(b) are pictures of the two vacation condominium complexes in which the defendant purchased condominiums with stolen investor monies. Many of the ELIV investors from whom the defendant stole monies do not have primary residences as fancy as the residence in which Mr. Valente lived. And, most, if not all, of the ELIV investors did not have two vacation condominiums to use for vacation get-aways. For over 42 months the defendant lived the high life at the expense of his investors. Now the investors will have to struggle for the rest of their lives to try to return to the *status quo ante*, let alone build their nest eggs as hoped. The egregious nature of the defendant's crimes, his background of deceit, and the needs for general and specific deterrence, as well as to provide just punishment, warrant a sentence that includes 240 months of prison time.

## Conclusion

For the reasons stated above and in the government's sentencing memorandum dated October 30, 2015, the defendant's conduct is properly scored in the PSR and the Court should impose a sentence that includes 240 months of imprisonment.

If there is anything further you may need, please contact me.

Very truly yours,

RICHARD S. HARTUNIAN
United States Attorney

By: */s/ Richard D. Belliss*
Richard D. Belliss
Assistant U. S. Attorney
Bar Roll Number: 515295

United States Attorney's Office
James T. Foley U.S. Courthouse
445 Broadway
Albany, N.Y. 12207
Telephone: (518) 431-0247
Fax: (518) 431-0249
E-mail: richard.belliss@usdoj.gov

cc: Hon. Lawrence K. Baerman, Clerk (Electronic filing)
U.S. District Court Clerk, Albany

Joel D. Schwartz, Esq. (Electronic service)
Shulman, Rogers, Gandal, Pordy, Ecker, P.A.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20865

Angela Bennett Rodriguez (Electronic service)
U.S. Probation Office

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, ) CASE NO.: 1:15-CR-124

vs.

SCOTT VALENTE,
Defendant.

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HON. GARY L. SHARPE**
**FRIDAY, NOVEMBER 20, 2015**
**ALBANY, NEW YORK**

**FOR THE GOVERNMENT:**
Office of the United States Attorney
By: Richard D. Belliss, AUSA
445 Broadway, Room 214
Albany, New York 12207

**FOR THE DEFENDANT:**
Shulman Rogers, PA
By: Joel D. Schwartz, Esq., & Russell D. Duncan, Esq.
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854

**THERESA J. CASAL, RPR, CRR, CSR**
Federal Official Court Reporter
445 Broadway, Room 509
Albany, New York 12207

(Court commenced at 11:02 AM.)

THE CLERK: The date is Friday, November 20, 2015, at 11:00 AM. In the matter of the United States of America versus Scott Valente, case number 15-CR-124. We are here for sentencing. Appearances for the record, please.

MR. BELLISS: Good morning, your Honor. Rick Belliss on behalf of the United States. I'm accompanied by co-case agent FBI Special Agent Jeff Alford.

THE COURT: Good morning.

MR. SCHWARTZ: Good morning, your Honor. Joel Schwartz for Mr. Valente.

THE COURT: Good morning. Good morning, Mr. Valente.

THE DEFENDANT: Good morning. Good morning, your Honor.

THE COURT: All right. We're here for purposes of sentencing. There are certain issues that we need to resolve before we get into the sentencing process. The first is Probation, in response to some late submissions, has submitted a second addendum to the presentence report. I know Probation has reported to me that they have provided that second addendum as promptly as they could to both the Government and the defendant. In particular, has the defense had an opportunity to look at the second addendum to the PSR and discuss it with Mr. Valente?

MR. SCHWARTZ: Yes, your Honor, we have.

THE COURT: All right. Government satisfied it's had an opportunity to see the second addendum?

MR. BELLISS: Yes, your Honor.

THE COURT: All right. That then should complete the presentence report.

There is an outstanding issue with respect to a motion by the defendant to redact his sentencing memorandum, which I denied by minute order. I'll explain that in a second, but further compounding that is a letter the Court has received from Mr. Valente's brother and sister, challenging certain comments that are made in the defendant's submission.

As to the motion to redact the sentencing memorandum, I have explained in a number of decisions, but probably most cogently in *United States v. Strevell*, which can be found at 2009 WL 577910, a decision by me on March 4 of 2009, the inner play between what, in essence, in this case is medical information, privacy information as it would relate to the defendant, and the interplay between that and the common law right of access and the First Amendment right of access by the public.

In summary, what I said in that opinion is there is nothing more quintessential to the public's right to know when it comes to a sentencing proceeding why a Judge is

imposing a specific sentence and what factors the Judge is relying on in reaching that conclusion. It is for that reason that I deny the motion to seal the defendant's sentencing memorandum because, in my view, the First Amendment right of access and the common law right of access outweighs the defendant's interest in the privacy of his medical information.

With respect to the letter from the brother and sister, that's a matter which is different than the defendant's right to seal. So in that regard, I am ordering sealed so much of the defendant's submission as it pertains to, in particular, the footnote, as I recall it might have been footnote number 1 on page 2 of that document, and rather than require the parties to engage in any redaction, because the redaction is so minimal, I'm gonna direct my clerk to redact that footnote to remove that reference, file the original sentencing memorandum under seal and then substitute for that the redacted sentencing memorandum which the Court will redact. That should take care of the problem that's generated from the letter by the brother and sister.

The Government has reported to me that Miss DiBenedetto wishes to speak as a victim in the case and intends to do so on behalf of her mother, and I know the defendant has objected to that. Does the defendant continue his objection to that?

MR. SCHWARTZ: Your Honor, we object only to the extent that Miss DiBenedetto speaks outside of the place that she is taking for Mrs. DiBenedetto, the mother. Part of what we understand Miss DiBenedetto had intended to speak about was allegations not related to this case and we would still maintain our objection with regard to that. I've spoken to the Government and he suggested that some of the statements that Miss DiBenedetto intends to make now will be more focused on her speaking in place of Mrs. DiBenedetto and focused on the events related to this charge. And so we have a sort of standing objection if the statement goes beyond the scope of what I just described.

THE COURT: Well, I think those things are probably superseded by the information that's contained in the second addendum. But, in any event, we'll just take it one step at a time.

I know the defense cited to me the Rule of Federal Procedure dealing with who's permitted to speak at the time of sentencing and who's not, but it is my view, when I look at the Crime Victims Act, and when I look at the victim impact statements of Miss DiBenedetto's mother, she clearly is 85 years old, there are assertions in her victim impact statement that indicate to me she suffers from stress and emotional fatigue as a result of her status as a crime victim, and it's clear to me that the Crime Victims Act

permits people to stand in a victim's stead, and specifically references family members and representatives, so I'm gonna permit Miss DiBenedetto to speak.

Are there any changes to who wishes to speak?

MR. BELLISS: Your Honor, there are. I think I communicated this to John. There are four victims who would like to speak: Mr. Sigreto, Mr. and Mrs. Conroy, Miss DiBenedetto, for her mother, as we just discussed, and Ms. Carpenter.

THE COURT: All right.

MR. SCHWARTZ: Your Honor, if I may, with regard to Mr. Sigreto, I've spoken with the Government pursuant to a request we made under Rule 32 and Rule 26.2 for any *Jencks* material and just for the record, the Government has instructed me that there was no interview and there's no written statement by Mr. Sigreto. If that is correct, we won't object. If there is, we haven't received it and, therefore, we would object under Rule 32(i)(4).

THE COURT: I presume the Government stands by whatever commitment it's made to the defense?

MR. BELLISS: Yes, your Honor.

THE COURT: All right. All right. What we need to do is follow the protocol that's directed by the Circuit, which is we need to assess the presentence report, in terms of the accuracy of the factual information that's contained

in it, and resolve any factual objections that are pertinent to any decision that I might make. We then need to look at the Sentencing Guidelines and resolve any issues that are related to the Sentencing Guidelines, and by the same token, we need to look at the defendant's applications for departures under the Guidelines and the application for a variance from the Guidelines. I have always recognized that the arguments in support of any departures of the Guidelines and/or variance overlap. So, what I propose to do is address counsel over factual content of the presentence report, resolve the scoring issues in the Guidelines. I'll permit the victims to then speak, the Government to speak, defense counsel to speak, and Mr. Valente has the last word.

Everybody on the same sheet of music with my proposal?

MR. BELLISS: Yes, your Honor.

MR. SCHWARTZ: Yes, your Honor.

THE COURT: All right. I have reviewed the presentence report, including all the addenda. I have reviewed all of the submissions of both sides, including those recently filed with me, which include additional letters speaking on Mr. Valente's behalf, and I have supplied the parties a Court Exhibit. For the defendant's edification, the Court Exhibit, for my purposes, is principally a summary of the guideline findings that are

contained in the presentence report, and they do not contain a confidential recommendation from Probation. The Government has heard this a thousand times from me, but you have not, so, therefore, I educate you on that Court Exhibit.

By a unanimous vote of the Board of Judges, with one judge dissenting, me being that judge, the Northern District of New York does not share confidential Probation recommendations with either the Government or the defense. That's probably the majority position in most Circuits in the country. It's one I cannot countenance. I don't believe anybody should be talking to me about what is an appropriate sentence without me disclosing that to both parties so that they can comment on that recommendation if they care to. So, the Court Exhibit I have supplied contains no recommendation from Probation and I've had no conversations with Probation about what sentence they might recommend. I'm the only Judge in the district that does not have those conversations with Probation.

So, then, the Court Exhibit is merely a summary of the guideline findings. But, in addition, it does contain written special conditions of supervised release that are recommended to me by Probation. That constitutes an exception under the Local Rules about disclosure, so that all judges are now disclosing the recommendations about

supervised release. At the appropriate time, I'll ascertain from the parties whether there are any objections to those special conditions of supervised release. Absent any objections that I have to resolve, I'm simply going to incorporate them into the judgment. Since I've supplied them in writing and everybody's had a chance to see 'em, I see no need to take 20 minutes to read those into the record when I've supplied them in writing.

All right. As that summary reports, the Sentencing Guidelines here result in a level 34, a criminal history category IV, with an advisory guideline range of 210 to 262 months. It records an advisory supervised release range of one to three years. It records a current restitution figure of $8,200,579.69.

Do the parties concur that that's the current restitution figure recommended in the presentence report?

MR. BELLISS: Yes, your Honor.

MR. SCHWARTZ: Yes, your Honor.

THE COURT: All right. I know, in summary, from the Government and defense submissions that the Government recommends a 240 month sentence and the defendant recommends that the Court resolve issues under the Guidelines under applications for departure and variance and seeks a sentence between 59 and 108 months. That's the summary of the parties' positions in their sentencing submissions.

We then need to turn to the factual content of the presentence report. Other than the fact that certain facts might play on the resolution of the guideline issues, other than that, are there any objections to the factual content of the presentence report by the Government?

MR. BELLISS: None, your Honor.

THE COURT: Any objections to the factual content by the defendant?

MR. SCHWARTZ: No, your Honor.

THE COURT: All right. Let's then turn to the guideline scoring themselves. There was a place holder argument set forth by the defendant in his conversations with Probation, and I'm not sure where we're at with that place holder argument, having to do with the loss calculation. We concur, I take it, that the 2015 book now controls the loss amount, 2015 book referring to the Sentencing Guidelines. I know it is the defendant's position with respect to that place holder argument that the loss amount should be 2.2 million. It's the Government's position that the loss amount should be that amount we just discussed with respect to restitution. What does the defendant want to tell me about the place holder argument, in terms of the loss amount?

MR. SCHWARTZ: Two things, your Honor, if I may. First, I believe the Government is asserting that the loss

amount is not 8.2 but it's the 4.5 after the adjustment for the current value.

THE COURT: I was summarizing at that point.

MR. SCHWARTZ: I missed that part of the summary.

THE COURT: Misplaces it in a level 18 even under the new book.

MR. SCHWARTZ: Yes.

THE COURT: So the issue here is whether or not the loss amount, for purposes of calculating the Guidelines, is less than the bottom of the new amount or above.

MR. SCHWARTZ: That's correct. Effective November 1st, I believe it's three-and-a-half million dollars.

THE COURT: Yes.

MR. SCHWARTZ: And we maintain our position that now the adjustments made to Section 2B1.1 of the Guidelines has incorporated not just an objective intent but a subjective intent with regard to the loss and it focuses on the idea of the harm the defendant intended to cause. And we believe that notwithstanding the fact that there's a general principle that the Court should look to the greater of the intended versus actual loss, when the actual loss figure, even at the three -- $4.7 million is in flux, the more certain figure is the $2.2 million and it also squares with the notion of subjective intent, which is what the

Sentencing Commission has now essentially codified and previously been a minority position in some Circuits.

And so it's our position that for the purpose of accuracy and consistency in regards to both mens rea and ex rea effect, it would be more appropriate for the Court to look at the $2.2 million figure. We know that so long as the investments that are in the hands of I guess now the SEC, the investments that still exist, their value is in flux. For instance, one investment was this company Square, it was a pre-IPO investment previously, in the last months it's gone public and it started out, I think, at $11, now it's worth $13, and so until someone actually sells these investments or can find a market and buyer for these investments, that figure is always gonna be in flux. It could become huge and, essentially, eradicate the loss of the investors or it could diminish to nothing.

Frankly, while we very much appreciate the Department of Justice and their culling from the IRS or assistance from the IRS in trying to get their arms around this figure, with all due respect, as I outlined -- or as we've outlined in our sentencing memorandum, the Securities and Exchange Commission has been sitting on this and not acting to get these investments sold or back in the hands of the investors, so each of the people sitting behind me can make his or her own decision about what to do with those

investments. Because of the fluidity of the situation, it seems most appropriate that the Court look to the things that are more certain and then square up both with intent and fact.

THE COURT: The Government want to respond?

MR. BELLISS: Just briefly, your Honor. We do submit to you that Probation's calculation for purposes of the Sentencing Guidelines enhancement that we're dealing with is correctly determined. It's a conservative estimate. We believe the Court has to come up with a reasonable estimate. This case and been difficult to, as Mr. Schwartz was saying, to determine exactly what the loss is in this case, but we believe the conservative figure calculated by Probation is the one the Court should use in calculating the enhancement.

THE COURT: Well, I don't think the parties disagree. The legal resolution of that is I have to make a reasonable estimate of the loss by a preponderance of the evidence. And the question is whether, in this particular instance, Probation's methodology in calculating the loss amount is reasonable, and in my view it is, and it results in a conservative loss amount. In essence, what the defendant is asking me to do is to limit the loss to the 2.2 million in management fees. And in my view that unreasonably limits the harm that Mr. Valente caused the

investors.

It's clear to me from the factual content of the presentence report, and I don't recall specifically whether all of the facts that I'm about to recite are recited in the presentence report, I believe they are, but in any event, they're in the information and they're in the plea agreement, facts which the defendant admitted. There's no question in my mind that having been barred by FINRA from engaging in essentially the business that he then developed, ELIV, starting it in his wife's name to hide the fact from financial regulatory agencies that he was about to engage in a fraud on more than a hundred people, to limit the loss amount to the 2.2 million would be unreasonable, and the reasonable figure Probation has reached, in my view, is the correct loss amount. Therefore, the Guidelines should be enhanced, as they are in the presentence report, by the plus 18 calculation.

That takes us then to the defendant's objection to the plus two that are added for the sophisticated means enhancement. I've read the parties' submissions in that regard, but I want to provide the parties an opportunity to supplement those submissions if they care to. Mr. Schwartz.

MR. SCHWARTZ: Nothing additional, your Honor.

THE COURT: Government.

MR. BELLISS: Nothing to supplement, your Honor.

THE COURT: All right. Mr. Valente notes in his objections and sentencing memorandum that in the addendum, Probation cites to paragraph -- this is with respect to the sophisticated means enhancement, which is found at paragraph 106 of the presentence report, the -- I note the presentence addendum cites to paragraph 110 incorporating 93, but sophisticated means is, in reality, in paragraph 105, and Mr. Valente's submission, docket 23, 3 and 7, he does the same thing. I'm not sure where the disconnect is, but we all recognize we're talking about sophisticated means in paragraph 106.

In that regard, the presentence report cites facts in support of the enhancement and uses the language including suggesting others. In other words, it's not an exhaustive list of those factors that support the sophisticated means enhancement, and here, the presentence report cites the creation of fictitious IRAs, which is clear, falsifying statements related to the creation and the rollovers of the IRAs, which is clear that Mr. Valente did so, creating falsified IRA documents that were sent to the Internal Revenue Service, clear that that happened, and then falsifying the spreadsheets sent to the SEC and falsifying account statements sent to investors. It's his argument that the enhancement does not apply because the comment in 2B1.1(b)(10) relates to execution or concealment conduct,

which was his argument, not essential, complex or intricate in this case. He argues that this is simply the conduct that forms the fraudulent basis of the three counts in the indictment to which he has pled guilty.

And then he argues that by applying that enhancement, it constitutes double counting, which is impermissible under the Guidelines.

The Government, in turn, responds that a normal fraud inevitably involves a defendant who routinely inflates the past performance of investments. That observation the Court concurs with, having handled these types of cases a number of times in the past. The Government argues, however, that Mr. Valente went further; he repeatedly made false statements to investors about the security of their investments and took innumerable steps to cover up the fraud. Unquestionably, he issued written, monthly, quarterly and annual statements containing lies about investment returns, the safety of the investment and such things as the existence of an auditor. He lies about his ability to accept, hold and manage IRAs, and the issuance of altered documents in an effort to deceive the IRS and the investors about the propriety of the IRAs. All of these things perpetuated his crimes, made them harder to detect, and further perpetuated the time frame in which the defendant could carry out his fraudulent behavior and

continue to escalate the losses to the victims. Based on those observations, it's my view that the enhancement is correctly scored and I so find.

That leads us then to paragraph 110, which is the plus two obstruction enhancement.

Does the defendant care to add anything to his sentencing submissions insofar as the obstruction enhancement is concerned?

MR. SCHWARTZ: Nothing supplemental, your Honor.

THE COURT: Does the Government wish to supplement anything?

MR. BELLISS: No, your Honor.

THE COURT: This, again, is paragraph 110, and it relates to whether or not there should be a plus two obstruction enhancement under 3C1.1 of the Guidelines. The PSR, at paragraph 110, relies on the conduct which is set forth in paragraph 93 to support the obstruction enhancement. In turn, paragraph 93 cites the bogus spreadsheet provided to the SEC and the fact that Mrs. Valente had Giaquinto change a figure in the spreadsheet to reflect that the investor account held assets of 10 million. And in turn, paragraph 93 cites paragraphs 61 and 70 for support of the assertion.

Paragraph 61 notes that the Felix Advisors provided a spreadsheet to Mr. Valente in March 2014 showing

the gross holdings by he and his wife as 3.25 million, not 10 million, all of which Mr. Valente was aware of in the SEC investigation.

The paragraph also notes other actions by Mr. Valente to fraudulently show an escalated value of the holdings and to remove the information showing that some of the holdings belonged to him and his wife, not the investors. Paragraph 70 notes that the FBI served Miss Giaquinto with grand jury subpoenas in early August of 2014.

Reviewing the submissions of the parties, I concur with the observations of Probation and the Government. Probation, in the addenda, notes that the Felix spreadsheet and the Giaquinto changes took place in the SEC civil investigation, but it is relevant conduct that forms the basis of the criminal investigation. As such, 3C1.1, note 1, provides, "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this Guideline if the conduct was purposely calculated and likely to thwart the investigation or prosecute the offense of conviction." 3C1.1, note 4(c), further lists "producing or attempting to produce a false, altered or counterfeit document or record during an official investigation or judicial proceeding" as an example of covered conduct. There's no definition of

official investigation requiring a criminal investigation and the SEC conduct evolved into the criminal investigation.

The Government further adds that Mr. Valente's conduct was clearly designed to induce the SEC to drop its investigation and forestall a criminal investigation. That's a logical conclusion that I believe is amply supported by the facts that are contained in the presentence report. Again, I note, the information alleges and the defendant admitted in his plea agreement and at the time of the plea that his criminal conduct occurred from December 2010 through June 16 of 2014. He further knew that as of April of 2009 he'd been barred from engaging in the business and conduct that forms the basis for the charges that are contained in the information. Thus, he well knew that his conduct after December 2010 was criminal. There's no question that the facts supporting the obstruction adjustment were designed to obstruct any investigation into his illegal conduct either by the SEC or other criminal investigating agencies, such as the FBI. It's clear to me, again, that the enhancement applies and I so find.

That leads us then to a resolution of Mr. Valente's objections to the calculation of the criminal history. That's found in paragraphs 120 through 122 and 124 of the presentence report.

With respect to paragraph 120, he argues that the

DWAI conviction for which there was no sentence of either probation or prison term should not score because the Second Circuit has determined that DWAI is not categorically included or excluded by the Guidelines and he cites *Potes-Castillo*, the Circuit's decision at 638 Fed 3d 106, at 110, a 2011 decision. Probation notes in its response to that argument that the Castillo -- *Potes-Castillo* decision was rendered at a time when there was a split in the Circuits concerning this issue, whether a DWAI alcohol-related driving conviction should count, and Probation points out that the Guidelines were subsequently amended to resolve that dispute, and at note 4A1.2, note 5, the Guidelines provide sentences for driving while intoxicated or under the influence convictions for driving while intoxicated or under the influence and similar offenses by whatever name they're known are always counted, without regard to how the offense is classified.

The Government did not respond to that argument, other than adopting Probation's calculation of the criminal history scoring. Does the Government want to add anything to this?

MR. BELLISS: No, your Honor.

THE COURT: Does the defendant want to add anything to this?

MR. SCHWARTZ: Yes, briefly, your Honor. It's our

position, in response to the Probation Officer's report, that this is a separation of powers issue. The Sentencing Commission cannot resolve a split in the Circuits. A higher court can resolve a split in the Circuits or the Congress can, but the Sentencing Commission cannot. This Court should follow the Second Circuit because that's the governing speaker to this Court about its behavior absent a Supreme Court decision or an act of Congress.

THE COURT: I have a factual question and I'm not sure the parties are prepared to address it, and I don't know that Probation is, but we'll see. In paragraph 120, there is one point added as a prior criminal conviction. It appears to me that on May 4 of 2006, Mr. Valente pled guilty not only to DWAI, but pled guilty to the misdemeanor of aggravated unlicensed second. Am I reading paragraph 120 correctly?

MR. BELLISS: I don't know that level of specificity, your Honor. I defer to Angela, if she knows.

THE COURT: Can you enlighten us, Angela?

PROBATION OFFICER: One moment, your Honor.

THE COURT: That's okay.

PROBATION OFFICER: Just double checking.

THE COURT: Take your time.

PROBATION OFFICER: Yes, your Honor, he pled guilty to both counts.

THE COURT: Which is also a misdemeanor. Wouldn't paragraph 120 score under that conviction, whether or not the DWAI related or not? What's defense say about that?

MR. SCHWARTZ: Actually, if that's correct, your Honor, yes.

THE COURT: Well, in any event, I recognize the argument you raise about the separation of powers and whether or not the Sentencing Commission guidance, which post dates the Circuit's decision, is binding on the Court. And I don't think I need to resolve that issue. I recognize your point and I don't declare it to be without merit, there's merit to the point. Nonetheless, I resolve the issue under both prongs that I've raised that it should score. The Circuit essentially leaves it to my discretion, and when I look at what should score and what shouldn't, I believe the alcohol-related offenses should score under the guidance which the Circuit provided in the case that you cite. And in particular, it should score, given the entire history of the criminal history here, which is not just the criminal convictions as they relate to alcohol. There are other episodes involved in those convictions that escalate the consequences of the alcohol-related behavior, but it's also the history of that behavior that persuades me that these things are correctly scored. Whether that history reflects the failure to abide by restrictions placed on him

as a result of the convictions, restrictions I'm referring to are things like the failure to abide by probationary sentences, the failure -- a conditional discharge imposed by a court is, in essence, a probationary sentence as well. In other words, when a Court imposes a conditional discharge in State Court, the first requisite is don't violate the law, local, state or federal; that's a matter of state law. So, in each of these things, there are the failure by Mr. Valente to abide by any restrictions on his behavior imposed by the Courts as a result of these convictions. But, in any event, as I already said, paragraph 120 would score, in any event, because of the aggravated unlicensed, which is a misdemeanor.

That takes us then to paragraph 121. Here, the conviction on April 20th of 2009, one is for DWAI and, in addition, speeding, so there was no contemporaneous misdemeanor conviction with this one. It appears to me that he was arrested on January 8th of 2008 for DWI, driving while intoxicated as a misdemeanor, was also charged with driving with blood alcohol content of .08 or more, which was a misdemeanor, and speeding. It appears to me on April 20th of 2009, the State prosecutors recommended a reduction of that misdemeanor charge to the violation of DWAI. He was never charged with a felony as a result of the second arrest for DWI, and he pled to the DWAI and speeding, received a

conditional discharge, fines and his license was revoked. I note that on September 27th of 2010, his conditional discharge was revoked and additional fines.

It's my observation from my review of the presentence report that the basis for the revocation of the original conditional discharge was his arrest on November 21, 2009, which is noted in paragraph 122, which is simply a continuation of the conduct that's reflected in the criminal history.

The defendant raises the same arguments about the DWAI, relying on the Circuit's decision in that regard, and I've already resolved that issue in connection with the preceding paragraph and resolve it in this paragraph in the same way. I believe the plus one under 4A1.1(c) is correctly scored.

That takes us then to paragraph 122, which scores as a plus two. Here, Mr. Valente was arrested on November 21, 2009, for DWI, once again as a misdemeanor. My view is that's common in the state system. The police at the time of the arrest rarely look back to the licensing restrictions and the prior history and charge a felony at the time of arrest. Again, he was charged with a blood alcohol content of more than .08, charged with aggravated unlicensed, operating while suspended and various traffic infractions. That amounts to one, two, three, four

misdemeanors he was charged with.

On June 6th of 2013, he pled guilty to DWAI as a misdemeanor, two or more convictions within ten years, that scores as a plus two and the Court notes that the defendant was serving a probationary sentence when he committed portions of the federal offense.

I don't denote any objections to that scoring by anyone. Am I correct?

MR. BELLISS: Yes, your Honor.

MR. SCHWARTZ: Your Honor, paragraph 122 we still maintain should be a one rather than a two because we believe, in effect, it was a suspended sentence.

THE COURT: I disagree with that assessment, I believe it's appropriately scored for the reasons I've already articulated.

123, the defendant was arrested on April 25th, again DWI as a misdemeanor, again more than .08 blood alcohol as a misdemeanor, aggravated unlicensed as a felony, aggravated unlicensed third as a misdemeanor and various traffic infractions.

On November 26, the state authorities allowed him to again plead to a misdemeanor offense DWI, aggravated unlicensed second. He was sentenced to three years' probation, a fine, license revoked. Probation was transferred to Albany. He violated probation by operating a

vehicle without an interlock device. That violation was filed in May of 2013. He pled guilty to that violation in September of 2013, and he maxes on probation on February 4, 2016. Probation notes, and the Court concurs, the defendant was serving a probationary sentence when he committed portions of the instant federal offense. That then scores in paragraph 123 as a plus one.

Does the defendant contest that scoring?

MR. SCHWARTZ: Nothing additional to our submission.

THE COURT: All right, same ruling, which leads us then to paragraph 124. In August of 2013, he was arrested for no interlock device, which was a misdemeanor, aggravated unlicensed as a misdemeanor, false impersonation -- he lied about his identity to the police -- as a misdemeanor and various traffic infractions.

In February of 2014, he pled guilty to the interlock device and, again, the Court notes he was serving a probationary sentence when he committed portions of the instant offense. I take it the defendant raises the same arguments the defendant has raised with respect to this one as well?

MR. SCHWARTZ: Yes, your Honor.

THE COURT: Which I resolve adverse to him, believing Probation correctly scored it.

That leads to a total of six points, which there is an additional two under 4A1.1(d) in that the instant offense was committed while the defendant was serving multiple state probationary sentences. Therefore, that's a total of eight points, and a criminal history category of IV. The Court finds that the presentence report correctly scores the Guidelines in that regard, both as to the total offense level and as to the criminal history.

That then takes us to, under the Circuit's guidance as to how we must proceed, the defendant's submissions insofar as they would constitute a recognized departure under the Guidelines. And here, I note two, I believe. Mr. Valente moves for a departure under 4A1.3(b), noting that his criminal history is overstated. His argument is is that the criminal history involved alcoholism and no jail time and such a record is atypical of those commonly found in criminal history category IV and warrants a horizontal departure because of his past history, which is indicative of alcohol dependence and not recidivism.

He then moves for a departure under 5H1.3, which deals with the mental and emotional history, and he argues that his mental and emotional conditions have compromised his judgment and caused him to avoid confrontation with people as bases for a departure from the Guidelines. So I see those two bases under the Guidelines as arguments for

departure.

Are there any others he's raising as arguments for departure? I'm not addressing variances.

MR. SCHWARTZ: Nothing additional with regard to departure, your Honor.

THE COURT: The Government have anything further to tell me about those departures?

MR. BELLISS: No, your Honor.

THE COURT: I'm satisfied that while those two sections do afford a basis for a Court to depart from the Guidelines, the facts of this case warrant no departure. As I've already noted, this view of Mr. Valente's past criminal behavior ignores the fact that he committed numerous misdemeanor violations, although associated with his penchant for driving while intoxicated. It also ignores his persistent disregard of court orders, conditional discharge and probation to obey the law. It also ignores the fact that his fraudulent behavior was designed to escape police detection. I'm hard-pressed to understand how a history of alcohol abuse justifies the fraud he imposed on more than a hundred people here and I don't believe that his criminal history is overstated in that regard. It reflects a penchant on his part for disregarding the law, just as his creation of ELIV in the first place ignored the fact that he'd been barred from the industry a year earlier.

In addition, while clearly there are mental and emotional conditions that are reflected in the presentence report and reflected in his sentencing submissions, none of those things warrant a departure here in light of the fraudulent nature of the conduct and the harm that he caused the investors, which is amply demonstrated in the victim witness statements which I have seen and reviewed. Therefore, I don't believe any departures are warranted and I decline to reduce the scoring on the basis of the departures.

What that leaves are the applications for a variance. And as I said at the outset of these proceedings, in my view, the arguments for departure, the arguments for variance overlap and typically are gonna result from a conversation by defense counsel and perhaps the defendant with me in anticipation of sentencing. So I don't propose to resolve those issues right now.

I think what we're better off doing at this point is for me to turn to those who wish to speak to me as victim or victim advocates. Then I'll hear from the Government about its view as to what's an appropriate sentence, incorporating any arguments it wants about variance or otherwise, and then I'll turn to defense counsel and the defendant.

So, I'm prepared to hear from the victim advocates

at this point.

MR. BELLISS: Your Honor, first the Government would like to present to you Mr. Pete Sigreto.

THE COURT: There's no magic to this, Mr. Sigreto. You just take your time, tell me whatever it is you want to tell me.

MR. SIGRETO: Well, your Honor, as I look around the courtroom, unfortunately I see a lot of familiar faces, they are faces of my friends, family who invested with the defendant. And how he went about investing was coming to our houses, talking to us, supposing to be our friend and, through word of mouth, friends told friends, relatives told relatives, and that's how he got his clientele.

Now, over the years, my grandparents were immigrants from the Ukraine and, on my father's side, immigrants from Italy. They came to this country, didn't speak English; they made a life, spoke English. They tried to provide more for their children and, vise versa, my parents tried to provide a little more for me, I tried to provide a little more for my kids and grandkids. And what I invested with him was my inheritance which my parents left me, which I was trying to use for a down payment on my son's house, education for my granddaughter. That now is all gone.

I am now retired, 60 years old, I worked for the

defense department for 26 years as the crazy person running into burning buildings as you people ran out. I was a paid fireman for 26 years. And now I'm to the fact that who is gonna hire a 60-year-old retired fireman for me to make up the money I lost with the defendant. By goin' back to work at this late age -- I mean, I had to retire early because of the strenuous job that I did for 26 years and now I'm gonna try and go back to work very shortly and make up for what I lost. Thank you. And on the last note, I just, like I said, would like the Court to impose whatever the -- what is it? -- appropriate sentence. Thank you.

THE COURT: Thank you, Mr. Sigreto.

MR. BELLISS: Your Honor, the Government would next present to you Ms. Cathy Conroy.

MS. CONROY: Good morning, your Honor.

THE COURT: Good morning.

MS. CONROY: I wanted to speak here today to show the Court we are real people, we are real victims. I am 59 years old and I have always been a single supporting person. I have worked my entire life. I have saved for both my personal savings as well as my retirement. I bought a house later on in my life and I relied on my retirement to pay off the balance of my home.

In 2013, I was laid off from my job of 37 years and I was devastated by that. But I realized, thank God, I

had always been able to put away and save for my retirement.

Then, in 2014, I met Scott Valente at one of his seminars and that's where he began his fraud and con on me as a victim. He stole from me at least half of my retirement and a good portion of my savings. He not only stole the money, what he did, he stole my past, my present and my future. My past of all the sacrifices I've made over all those years, he totally disregarded and just took 'em for his own greed. The present, I am filled with stress and anxiety and worry. What will happen in the next 30 years in my life as I try to provide for my own financial wellbeing, the lifestyle I've become accustomed to, which is modest, I don't overlive my means. The future is so uncertain, I don't have the security of having my full retirement and my full savings. I don't know what that will bring. As I age, will there be medical needs that I won't be able to attend to because of lack of funds anymore? I don't know.

Presently, I am also faced with tax bills, professional fees, to the tune of thousands of dollars right now that I'm trying to resolve with the Internal Revenue because of the fraud that he has committed. And again, my future is just filled with so much uncertainty. I am filled with distrust, anger. I am angry, angry, angry at that man. I am also angry with the Government that they couldn't put a stop to him before. With all his prior convictions,

somebody should have stopped that man in his tracks.

Your Honor, I ask that you sentence Scott Valente for the criminal he is to the fullest extent that he plea bargained for so that he stays in jail for years and years to come. He bestowed on all these witnesses a lifetime, a life sentence of despair and uncertain financial roads ahead of them. He should have to pay the price for that. I hope he is remanded today and walks out of here in handcuffs in front of all of us. He had the summer, from June until now, to put his affairs in order and to say his goodbyes to his family. We need to see justice done today. He shouldn't be given any extra time to con the whole system and to con all of us again.

I hope that the Bureau of Prisons sentences him to a prison far, far away from his family, so that he will only know isolation and loneliness for the term of his sentencing. I also hope that when he is in prison that he is not put in with just white collar criminals, that he is in the mix of people, so that every day he knows he'll be lookin' over his shoulder, who is going to steal from me, who could possibly assault me. I want him to be filled with fear the way that we are all fearful of our futures.

Thank you, your Honor, for the opportunity to address this Court. And again, I plead with you, give him the maximum allowed that you can give him today under the

plea agreement. Please give us justice today as we have waited so long and have needed to hear today. Thank you again.

THE COURT: Thank you.

MR. BELLISS: Your Honor, Ms. Carol DiBenedetto would like to speak on behalf of her mother, Rita.

MS. DiBENEDETTO: Thank you, your Honor, for the opportunity to speak with you today. I am Carol DiBenedetto and I'm here to speak with you on behalf of my mother -- I'm sorry, I was really affected by the last victim -- on behalf of my mother, Rita DiBenedetto, a victim of Scott Valente's fraud. And Rita's in the red sweater (indicating).

THE COURT: I see you, Rita.

MS. DiBENEDETTO: I'm sorry?

THE COURT: I was tellin' your mother I see her.

MS. DiBENEDETTO: Okay. My mother, Rita, the 85-year-old widow of her beloved husband, Gene, was systematically swindled out of her life savings by Scott Valente, the son of her long-time friends. Shortly after my father suffered a massive stroke and heart surgery which left him paralyzed, cognitively challenged and bound to a wheelchair for the rest of his life, Scott began stealing from my parents. As my mother struggled with her husband's illness and the challenges of full-time caretaking and running the household --

THE COURT: Hang on just one minute. You're objecting? The objection is overruled. Continue, please.

MS. DiBENEDETTO: Scott Valente preyed on their vulnerability. Valente took advantage of their troubled situation, pretending that he wanted to help, pretending to act in their best interest as a financial advisor and a reputable investment firm, while, in fact, choosing to defraud my parents out of their retirement nest egg.

Unbelievably, Valente continued to steal from them despite being fully aware that my father was diagnosed with terminal cancer and my mother was diagnosed with mild cognitive impairment, masking it all by sending flowers and visiting the hospital during my father's last days, attending my father's funeral and visiting my grief-stricken mother after my father's death. Scott Valente's amoral behavior, his crimes and deception, have devastated my mother, both financially and emotionally. In my mother's own words, she's endured many sleepless nights and worries everyday.

For the past year-and-a-half, my mother has been forced to live within a pitifully-tight budget, scraping by Social Security check to check and is in constant stress and fear of losing her home of 52 years, a home my parents built together and where they raised their two daughters, including me, me and my sister.

My mother's trust in other people has been shaken and her contact with close friends, Scott's parents, has been completely severed. Valente's scams, lies and negligence also caused unbearable administrative burdens, including onerous IRS and state tax notices, lapsed insurance policies, overpaid and possibly unrefundable income and property taxes, unpaid bills, late fees and penalties and complications associated with his tampering with my mother's estate plans and power of attorney.

We live in fear of the wide-reaching fallout from Valente's thievery, which continues to surface seemingly every day. After an arduous discovery process, we now know that Scott Valente stole my parents' entire nest egg from 2008 to '11. Using precisely the same patterns of theft from earlier years, he stole about one-third of the total during the four years that he pretended to run a reputable investment firm. Shockingly, he stole from my parents while under the watch of long-established financial institutions by very obviously forging checks, writing over the "paid to" line and depositing them into his personal accounts. Perhaps most heartbreakingly, my mother struggles every day with her grief, emotional anxiety and feelings of vulnerability and insecurity associated with these consequences of Valente's crimes. Scott Valente has single-handedly destroyed the sense of security, peace and

quality of life that my mother should be entitled to enjoy in her retirement. Scott Valente fully intended to take advantage of a struggling family and a tragic situation.

We ask that the Court consider giving Valente a sentence commensurate to the financial and emotional consequences caused by his unconscionable elder abuse. In my mother's own words, an appropriate sentence would be a life in prison. As a witness to the devastation that has happened and continues to unfold, I agree -- I just added that this after learning -- I fully support that he should be remanded today. Finally -- or we, we, me speaking for my mother and I.

Finally, because the lion's share of my mother's losses occurred during 2008 and '9, and because these thefts were identical in methodology to those in subsequent years of 2010 and '11, we respectfully request that my mother's total financial loss be considered over the full term of Valente's thievery for restitution and not be limited to the cutoff date proposed for this case.

Thank you again for your time and consideration.

THE COURT: Thank you.

MR. BELLISS: And finally, your Honor, if Miss Carpenter is here. Miss Carol Carpenter.

MS. CARPENTER: Thank you, your Honor, for allowing me to speak to you today. Hi, my name is Carol

Carpenter and I'm speaking on behalf of myself and my husband, John Deo. I'm 65 years old and disabled now with severe arthritis, fibromyalgia and many other side effects of the many eye surgeries and now the loss of my eye after 20 surgeries.

My husband and I have both worked hard for many years with the assumption we had planned for our future retirement. I have been self-employed for over 37 years, which means I had no pension other than what I set aside in my IRA account or invested. Many years I grossed over a hundred thousand dollars in business expenses which allowed me to make sizeable contributions to my future retirement. My husband had previously rolled his pension and invested his accident settlement with Scott.

In addition to my own self-employment, some of those years I worked for Scott at PKS and then at ELIV. We trusted him so much and talked with him about many things. He even did our taxes. In fact, when my mother died last June 2, 2014, he was among the first people that I called. I then had major eye surgery the next day, stitching my eye totally shut. In addition, I was handed a copy of the newspaper article stating U.S. Securities and Exchange Commission accusing Scott as a stockbroker and duping investors out of 8.8 million over the past twenty years. I was totally shocked with all of this. While working with

PKS -- or with Scott at PKS, the news of Bernie Madoff broke and the tremendous financial damage he did to many people. None of us could believe, even Scott entered in the discussions of what he did, and now Scott has done it to me and to all of us.

Now both my husband and I have to continue and work when we should both be retired. My husband, now 72 years old, has to work until he's 86 to qualify for his pension, and now I, with only one eye, find it very difficult to do most kinds of work. No matter how long we continue to work, we'll never be able to get back to where we were.

Now we have to make decisions about every expenditure we make; otherwise, we can't afford what we absolutely need. And I am currently living on my Social Security of $841 a month, which is what I qualified for now because I had to take it early. Anytime there is a discussion about money, I end up crying because of the stress of having no savings or no money. I couldn't afford the weekly trip to the New York City eye specialist for the necessary treatment that could have probably saved my vision and my left eye. The one weekly trip we did take cost us $200 with only one meal at a cheap diner and no extras. The medical bills would have been covered by our insurance and this was after 16 emergency surgeries by my local and retina

specialist in the last three years. Since seeing the New York City eye specialist, I've had four more local emergency surgeries with the final result being no possible future in my left eye. The medical opinion is that the stress of the last year-and-a-half has not helped the healing process. In addition, the stress of all of this has caused me to be unable to sleep at night and finally crash around five or 6:00 AM and getting up around 1:00 PM and ruining most of the day. All this stress and no money anywhere has caused constant fighting between my husband and I.

Regarding the amount of sentencing I would recommend, I would recommend the full 20 years of jail time so that other people doing the same thing will see you don't get off without paying the penalty. However, if Scott was able to pay us all back at least our invested amounts, I would be amenable to a reduced sentence. No one can truly understand how this feels until you're the one who is devastated and left with nothing.

Thank you, your Honor, for allowing me this opportunity.

THE COURT: Thank you. Mr. Belliss.

MR. BELLISS: Your Honor, with respect to the two remaining arguments posed by the defense counsel, the Government will rely on submissions to you.

With respect, briefly, just for the sentence that

the Government seeks here, it is a severe sentence that the Government seeks, your Honor, but it is warranted by the defendant's conduct. As the Court is aware, there are many different ways to steal money from people. Mr. Valente's method of stealing money from people was particularly insidious because he used personal trust built up through personal relationships and that of the relationships his parents established with many of the folks who are seated in the gallery of your courtroom. He used that trust to convince people to give him what were their life savings, either for retirement or their grandchildren or their children's educations, and he took those moneys and he lived what was a very rich and lavish lifestyle for the 42 months that the ELIV company was in business. And the only reason he came to an end in that, your Honor, is because the SEC commenced its investigation in early 2014 and, obviously, the criminal investigation followed shortly thereafter.

You have heard from four victims who have spoken today, as well as the fifty some odd victim impact statements that you have, that the financial impact on these victims is, in fact, devastating. Many of the financial impacts have spilled over into physical ailments from the stress, the anger and the emotion. The broken trust that Mr. Valente has committed and perpetrated on all the victims in this case, your Honor, warrants the sentence that the

Government seeks. Thank you.

THE COURT: Before you stop, I certainly recognize the number of folks that are here who are victims, and I certainly recognize the difficulties the Government labors under, and I see your Financial Litigation Unit here, I know they're aware of that. I take it you have discussed with the victims the limits of the Court's power insofar as restitution is concerned as it reflects the charges to which Mr. Valente has pled guilty to?

MR. BELLISS: We have, your Honor. We've attempted to explain our methodology. And as you heard from at least Miss DiBenedetto, not every victim concurs with our recommendations, but that is the recommendation that we believe as the Government we can support based upon the criminal conduct for which this defendant stands convicted.

THE COURT: And you have explained to them the limits of the law as it relates to restitution and the charges that are contained in the information?

MR. BELLISS: We have, your Honor.

THE COURT: All right. Thank you.

(People in the courtroom are saying, "No.")

THE COURT: Well, I'll address that in a moment, folks. Go ahead.

MR. SCHWARTZ: Thank you, your Honor. Before I

get to my general argument, one housekeeping issue to make sure the Court has covered it. When your Honor affirmed or granted the enhancement with regard to obstruction of justice, we made two arguments: One was that it wasn't part of the criminal investigation; therefore, he could not have known he was obstructing the criminal investigation. Your Honor ruled on that part. If I'm wrong, please forgive me. The second argument that we made, your Honor, was that because the basis for the obstruction of justice was also a basis for the sophisticated means enhancement, a comment in the Guidelines prohibits the application of the obstruction of justice application as well. For the record, your Honor, we maintain that and we ask for a ruling on that.

THE COURT: If I did not make it clear, I emphasize the language in the presentence report that said, among other factors, it was, and I know it's a part of your argument that you can't simply remove reference to a spreadsheet or something else from an original PSR and then rely on other factors, that was part of your argument, all of which I reject. My ruling is is that there are ample instances of obstruction that are contained in the presentence report as I've already defined.

While I believe he fully understood what the consequences of his actions were, in terms of any investigation that would flow, I believe that was a part of

the fraudulent conduct from the day he created the organization from which he took the investments, which is why he hid it in his wife's name, fully understanding he couldn't engage in the business he was about to engage in. So his conduct was fraudulent from the outset, and the other factors that are cited in the presentence report are sufficient to constitute the obstruction enhancement.

MR. SCHWARTZ: Very well, your Honor. The second housekeeping matter is with regard to the investor testimony this morning. While, of course, the defense recognizes and respects Rule 32 and 18 USC 3771, which requires the Court to permit the opportunity for people who assert themselves to be victims to speak, it's our position that the Court may not consider this in sentencing because it's not evidence. It's not evidence because it wasn't given under oath and it's not evidence because it wasn't subject to cross-examination. If the Court is going to make that a consideration and treat it as evidence, so to speak, we would ask that the defense be permitted to submit two FBI 302 reports, one from Miss DiBenedetto and one from Miss Carpenter, which tell a slightly different version of events that the Court can use to weigh, if the Court decides that what was said is, in fact, evidence.

THE COURT: Well, I'm not certain what the basis of your application is. I didn't hear anything from any of

these folks that isn't included in the victim witness statements that are a part of the addendum attached to the presentence report. The basis of the objection, as I understood it, that you made to Miss DiBenedetto's statements to me here this morning have to do with the breadth and scope of the theft of the money from her family, which exceeds the amount attributable to the conduct to which he's pled. That's an issue I intend to discuss at the appropriate time, in terms of restitution, and was the function of my question of the Government so that I could adequately address that at the appropriate time.

So, to the extent that there are things which are said here this morning, it's always appropriate for me to hear from the victims, that's the whole function of the Crime Victims Act that Congress has interposed, an act that I admire Congress for passing, I totally agree with it, victims should have a right to speak. I, of course, rely on what's contained in the presentence report and the factual assertions in there that must drive any sentencing decision I must make. Some of what they said is in there.

Any further record you want to make in that regard?

MR. SCHWARTZ: Yes, your Honor. Respectfully, there's an FBI 302 that was produced by the Government pursuant to our request and in a timely fashion that

suggests that Miss Carpenter told the FBI agents that she did not feel misled by Mr. Valente, and if the Court is gonna consider her statements that she does feel misled now, when she was interviewed by --

THE COURT: You had an opportunity to submit anything to me for purposes of sentencing that you cared to. I decline to open the record in that regard.

MR. SCHWARTZ: Very well, your Honor.

Your Honor, with regard to our general argument, if the Court accepts the totality of the Government's position today, Mr. Valente will leave the federal prison system when he's 78 years old with a debt to investors of $8.2 million and restitution on top of that of $10.5 million civil judgment. The sum total of that makes this a terrible day. It's a terrible and unfortunate day because it's going to be, even when Your Honor leaves the bench, a day of unsolved and unresolved problems. Now, these problems all 100 percent and entirely were caused by Scott Valente, there's no question about that. But whether Your Honor imposes a 20-year sentence or not, the investors are not gonna leave here today having recovered all their money or having -- or having an anticipation of recovering all their money and they're not going to leave here today having received any relief from the Internal Revenue Service for penalties they're not responsible for because they are the

result of the conduct of Mr. Valente. The maximum sentence is not going to change that.

The problems that I've identified are not fixed by sending Mr. Valente to prison for 20 years rather than the six to nine years we recommend. Twenty years rather than six to nine years means Scott will never work a day to earn back money to pay any restitution in any significant way. Twenty years rather than six to nine years means that the taxpayers, including the ladies and gentlemen behind me, will shoulder the cost of paying for Mr. Valente's aging and his infirmity. The 20 years rather than the six to nine years will mean that Elaine Valente will be faced with the choice of being alone or abandoning Mr. Valente. The 20 rather than the six to nine years means that his parents will die with their son in prison. And most importantly for purposes of 18 USC 3553, your Honor, the 20 rather than the six to nine years will completely undermine the role the Guidelines are supposed to play in the federal criminal justice scheme.

For as long as I've been involved with Scott, he has done everything he could to speed the process of financial recovery to the former ELIV investors. He confessed judgment in the SEC case. He entered a guilty plea in this case, accepting the counts proposed by the Government. Your Honor, if I turned around and asked the

investors if they wanted Scott to go to trial and for this day to come not now but 12 months from now, after Scott tried the case and incurred greater costs with this Court, in terms of its resources and in terms of the availability of the Justice Department pursuant to their cases, no one would raise their hand. They want this to happen today. Scott gave that up, in part, to speed the process of return of what's available to the investors he worked for.

And while this sentencing will, in fact, begin to speed the process of any financial recovery, the Court should know and the ELIV investors should know that they did not have to wait for today for that process to happen.

We've outlined, I think very clearly but succinctly, in our sentencing memorandum that the SEC, frankly, has avoided dealing with distribution. They would not take money out of the seized assets in order to finish the independent accounting they asked for. They kicked the can down the road once they found out that the Justice Department was close to executing a plea agreement with Mr. Valente, even though they had an order and a confessed judgment in place and all the assets in their hands. They have not distributed funds that are in the coffers of the Clerk of the Southern District of New York for the $72,000 proceeds from the house in South Carolina and $60,000 proceeds from the sale of the house in Guilderland. None of

that has been distributed to the victims. And the Justice Department respectfully has just abandoned its claim on the proceeds of the South Carolina house. So that money is sitting there.

And frankly, your Honor, if you were to ask the investors sitting behind me, or a number of them, whom they were more in touch with over the last year to get information about what was going on, me and my colleagues and my law firm or the Security and Exchange Commission lawyers, it was our law firm. They weren't getting information, they weren't getting their money back and the SEC was sitting on this. And so, to the extent that they are looking to today as a panacea, as a thing that's going to get the justice that the witnesses ask for today, they don't need Scott to get the 20 years to advance their interests any further than they would if Scott were given the six to nine years that we're suggesting is more appropriate.

As for the length of sentence, we'll rest primarily on our briefs, but we'll add two things. Because the Government is asking for 240 months, they're essentially giving no credit for the acceptance of responsibility and entering of a guilty plea that Scott consummated. As I said, a trial would be costly to the taxpayers and would have delayed today ultimately. That means there's no

incentive in the Northern District of New York for someone like Scott Valente, who was clearly identified as committing criminal conduct and assiduously and carefully tracked and caught by the FBI. There's no incentive for him to plead guilty because, as a result of piling up the points under the Sentencing Guidelines, it viscerates any reduction or offset for acceptance of responsibility and cooperation and the cooperation we particularly outlined in our sentence.

And we have two words to address the issue of variance, your Honor, under sentencing disparities, and that's McGinn and Smith. This Court, sitting in Utica, looked at two defendants after they went to trial, after they delayed the complaining witnesses' day of justice for them, and they received sentences of 15 and 10 years respectively for a $99 million fraud where 900 victims were involved. If the Northern District of New York is going to scale or identify and respect that 18 USC 3553(e)(6), sentencing disparities variance, and the notion of having a nationwide scale essentially upon which white collar securities fraud defendants are placed, the sentence today has to respect or take into consideration what happened after McGinn and Smith went to trial instead of pleading guilty and after they were convicted with defrauding many more people for much more money.

With regard to the civil money judgment, and I

want to recognize that Mr. Belliss has been incredibly forthcoming and cooperative in all aspects of the negotiations and providing of discovery, Mr. Belliss and I have had a slight disagreement that we'd like to -- I'd like to make a record about. The information at page 8 imposes the forfeiture, civil money judgment forfeiture under 18 USC 981(a)(1)(C). It's our position, and I don't want to mischaracterize the Government's position, but it's our position that (a)(1)(C) does not cover any of the crimes charged. In conversations with Mr. Belliss, he has submitted that 18 USC 981(a)(1)(C) references the money laundering statute and specific unlawful activity, and it says in any specific unlawful activity as described in the money laundering statute, which is 18 USC 1956, in the definition section is covered because the money laundering statute then turns and adopts the RICO standards or the RICO definitions --

THE COURT: Did you raise any of this argument in your sentencing submissions?

MR. SCHWARTZ: I didn't, your Honor, because I saw the 981 issue --

THE COURT: How am I gonna resolve somethin' like this when you're throwin' it at me at 12:25 into a proceeding that started at 11 o'clock and you never saw fit to present it to me before?

MR. SCHWARTZ: I didn't see fit to because I recognized it yesterday, I asked Mr. Belliss about it and I want to make a record that this is an outstanding issue. I think Mr. Belliss may be correct, but I want to make sure that this record is made. The issue is we don't think 1341 is covered because it's not part of racketeering activity and not specifically identified in --

THE COURT: And this argument relates to what, a civil judgment that's part of the forfeiture allegation?

MR. SCHWARTZ: Yes.

THE COURT: The $10 million concession in the plea agreement that you would enter that judgment?

MR. SCHWARTZ: Yes, your Honor.

THE COURT: You're now reneging on the plea agreement?

MR. SCHWARTZ: No, your Honor. The problem is it says 981(a)(1)(C). When I looked at it, I went and read the statute again last night, I immediately contacted Mr. Belliss and raised the issue. Subject to further review at the time the money judgment is executed, there is a question about it. Mr. Belliss has his position, we're making a record of ours.

THE COURT: Okay.

MR. SCHWARTZ: That's all. Finally, with regard to restitution, the $8.2 million as was asserted before in

our submissions needs to be offset and should be offset for the money that was -- the value of the investments and any money that was recovered.

And those are our two arguments with regard to restitution and outstanding funds.

THE COURT: Thank you. Mr. Valente, you have the last word. You're not obligated to speak. Would you like to speak?

THE DEFENDANT: Yes, your Honor.

THE COURT: Please, go ahead.

THE DEFENDANT: I would like to apologize to the Court. I would like to make a statement to everyone that I have harmed. I can't even begin to find the words to tell all of you how truly, truly sorry I am. I started out with good intentions, but I lost my way and started doing things with your money that I knew was wrong, then I lied to myself and to other people about what I was doing. When I realized how much harm that I caused to each one of you who trusted me, I should have stopped and admitted what I had done. Instead, I covered up my lies and I created false documents.

I have no excuse for what I did. I was greedy and I was selfish and I was thoughtless. I harmed my mom and dad, who have always been there for me all my life. I harmed my sister and her husband, Richard, and my nephew, Michael, and my niece, Erin. They will never be part of my

family. My wife trusted me and I hurt her as well. I caused harm to the person who I love with all my heart and soul. I harmed my friends and neighbors. I am very sorry to my children and my two granddaughters, and I should have followed -- I should have followed my heart and the Commandments and none of this would have happened to anybody if I just followed those easy things, steps to do.

I am so sorry for making everyone suffer. I will pray every day for each of you as I have been over the last year praying. God willing, if I can come home early, I can make restitution, I will work, and I will make restitution.

I am ready to accept my punishment and I -- and I please, please, please, please ask for your forgiveness, I please ask for forgiveness. That's all.

THE COURT: Thank you. Let me offer a coupla comments to the victims, first, who I know are here in the courtroom.

I'm reminded of a TV show I used to watch when I was a youngster, and I'm much older than most of you, so you won't even recognize the TV show, it used to be called, "The Naked City." It was about New York, and it always started with, "There are nine million stories in this city." Well, there are more than a hundred stories out there from those of you who've been victimized by this conduct. You're not all the same. The circumstances are not all the same, the

anger is not the same in every degree, the harm is not the same in every degree, but it all overlaps, and you're all victims of criminal behavior.

I know you want your money back, but you must accept that the Government has limits to its authority, in terms of what it can do here. It is limited by the nature of Mr. Valente's admission to the crimes that are charged here. He ran ELIV for 42 months. That's the conduct that he's pled guilty to, which is taking your money, based upon false representations, over that 42-month period. In terms of my authority to order restitution and the Government's authority to enforce that order of restitution, that order of restitution has to be limited to the criminal conduct that's in front of us right now. Ya can't go back to fraud that may have been committed earlier or fraud that may have been committed later. I'm not tellin' ya that there isn't recourse, in terms of that fraud; there may or may not be. But there isn't in this proceeding. This proceeding is limited to the conduct to which he's pled guilty, it's a criminal case in that regard.

I have nothing to do with the Southern District of New York, the SEC and whatever civil litigation is pending in the Southern District of New York and the federal judge that is overseeing that civil litigation. I'm sure the Government is in consultation with those folks and it will

do what it can to orchestrate the restitution award that I'm gonna make in this case. But understand that there is not gonna be, in the end, the assets that are gonna pay back all that you have lost, it's not gonna happen, because I've seen these cases a thousand times and some of those assets have been dissipated; they have been dissipated in condos in Vermont, they have been dissipated in home improvements to the tune of $443,000, they have been dissipated in jewelry that the defendant's wife is wearin', they have been dissipated here and there, and the Government will do everything it can to rally those assets and pay you back as equitably as they can. That's all I can say about the restitution.

But there's somethin' else I want to comment on, too. I've read every one of those victim statements that were submitted to me and there's always a common theme that I see in victim statements in every kind of crime, not just financial crime, and that is, victims tend to point the fingers inward. How could I have been so stupid that I didn't check him out? How could I have been so stupid that I relied on his relationships with family and friends that one or more of you have? You look in the mirror and you call yourself stupid because this happened to you. Please, please, don't do that to yourselves. You're not stupid. You are victims of crime. There's only one person who's

principally responsible for the harm you suffered and he's sittin' right over here, and it's not you, so don't beat up yourselves over what's happened to ya.

The question for me is what is a reasonable sentence in light of the facts that are before me, and in assessing that, I have to be guided by my evaluation, which I am, of the presentence report, the addendums to the presentence report, the submissions by the parties, the Sentencing Guidelines, and the factors, sentencing factors, that are outlined in federal law, Title 18, Section 3553. I have taken all of those things into consideration in arriving at a sentence which I believe is fair and reasonable.

As I have already said, at one time or another in these proceedings, Mr. Valente, you continue to defraud yourself just as you have defrauded these more than 100 people. I hear you again today, as I heard you in the presentence report when you talked to Probation. "I never intended to hurt these people." That's a deception of yourself. That is a deception that says I thought this would all work out great, and I would take their money, generate these great profits and make their lives just wonderful. Well, if you really thought that, you would not have created ELIV, in your wife's name, hiding your identity, knowing full well that you'd been barred from this

kind of behavior by the financial regulatory agencies before you ever created the organization. If that were true, that you had their best interests in mind, there wouldn't be $230,000 cash withdrawals from you and your wife's account, there wouldn't be $443,000 in credit card purchases, there wouldn't be two condominiums in Vermont, there wouldn't be $35,000 worth of jewelry, there wouldn't be $424,000 worth of home improvements, $29,000 worth of mortgage payments and $20,000 in liquor purchases. Instead, the money would have gone to the best interests of these folks, instead of the best interests of you and your wife.

This was a fraud from the outset and when you look at that, in my view, this sentence must reflect the seriousness of this offense, it must promote respect for the law, it must provide just punishment and it must serve to deter similar criminal conduct that's committed by others.

I concur with the Government's observations in its sentencing memorandum. In 1989 (sic), you were barred from the broker/dealer industry after making unauthorized, excessive and unsuitable trades. Within a year, you created ELIV through your wife's name, as a nominee, a new investment firm that was never registered with the SEC, FINRA or any other regulatory agency. Ya then lied to more than a hundred investors for 42 months about the returns you were generating, the security of their investments and the

tax consequences that then resulted from your actions as you solicited more than $10 million.

In the meantime, you were spending the money as I just outlined. The mental, physical and emotional toll to these folks is incalculable. I hope, as your attorney indicated to me, you have read that entire presentence report, which includes that stack of victim witness letters that are contained in it. One of the most cogent observations I heard, I heard it this morning, but it's in the presentence report, is you were confronted with the notion "are you a Bernie Madoff," and you denied that you were, when, in fact, you are.

But probably one of the most cogent observations I read is this, and I'm not attributing this to anybody in particular, I am not gonna drag them through this proceeding. "I asked how this can be considered a white collar crime? Is it because there's no physical violence in the act of committing these crimes? As a victim of Scott Valente's crimes, I'll tell you there certainly is violence. He used the tip of his pen just like a knife to hack away and destroy my wellbeing, my hopes, my dreams and my financial future. Along with the financial devastation, he has left me full of distrust and anger and anxiety that I will never recover from."

That observation, while not said by many, is felt

by every one of them. You have destroyed lives here, you have caused physical, emotional harm.

It is my sentence that a guideline sentence, as I have found the guidelines to be, is a reasonable sentence. I concur with the Government's recommendation. I hereby sentence you to 240 months on each of Counts I and II. I sentence you to the maximum three years on Count III to be served concurrently.

I sentence you to a period of supervised release of the maximum of three years. I do so under the general conditions that have been adopted by the district and I impose the special conditions, eight in number, which I have supplied you in writing.

In addition, I order restitution. In light of my evaluation of the finances contained in the presentence report, I find that you have the ability to pay it, to the extent that I've already discussed what assets may be available to do so.

I incorporate in the language of the payment the recommended language that the Government has supplied me in docket number 31, which is a substitute for the language that's contained in the Court Exhibit that I supplied you this morning. As a consequence, I'll recite it. "The defendant, Scott Valente, shall pay restitution in the amount of $8,200,579.69, which is due and enforceable by the

U.S. Attorney's Office against any of his assets, including assets discovered during the investigation and those assets currently subject to a court order freezing the ELIV Group LLC's assets, referencing SEC v. Valente, 14-Civil-3974, Southern District of New York, with any remaining restitution payable in monthly installments of $25 or 10 percent of his gross monthly income while incarcerated and, upon his release, in minimum monthly installments of 25 percent of his gross monthly income until restitution is fully paid. Until restitution is fully paid, the defendant is restrained from transferring any asset with a value of $2500 or more unless it is necessary to liquidate and apply the proceeds of such property to his restitution. If, at any time, the defendant has the ability to make full or substantial payment toward restitution, he shall do so immediately. Any restitution is to be made payable to the U.S. District Court and forwarded to Clerk, U.S. District Court, Post Office Box 7367, 100 South Clinton Street, Syracuse, New York, 13261, for transfer to the victims.

Because of the restitution order, I impose no fines or other costs in connection with this sentence. That would divert money away from the victims and I elect not to do so.

I do impose the special assessment of $300, but I remit that so that it is not due and owing, even as little

amount as $300 should go to the victims, it should not go to the federal government.

I order the forfeiture as outlined in the plea agreement and the preliminary order of forfeiture, consistent with any substituted language that the parties concur that I should incorporate in the judgment insofar as the forfeiture is concerned. I say that because I recognize the Government has supplied me some concessions that certain property that's contained in the preliminary order of forfeiture either the issues have been resolved or it's no longer available. And to the extent the Government and the defendant can resolve their issue over the language or reflect whatever it is that you would like me to incorporate in the judgment insofar as the forfeiture is concerned, I'll resolve it at that time.

You have waived your right to appeal, Mr. Valente, any sentence of 210 months or less. I have imposed a greater sentence. You should discuss the waiver of appeal with your attorney, it has certain consequences insofar as your plea of guilty is concerned, reserves certain rights to you in terms of your sentence, and I know Mr. Schwartz would be happy to explain that to you and file any notice of appeal you elect to file. Any appeal you file must be filed within 14 days of the date judgment is entered.

Is there anything further on the part of the

Government?

MR. BELLISS: No, your Honor.

THE COURT: Anything further, Mr. Schwartz?

MR. SCHWARTZ: No, your Honor.

THE COURT: Consistent with this judgment, I remand the defendant to the custody of the marshals.

(This matter adjourned at 12:44 PM.)

\- - - - -

CERTIFICATION OF OFFICIAL REPORTER

I, THERESA J. CASAL, RPR, CRR, CSR, Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 11th day of March, 2016.

**/s/ THERESA J. CASAL**

THERESA J. CASAL, RPR, CRR, CSR

FEDERAL OFFICIAL COURT REPORTER

AO 245B NNY(Rev. 09/12) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Northern District of New York

UNITED STATES OF AMERICA
V.

Scott Valente

**JUDGMENT IN A CRIMINAL CASE**

Case Number: DNYN115CR000124-001

USM Number: 21860-052

Joel D. Schwartz and Russell D. Duncan
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
301-230-5200
Defendant's Attorney

**THE DEFENDANT:**

x pleaded guilty to count(s) 1, 2, and 3 of the Information on May 11, 2015.

☐ pleaded nolo contendere to count(s) ______ which was accepted by the court.

☐ was found guilty on count(s) ______ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 U.S.C. §§ 78j(b); 78ff | Securities Fraud | April 1, 2014 | 1 |
| 18 U.S.C. § 1341 | Mail Fraud | June 2014 | 2 |
| 26 U.S.C. § 7212(a) | Obstructing and Impeding the Internal Revenue Laws | May 2013 | 3 |
| 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 | Forfeiture Allegation | | |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed in accordance with 18 U.S.C. § 3553 and the Sentencing Guidelines.

☐ The defendant has been found not guilty on count(s) ______

☐ Count(s) ______ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 20, 2015
Date of Imposition of Judgment

Gary L. Sharpe
Gary L. Sharpe
U.S. District Judge

November 20, 2015
Date

AO 245B NNY(Rev. 10/05) Judgment in a Criminal Case
Sheet 2 Imprisonment



DEFENDANT: Scott Valente
CASE NUMBER: DNYN115CR000124-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

240 months on each of Counts 1 and 2, and 36 months on Count 3, all counts to run concurrently, for a total term of imprisonment of 240 months.

☐ The court makes the following recommendations to the Bureau of Prisons:

x The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ______________ ☐ a.m. ☐ p.m. on ______________ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on ______________ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______________ to ______________

at ______________ , with a certified copy of this judgment.

______________
UNITED STATES MARSHAL

By ______________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Scott Valente
CASE NUMBER: DNYN115CR000124-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:

3 years on each of Counts 1, 2, and 3, terms to run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

x The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

x The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Deselect, if inapplicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, import, or manufacture any and all controlled substance and all controlled substance analogues, as defined in 21 U.S.C. § 802, and any paraphernalia related to any controlled substances, except that possession and use of a controlled substance properly prescribed by a licensed medical practitioner is permitted;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement;
14) the defendant shall not possess a firearm, destructive device, or any other dangerous weapon;
15) the defendant shall provide the probation officer with access to any requested financial information; and
16) the defendant shall submit his or her person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by the defendant. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

DEFENDANT: Scott Valente
CASE NUMBER: DNYN115CR000124-001

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program for substance abuse which shall include testing for use of controlled substances, controlled substance analogues, and alcohol. This may include outpatient treatment as recommended by the treatment provider based upon the defendant's risk and needs. The defendant may also be required to participate in inpatient treatment upon recommendation of the treatment provider and upon approval of the Court. The probation office shall approve the location, frequency, and duration of outpatient treatment. The defendant shall abide by the rules of any treatment program which may include abstaining from the use of any alcohol. The defendant shall contribute to the cost of any evaluation and/or treatment in an amount to be determined by the probation officer based on the defendant's ability to pay and the availability of third party payments.

2. The defendant shall participate in a mental health program which may include medical, psychological, or psychiatric evaluation and outpatient treatment as recommended by the treatment provider based upon the defendant's risk and needs. The defendant may also be required to participate in inpatient treatment upon recommendation of the treatment provider and upon approval of the Court. The probation office shall approve the location, frequency, and duration of outpatient treatment. The defendant must abide by the rules of the program which may include a medication regime. The defendant shall contribute to the cost of any evaluation and/or treatment in an amount to be determined by the probation officer based on the defendant's ability to pay and the availability of third party payments.

3. The defendant shall refrain from the use of alcohol and be subject to alcohol testing and treatment while under supervision.

4. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

5. The defendant shall participate in a program of financial and credit counseling. The program shall be approved by the United States Probation Office.

6. The defendant shall apply all monies he receives from any income tax refunds, lottery winnings, judgments, and/or any other anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

7. The defendant shall pay all taxes, penalties, and interest due the Internal Revenue Service, and the defendant shall provide financial information to the Internal Revenue Service as requested.

8. The Court finds there is a reasonably foreseeable risk that the defendant may engage in criminal conduct similar or related to the present offense or the defendant's past criminal conduct. Therefore, the Court directs the defendant to notify of risks that may be occasioned by his criminal record or personal history or characteristics, and directs the probation officer to confirm the defendant's compliance with this notification requirement.

## DEFENDANT'S ACKNOWLEDGMENT OF APPLICABLE CONDITIONS OF SUPERVISION

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

The conditions of supervision have been read to me. I fully understand the conditions and have been provided a copy of them.

| | |
|---|---|
| Defendant | Date |
| U.S. Probation Officer/Designated Witness | Date |

DEFENDANT: Scott Valente
CASE NUMBER: DNYN115CR000124-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 300 (remitted) | $ 0 | $ 8,200,579.69 |

☐ The determination of restitution is deferred until __________ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

x The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(I), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| (see Victim list in Appendix A) | (see individual amounts in Appendix A) | | |
| **TOTALS** | $ 8,200,579.69 | $ 8,200,579.69 | |

☐ Restitution amount ordered pursuant to plea agreement $ __________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

x The court determined that the defendant does not have the ability to pay interest and it is ordered that:

x the interest requirement is waived for the ☐ fine x restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Scott Valente
CASE NUMBER: DNYN115CR000124-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A** ☐ In full immediately; or

**B** ☐ Lump sum payment of $ ______________ due immediately, balance due

☐ not later than ______________________ , or
☐ in accordance with ☐ D, ☐ E, ☐ F, or ☐ G below; or

**C** ☐ Payment to begin immediately (may be combined with ☐ D, ☐ E, or ☐ G below); or

**D** ☐ Payment in equal ___________ (e.g., weekly, monthly, quarterly) installments of $ _____________ over a period of __________ (e.g., months or years), to commence _________ (e.g., 30 or 60 days) after the date of this judgment; or

**E** ☐ Payment in equal ___________ (e.g., weekly, monthly, quarterly) installments of $ _____________ over a period of __________ (e.g., months or years), to commence _________ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**F** ☐ Payment during the term of supervised release will commence within _________ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**G** x Special instructions regarding the payment of criminal monetary penalties:

The restitution imposed is due and enforceable by the U.S. Attorney's Office against any of the defendant's assets, including assets discovered during the investigation and those assets currently subject to a court order freezing The ELIV Group, LLC's assets (SEC v. Valente, et al., 14 Civ. 3974 (S.D.N.Y.)), with any remaining restitution payable in monthly installments of $25.00 or 10% of the defendant's gross monthly income while incarcerated, and upon the defendant's release from imprisonment in minimum monthly installments of 25% of the defendant's gross income, whichever is greater, until restitution is fully paid. Until restitution is fully paid, the defendant is restrained from transferring any asset with a value of $2,500 or more, unless it is necessary to liquidate and apply the proceeds of such property to his restitution. If at any time the defendant has the ability to make full or substantial payment toward restitution he shall do so immediately.

The special assessment is remitted pursuant to 18 U.S.C. § 3573.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to **Clerk, U.S. District Court, Federal Bldg., 100 S. Clinton Street, P.O. Box 7367, Syracuse, N.Y. 13261-7367**, unless otherwise directed by the court, the probation officer, or the United States attorney. If a victim cannot be located, the restitution paid to the Clerk of the Court for that victim shall be sent to the Treasury, to be retrieved if and when the victim is located.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

☐ Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

x The defendant shall forfeit the defendant's interest in the following property to the United States:
The items outlined in the Preliminary Order of Forfeiture, consistent with any amendments or changes to the substantive language of the Forfeiture Allegation and Preliminary Order of Forfeiture which the parties agree to be appropriate.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Northern District of New York

Caption:
United States of America v.

Scott Valente

Docket No.: 1:15-cr-124
Hon. Gary L. Sharpe
(District Court Judge)

Notice is hereby given that Scott Valente appeals to the United States Court of Appeals for the Second Circuit from the judgment [✔], other [ ] _______ (specify)
entered in this action on November 20, 2015
(date)

This appeal concerns: Conviction only [ ] Sentence only [✔] Conviction & Sentence [ ] Other [ ]

Defendant found guilty by plea [✔] trial [ ] N/A [ ]

Offense occurred after November 1, 1987? Yes [✔] No [ ] N/A [ ]

Date of sentence: Novmber 20, 2015 N/A [ ]

Bail/Jail Disposition: Committed [✔] Not committed [ ] N/A [ ]

Appellant is represented by counsel? Yes [✔] No [ ] If yes, provide the following information:

Defendant's Counsel: Joel D. Schwartz; Russell D. Duncan
Counsel's Address: 12505 Park Potomac Ave; 6th Fl
Potomac, MD 20854
Counsel's Phone: 301-945-9240

Assistant U.S. Attorney: Richard D. Belliss
AUSA's Address: 445 Broadway; 2nd Fl
Albany, NY 12207
AUSA's Phone: 518-431-0247

Signature