# 15-3912

*To be Argued by:* STEVEN D. CLYMER

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

**Docket No. 15-3912**

UNITED STATES OF AMERICA,
*Appellee,*
v.
SCOTT VALENTE,
*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEE UNITED STATES OF AMERICA

Richard S. Hartunian
*United States Attorney for the*
*Northern District of New York*
100 South Clinton Street
Syracuse, NY 13261-7198
Tele: 315-448-0672
Email: Steven.D.Clymer@usdoj.gov

RICHARD D. BELLISS
STEVEN D. CLYMER
*Assistant United States Attorneys*
*of Counsel*

## TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES PRESENTED.......1

STATEMENT OF THE CASE..................................3

A. Introduction................................................3

B. Procedural History......................................3

STATEMENT OF FACTS ........................................5

A. Offense Conduct.........................................5

B. Victim Impact ..........................................10

C. Sentencing Guidelines Calculations ..............................................16

1. Offense Level ......................................16

2. Criminal History Category and Guidelines Range.................................17

D. Sentencing................................................19

1. Valente's Objections to the PSR .........19

2. Valente's Sentencing Memorandum......................................20

3. The Sentencing Hearing ......................21

SUMMARY OF ARGUMENT ...............................26

ARGUMENT ........................................................27

POINT I:
The District Court Did Not Err by Determining That Valente's Prior Sentences for Driving While Impaired and Use of a Vehicle Without an Ignition Interlock Device Should Be Counted When Calculating His Criminal History Score...........27

A. Background..............................................27

B. Governing Law .........................................32

1. Determining Whether Prior Sentences for Non-Felony Offenses are "Counted" for the Purpose of Assessing Criminal History Points ......................................32

2. The Guidelines' Treatment of New York State DWAI Infractions............................................38

a. The New York State DWAI Offense ..........................................38

b. Governing Law Before *United States v. Potes-Castillo* ..........................................38

c. *United States v. Potes-Castillo* and Guidelines Amendment 766 ............................40

C. Standard of Review..................................43

D. Discussion...............................................44

1. As Amended Application Note 5 Makes Clear, the District Court, as a Matter of Law, Properly Counted Valente's DWAI Sentences When Determining His Criminal History Score. ................44

2. Even If Application Note 5 Did Not Require Counting of Valente's DWAI Sentences, the District Court Properly Exercised Its Discretion by Doing So. .................49

3. The District Court Correctly Counted Valente's Conviction for Using a Vehicle Without an Ignition Interlock Device.....................52

Point II:
The District Court Properly Assessed Two Criminal History Points for Valente's Recidivist DWAI Sentence Despite the Delay in Valente's Service of His Resulting Sixty-Day Jail Term Due to Medical Issues.....54

A. Background..............................................54

B. Governing Law: The "Actually Served" Requirement................................56

C. Standard of Review...................................60

D. Discussion ............................................... 61

1. The District Court Properly Assessed Two Criminal History Points for Valente's Yet-Unserved Sixty-Day Jail Term for His Recidivist DWAI Conviction. ......................................... 61

2. In Any Event, Any Error in Scoring Valente's Recidivist DWAI Conviction Was Harmless. ............................................ 63

Point III:
The District Court Did Not Abuse Its Discretion in Determining the Loss Amount. ........................................................... 63

A. Background ............................................... 63

B. Governing Law ......................................... 65

C. Standard of Review .................................. 66

D. Discussion ............................................... 67

Point IV:
The District Court Properly Applied the "Sophisticated Means" Enhancement. ............. 71

A. Governing Law ......................................... 71

B. Standard of Review ..................................72

C. Discussion ................................................73

Point V:
The District Court Properly Increased Valente's Offense Level for Obstruction of Justice.. ............................................................74

A. Background ..............................................74

B. Governing Law ........................................78

C. Standard of Review ..................................80

D. Discussion ................................................80

Point VI: The District Court's Denial of Valente's Departure Motions is Not Appealable. ......................................................82

A. Background ..............................................82

B. Governing Law and Standard of Review ......................................................84

C. Discussion ................................................85

Point VII:
Valente's 240-Month Within-Guidelines Term of Imprisonment Was Substantively Reasonable, Especially in Light of the Devastating Effect His Fraud Had on His Many Victims. ..................................................86

A. Governing Law ........................................86

B. Standard of Review..................................86

C. Discussion.................................................87

CONCLUSION .......................................................94

## TABLE OF AUTHORITIES

CASES:

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)............89, 90

*United States v. Ayers*,
416 F.3d 131 (2d Cir. 2005)...........................80, 81

*United States v. Bennett*,
252 F.3d 559 (2d Cir. 2001)................................80

*United States v. Broxmeyer*,
699 F.3d 265 (2d Cir. 2012)................................86

*United States v. Caesar*,
124 F. App’x 60 (2d Cir. 2005) ...........................63

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)...........................86, 87

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013)................................91

*United States v. Cuevas*,
496 F.3d 256 (2d Cir. 2007)................................84

*United States v. Defeo*,
36 F.3d 272 (2d Cir. 1994)..................................63

*United States v. Deigert*,
916 F.2d 916 (4th Cir. 1990)................................39

*United States v. DeJesus-Concepcion*,
607 F.3d 303 (2d Cir. 2010).....................36, 37, 41

*United States v. Duffy*,
29 F.3d 625 (5th Cir. 1994)............................59, 61

*United States v. Fernandez*,
443 F.3d 19 (2d Cir. 2006)...................................87

*United States v. Fiore*,
381 F.3d 89 (2d Cir. 2004)...................................79

*United States v. Florez*,
447 F.3d 145 (2d Cir. 2006).................................92

*United States v. Fofanah*,
765 F.3d 141 (2d Cir. 2014),
*cert. denied*, 135 S. Ct. 1449 (2015)........72, 73, 74

*United States v. Gonzalez*,
529 F.3d 94 (2d Cir. 2008)...................................86

*United States v. Gonzalez-Rivera*,
2011 WL 4916395
(S.D.N.Y. Oct. 17, 2011) ...............................29, 41

*United States v. Halloran*,
821 F.3d 321 (2d Cir. 2016).................................66

*United States v. Jackson*,
346 F.3d 22 (2d Cir. 2003)...................................74

*United States v. Jakobetz*,
955 F.2d 786 (2d Cir. 1992).................................38

*United States v. Kent*,
821 F.3d 362 (2d Cir. 2016).................................60

*United States v. LeBlanc*,
45 F.3d 192 (7th Cir. 1995)............................38, 39

*United States v. Loeb*,
45 F.3d 719 (2d Cir. 1995).............................38, 39

*United States v. Martinez-Santos*,
184 F.3d 196 (2d Cir. 1999)..........................passim

*United States v. Matta*,
777 F.3d 116 (2d Cir. 2015).................................86

*United States v. Moore*,
968 F.2d 216 (2d Cir. 1992).................................38

*United States v. Morales*,
239 F.3d 113 (2d Cir. 2000)...........................35, 43

*United States v. Norman*,
776 F.3d 67 (2d Cir.),
*cert. denied*, 135 S. Ct. 2333 (2015)........66, 68, 72

*United States v. Pando*,
545 F.3d 682 (8th Cir. 2008)..........................38, 39

*United States v. Paredes*,
__ F. Supp. 3d __, 2016 WL 2619845
(E.D.N.Y. May 5, 2016)................................47, 48

*United States v. Parris*,
573 F. Supp. 2d 744 (E.D.N.Y. 2008) .....89, 90, 91

*United States v. Patasnik*,
89 F.3d 63 (2d Cir. 1996)....................................45

*United States v. Potes-Castillo*,
638 F.3d 106 (2d Cir. 2011)..........................passim

*United States v. Ravelo*,
370 F.3d 266 (2d Cir. 2004).................................44

*United States v. Rayborn*,
957 F.2d 841 (11th Cir. 1992)..................60, 61, 62

*United States v. Reid*,
__ F.3d __, 2016 WL 3606371
(8th Cir. July 5, 2016) ..............................58, 59, 61

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007).................................87

*United States v. Rigas*,
583 F.3d 108 (2d Cir. 2009).................................86

*United States v. Rivernider*,
2016 WL 3632496
(2d Cir. July 7, 2016) .....................................65, 66

*United States v. Robinson*,
799 F.3d 196 (2d Cir. 2015).................................84

*United States v. Sanders*,
205 F.3d 549 (2d Cir. 2000).................................37

*United States v. Shick*,
258 F. App’x 370 (2d Cir. 2007) .........................60

*United States v. Stevenson*,
__ F.3d __, 2016 WL 4375010
(2d Cir. Aug. 17, 2016) ........................................85

*United States v. Stinson*,
465 F.3d 113 (2d Cir. 2006)..................................84

*United States v. Thompson*,
925 F.2d 234 (8th Cir. 1991)....................57, 58, 59

*United States v. Thornton*,
444 F.3d 1163 (9th Cir. 2006)........................38, 39

*United States v. Ubiera*,
486 F.3d 71 (2d Cir. 2007).............................35, 37

*United States v. Ware*,
577 F.3d 442 (2d Cir. 2009)...........................68, 79

*Williams v. New York*,
337 U.S. 241 (1949).............................................46

FEDERAL STATUTES, RULES AND OTHER AUTHORITIES:

15 U.S.C. § 78j(b) .......................................................3

18 U.S.C. § 1341 .........................................................3

18 U.S.C. § 3553 .......................................................22

18 U.S.C. § 3553(a)...........................................passim

18 U.S.C. § 3553(a)(2)(C)........................................92

18 U.S.C. § 3553(a)(2)(D) .......................................92

18 U.S.C. § 3553(a)(6) ........................................... 47

18 U.S.C. § 3553(f) ................................................. 49

18 U.S.C. § 3661 ..................................................... 46

26 U.S.C. § 7212(a) .................................................... 4

17 C.F.R. § 240.10b-5 ............................................... 3

U.S.S.G. § 1B1.3(a)(1) ............................................ 79

U.S.S.G. § 1B1.10 .................................................... 45

U.S.S.G. § 1B1.11(b)(1) .......................................... 19

U.S.S.G. § 1B1.11(b)(2) .......................................... 19

U.S.S.G. § 2B1.1 .............................................. passim

U.S.S.G. § 2B1.1(a)(1) ............................................ 16

U.S.S.G. § 2B1.1(b)(1) ............................................ 65

U.S.S.G. § 2B1.1(b)(1)(J) .................................. 20, 64

U.S.S.G. § 2B1.1(b)(2)(B) ................................. 16, 19

U.S.S.G. § 2B1.1(b)(2)(C) ................................. 19, 20

U.S.S.G. § 2B1.1(b)(10) ................................. 2, 16, 71

U.S.S.G. § 2B1.1(b)(19)(A)(ii) ................................ 16

U.S.S.G. § 2B1.1 cmt. n.3(A) .................................. 65

U.S.S.G. § 2B1.1 cmt. n.3(A)(i) ............................... 65

U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) ............................. 65

U.S.S.G. § 2B1.1 cmt. n.3(A)(iv) ............................66

U.S.S.G. § 2B1.1 cmt. n.3(C)..................................66

U.S.S.G. § 2B1.1 cmt. n.9(B)..................................71

U.S.S.G. § 3B1.1 .....................................................45

U.S.S.G. § 3C1.1 .............................................passim

U.S.S.G. § 3C1.1 cmt. n.1 .................................76, 79

U.S.S.G. § 3C1.1 cmt. n.4(B)..................................79

U.S.S.G. § 3C1.1 cmt. n.4(C)......................77, 79, 81

U.S.S.G. § 3C1.1 cmt. n.5 .......................................81

U.S.S.G. § 3E1.1(a)...........................................17, 93

U.S.S.G. § 3E1.1(b)...........................................17, 93

U.S.S.G. § 4A1.1 .....................................................32

U.S.S.G. § 4A1.1(a) ................................................57

U.S.S.G. § 4A1.1(b) .........................................passim

U.S.S.G. § 4A1.1(c) .........................................passim

U.S.S.G. § 4A1.1(d) ................................................18

U.S.S.G. § 4A1.2 .............................................passim

U.S.S.G. § 4A1.2(a)(1).............................................32

U.S.S.G. § 4A1.2(a)(3).......................................56, 57

U.S.S.G. § 4A1.2(b)(1) ............................................56

U.S.S.G. § 4A1.2(b)(2) .....................................56, 57

U.S.S.G. § 4A1.2(c) .........................................passim

U.S.S.G. § 4A1.2(c)(1).....................................passim

U.S.S.G. § 4A1.2(c)(2).....................................passim

U.S.S.G. § 4A1.2 cmt. n.2.......................................55

U.S.S.G. § 4A1.2 cmt. n.5................................passim

U.S.S.G. § 4A1.2 cmt. n.12(A)..........................36, 41

U.S.S.G. § 4A1.3(b)....................................20, 48, 82

U.S.S.G. § 5G1.2(d)................................................93

U.S.S.G. § 5H1.3................................................21, 82

U.S.S.G. App. C, amend. 500..................................44

U.S.S.G. App. C, amend. 617..................................44

U.S.S.G. App. C, amend. 709..................................35

U.S.S.G. App. C, amend. 766......................40, 42, 47

U.S.S.G. App. C, amend. 780..................................44

U.S.S.G. App. C, amend. 792..................................90

STATE STATUTES, RULES AND OTHER AUTHORITIES:

NY VTL § 1192(1)..................................................38

NY VTL § 1192(2)..................................................50

NY VTL § 1192(3) ............................................ 50, 52

NY VTL § 1193(1)(a) ........................................ 38, 51

NY VTL § 1193(1)(b)(i) .......................................... 50

NY VTL § 1193(1)(b)(ii) ......................................... 52

NY VTL § 1198 ........................................... 18, 52, 53

NY VTL § 1198(2) ................................................... 52

NY VTL § 1198(7)(a) .............................................. 53

NY VTL § 1198(7)(b) .............................................. 53

NY VTL § 1198(7)(c) .............................................. 53

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**
**Docket No. 15-3912**

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

SCOTT VALENTE,
*Defendant-Appellant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court, when determining the defendant's criminal history score, erred by adding a point for each of the defendant's two prior state sentences for driving while impaired by alcohol and for his prior state sentence for using a motor vehicle without a required ignition interlock device.

2. Whether the district court, when determining the defendant's criminal history score, erred by adding two points for the defendant's prior state sentence of sixty days' imprisonment and three years' probation for recidivist driving while impaired by alcohol where the defendant had not yet served that term of imprisonment because of ongoing medical issues and, if so, whether such error was harmless.

3. Whether the district court erred by determining loss amount based on the actual loss to investors, using two figures that the defendant admitted in his plea agreement and a third that the defendant has not established was inaccurate.

4. Whether the district court erred by increasing the defendant's offense level pursuant to U.S.S.G. § 2B1.1(b)(10) for use of "sophisticated means" where the defendant created and used numerous false documents and other deceptive tactics to perpetrate and conceal his fraud scheme.

5. Whether the district court erred by applying an obstruction of justice adjustment under U.S.S.G. § 3C1.1 where the defendant, in response to a government demand for records during a securities investigation, submitted a materially false document to a federal investigative agency to conceal his fraud scheme.

6. Whether the district court's denial of the defendant's motions for downward departure is reviewable on appeal where the district court understood its authority to depart?

7. Whether the district court abused its discretion and imposed a substantively unreasonable sentence where it sentenced the defendant to a within-guidelines 240-month term of imprisonment following

his conviction for defrauding over one hundred investors and inflicting substantial economic and other harm.

## STATEMENT OF THE CASE

### A. Introduction

Defendant-appellant Scott Valente appeals from a sentence of 240 months' imprisonment imposed by United States District Court Senior Judge Gary L. Sharpe following Valente's conviction by guilty plea for securities fraud, mail fraud, and obstructing and impeding the due administration of internal revenue laws. Valente claims that the district court improperly calculated his sentencing guidelines criminal history score by scoring prior sentences; erroneously determined his offense level by using an uncertain actual loss figure and applying enhancements for use of sophisticated means and obstructing justice; and further erred by refusing to depart or vary downward.

### B. Procedural History

On May 11, 2015, Valente waived indictment and, pursuant to a plea agreement with the government, pled guilty to an information charging securities fraud, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 [Count One]; mail fraud, in violation of 18 U.S.C. § 1341 [Count Two]; and obstructing and impeding the due administration of internal revenue

laws, in violation of 26 U.S.C. § 7212(a) [Count Three]. A. 9-65; GA. 1-9; Dkt. #1, #2, #3.[1]

On November 20, 2015, the district court sentenced Valente principally to concurrent terms of 240 months' imprisonment on each of Counts One and Two and a 36-month concurrent term of imprisonment on Count Three, for a total term of 240 months, to be followed by a three-year supervised release term. A. 201. Judgment was entered on the same day. A. 206-11; Dkt. #34. On December 4, 2015, Valente filed a timely notice of appeal. A. 212; Dkt. #42.

Valente is serving his term of imprisonment.

---

[1] References to pages of the appendix that Valente filed are preceded by "A." The charging information, which is not included in Valente's appendix, appears in the government's proposed appendix ["GA."]. References to entries in the district court's docket report in N.D.N.Y. Case No. 1:15-cr-00124-GLS-1 are preceded by "Dkt." The docket report appears at A. 1-8.

## STATEMENT OF FACTS

### A. Offense Conduct[2]

Valente had a checkered history as an investments representative and a broker. In May 1989, he was first registered by the Financial Industry Regulatory Authority ["FINRA"] as a General Services Representative."[3] In approximately 1992, he became a registered broker. PSR ¶ 32. On April 24, 2009, Valente was permanently barred from associating with FINRA members and was terminated from the company where he had worked as a broker "based on findings that that on multiple occasions [he] had made unauthorized, excessive, and unsuitable trades for customers and had provided false written account

---

[2] The description of the offense conduct in this brief is based on Valente's factual admissions in the plea agreement, A. 14-20, which he admitted were true at the change of plea hearing, A. 53, and the amended presentence investigation report located at Dkt. #33 ["PSR"]. Although Valente voiced objections to the guidelines calculations in the PSR, *see* PSR at pp. 61-64, he did not object to the factual content of the report. A. 151.

[3] According to its website, FINRA is "an independent, not-for-profit organization authorized by Congress to protect America's investors by making sure the securities industry operates fairly and honestly." *See* http://www.finra.org/about.

information to customers." PSR ¶ 33. Valente was the subject of seventeen customer complaints and twice filed for bankruptcy, once in 1994 and once in 2004. PSR ¶ 33.

In 2010, Valente began operating an unregistered investment/consulting business called "The ELIV Group, LLC" ["ELIV"]. Because Valente's registrations in the investment industry had been terminated, Valente used his wife, who has never been a registered broker or held a brokerage license of any kind, as ELIV's nominal owner. PSR ¶ 34. Valente was the *de facto* owner of ELIV, as well as its manager and sole employee with the ability to make decisions about investments and the use of funds entrusted to ELIV. PSR ¶ 35; A. 15.

Falsely representing ELIV to be "an accredited investment and consulting firm," Valente fraudulently solicited investments into "The ELIV Group Investment Fund." Among other things, he falsely claimed on the ELIV website that he had "a thirty year record of investing experience dedicated to the highest standards of service." PSR ¶ 37; A. 15. Valente recruited investors through hotel conferences, seminars, and word-of-mouth endorsements from existing investors. He told investors that ELIV would charge an annual 1% fee for managing their investments. PSR ¶¶ 38, 40. Some of these victim investors had known Valente or his family for twenty to thirty years. PSR ¶ 37. Valente's parents, siblings,

and other family members invested with him and he touted this as evidence that investments with him would be safe. PSR ¶ 38.

In addition to the false claims that he made about himself, Valente lied to prospective investors about ELIV's investment strategy and having earned a five-year average annual rate of return of 34.5% when, in fact, ELIV had not been in existence for five years and consistently had lost money through "highly risky and speculative investments . . . that were not acceptable to or agreed upon by many of the unsophisticated investors who invested with [Valente]." PSR ¶ 39. Valente mailed "investment contracts" to new investors, falsely claiming high annual rates of return when, in fact, the investment fund had lost money every year of its existence. The false statements were designed to encourage additional investments and discourage withdrawals. PSR ¶ 46; A. 15.

Valente further deceived investors by creating monthly performance statements that falsely reported imaginary investment gains in various accounts and mailing the statements to investors. PSR ¶¶ 42-45, 48-51. These statements also falsely identified an individual as an "auditor" and another as a certified public accountant, leading investors to believe that there were appropriate controls on the investment of their funds. PSR ¶ 41. In fact, the identified "auditor" had once worked as an unpaid intern at the brokerage firm that had terminated Valente. He never worked for

ELIV. The "certified public accountant" had prepared tax returns for Valente and his wife but did not work for ELIV. PSR ¶¶ 52, 53.

Valente also falsely represented to potential investors that ELIV was an approved custodian for tax-deferred individual retirement accounts ["IRAs"] and could both open new IRAs and create rollover IRA accounts. PSR ¶¶ 54-56; A. 17. Approximately 48 of Valente's clients relied on these false representations and rolled IRA or other retirement accounts over to purported ELIV IRAs, wrongly believing that these transactions were not taxable, when, in fact, the defrauded investors were losing their tax-deferred investments and exposing themselves to IRA early-withdrawal tax penalties and other taxes. PSR ¶¶ 54, 57. Valente sent fraudulent documents to the Internal Revenue Service ["IRS"] in an effort to falsely demonstrate that the investors held legitimate IRAs with ELIV. PSR ¶¶ 57, 58; A. 17-19.[4]

In March 2014, Valente was notified that there was an investigation by the Securities and Exchange Commission ["SEC"]. When the SEC demanded records from Valente, he submitted a fraudulently-altered spreadsheet from Felix Advisors, a legitimate

---

[4] Additional false statements that Valente made to individual investors are described in the PSR at ¶¶ 62-78.

investment firm that Valente falsely identified to investors as holding 40% of ELIV assets in an account that, in fact, did not exist. PSR ¶¶ 43, 47, 61, 83.[5] Valente had caused another person to alter the spreadsheet to show that ELIV held an account at Felix Advisors, when, in fact, Valente and his wife held the account. The altered spreadsheet also falsely inflated the value of the account. PSR ¶¶ 61, 70.

In June 2014, a federal district court in the Southern District of New York granted a motion by the Securities and Exchange Commission ["SEC"] for a preliminary injunction ordering Valente and ELIV to cease operations and freezing their assets. PSR ¶¶ 31, 88; A. 14-15. From late 2010 through the issuance of the injunction and asset freeze, Valente, through ELIV, had obtained approximately $10.5 million from more than 100 investors. PSR ¶ 80; A. 14. As reflected by the victim impact statements attached to the PSR, many of the investors were unsophisticated individuals who lost much or all of their life savings, retirement funds, and/or inheritances to Valente's fraud. Contrary to the representations Valente made to investors, ELIV lost money in thirty-one of the forty-one months between December 2010 and April

[5] Valente also falsely represented that Fidelity Investments held 60% of ELIV funds. PSR ¶¶ 47, 49.

2014. PSR ¶ 88; A 16.[6] Investigation revealed that Valente appropriated approximately $2.2 million of the funds invested, well in excess of the 1% management fee that he promised to investors. PSR ¶ 80. Valente used these stolen funds for cash withdrawals ($230,000); credit card payments ($443,000); a ski condominium in Vermont ($117,000); jewelry ($35,000); liquor ($20,000); mortgage payments ($29,000); and home-related improvements and repairs ($424,000). PSR ¶ 81; A. 19-20. Valente/ELIV had returned approximately $2.4 million to investors, falsely representing it to be distribution of profits or return of principal. PSR ¶ 89. When the federal court issued the asset freeze, the existing frozen ELIV investments were worth approximately $3,476,000. PSR ¶ 89. But, when the PSR was written, the government, based on an interpretation of a Felix Advisors spreadsheet, estimated that the value of the frozen assets had declined to $1,531,215.44. PSR ¶¶ 31, 89 & n.5.

## B. Victim Impact

The following is a small sample of passages from written statements by Valente's victims, many of whom also described difficulties with their credit ratings and/or the IRS due to their reliance on

---

[6] The PSR erroneously describes the end date of this range as April 2013. PSR ¶ 88. The plea agreement correctly describes it as April 2014. A. 16.

Valente's claims that they could "roll over" their existing IRAs and retirement accounts into ELIV accounts without tax penalties:

- From a person who reported investing $225,460: Valente's fraud "has affected my credit score due to IRA complications w/the IRS. I always wanted to buy a house and put a nice downpayment [sic] down, but at the moment haven't got any money. If my IRA is gone, I'll be working till the day I die." (pg. 69).[7]

- From a person who had hoped to finance his son Eric's effort to earn a spot on the Puerto Rican Olympic swim team in 2016: "The plan was for Eric to relocate to Puerto Rico upon graduation from college and the money invested with Mr. Valente was to support his athletic endeavor. Eric was unable to relocate to Puerto Rico to train . . . because our finances did not allow this. The loss of that money has impacted his goal . . . Mr. Valente does not have a conscious [sic] and has no insight and takes no responsibility for the financial impact he has made on the lives of those victims. (pg. 77).

---

[7] The victim impact letters are attached to the PSR, which is sealed entry #33 on the district court docket. The page number in parentheses corresponds to the CM/ECF page number that appears at the top of the portion of the PSR containing the letters.

- From a 59-year-old woman who put money into her savings and retirement accounts every week during a 37-year career, increasing the amount with every raise, and invested $118,000 with Valente: "The impact of Scott Valente's crimes will affect me forever. He has stolen from my past, present and future. He has destroyed the value of the sacrifices I made while building my retirement. Presently I have to deal with the stress and anxiety of worrying if my future will be financially sound. The future as I had planned is now totally ruined. I no longer have the certainty that my home will be paid for. Will I be able to meet any medical needs that may occur? What vehicle will I be able to afford and maintain? . . . . [Valente] used the tip of his pen just like a knife to hack away and destroy my wellbeing, my hopes, my dreams and my financial future. Along with the financial devastation he left me full of distrust, anger, and anxiety that I will never recover from." (pp. 84-85).

- From Valente's sister: "[t]he defendant had our money that had been saved for [our son's] wedding and he also had our son's money that he had saved towards the wedding . . . he stole all of our retirement money as well as a portion of our regular savings . . . He has taken away our ability to help our children [who] suffer with a chronic disease . . . ." (pg. 87).

- "Scott Valente stole my future, & that of my children. He came into my home, met my family, earned our trust, & then proceeded to steal every penny of my retirement & my children's college funds. He took my carefully invested funds from all of my 401Ks, savings, & inheritance from loved ones, shamelessly, callously & selfishly spent it on his own lavish lifestyle, all while lying to my face & in my statements, leading me to believe my retirement was secure. I now have zero retirement funds & my children are in debt beyond what they should be, all because of Scott's greed." (pg. 95).

- "The IRA money that was rolled into ELIV Group was started when I was 16 yrs old – selling golf balls, lemonade, caddying, mowing lawns[.] I am 53 & planned on retiring at 55 – not an option now. The personal account included my son's birthday and money gifts since he was a baby – 0[.] Also that money was there for his 1st car & college tuition in which he starts this fall – community (now) not private . . . what he stole from me is the very core of what I am – I have worked & saved my whole life – lived on a budget since I was 16 yrs old – always aggressively saving & going without . . . He sat at my table, with me and my family as we discussed my future and plans for my son & all it represented. How would you feel?" (pp. 103-04).

- "I'm 96 years old living on Social Security and my husband's pension who passed away. I was only hoping to invest in something safe that would generate a little extra monthly income for me. But, mainly to provide for my five children and grandchildren." (pg. 137).

- From an 85-year-old woman, who knew Valente "since he was born" and whose son was "best friends" with Valente: "Scott Valente stole all of my money. I'm a widow living on pennies, only able to pay the bare essential bills with a small bank account funded by monthly social security. Scott stole my entire nest egg that my husband Gene and I saved all of our lives. I live in fear of losing my home and my life that I created with my husband. My entire family has been devastated by this horrible crime." (pg. 175).[8]

---

[8] The daughter of this victim addressed the district court at sentencing, as did several of Valente's victims. The daughter explained that:

> Shortly after my father suffered a massive stroke and heart surgery which left him paralyzed, cognitively challenged and bound to a wheelchair for the rest of his life, Scott began stealing from my parents . . . . Valente took advantage of their troubled situation, pretending that he wanted to help, pretending to act in their best interest as a financial advisor and a

- From a community ambulance service that invested $47,190 with ELIV from funds that it uses to finance an annual college scholarship for high school students: "We will not be able to sustain funding the scholarship for much longer and will no longer be able to offer it to graduating high school seniors." (pg. 195).

A table setting out the names of Valente's victims, the amount each invested, distributions to each (if any), and the net loss for each victim appears in Appendix A of the PSR (pg. 58).

---

> reputable investment firm, while, in fact, choosing to defraud my parents out of their retirement nest egg. Unbelievably, Valente continued to steal from them despite being fully aware that my father was diagnosed with terminal cancer and my mother was diagnosed with mild cognitive impairment, masking it all by sending flowers and visiting the hospital during my father's last days, attending my father's funeral and visiting my grief-stricken mother after my father's death.

A. 175-76.

## C. Sentencing Guidelines Calculations[9]

### 1. Offense Level

After explaining that all three counts of conviction "grouped" for purposes of determining Valente's offense level and that Count One, the securities fraud conviction, was the most serious offense, PSR ¶ 102, the PSR determined that the base offense level for that count under U.S.S.G. § 2B1.1(a)(1) was 7. PSR ¶ 103. The PSR then explained that the loss amount was based on "the loss of principal to investors, including excess management fees collected," estimated to be $4,724,579.69. PSR ¶ 104. This resulted in an 18-level increase in the offense level. PSR ¶ 104.

The PSR then recommended the following additional increases: four levels under U.S.S.G. § 2B1.1(b)(2)(B) because the offense involved 50 or more victims, PSR ¶ 105; two levels under U.S.S.G. § 2B1.1(b)(10) because the offense involved sophisticated means; four levels under U.S.S.G. § 2B1.1(b)(19)(A)(iii) because "the offense involved a violation of securities law and, at the time of the

---

[9] The 2014 Federal Sentencing Guidelines Manual was used to calculate Valente's guidelines range in the PSR. PSR ¶ 101. Although Valente was sentenced on November 20, 2015, after the effective date of the 2015 guidelines, the 2014 Manual properly applied at his sentencing. *See infra* note 12.

offense, the defendant was an investment adviser," PSR ¶ 107; and two levels under U.S.S.G. § 3C1.1 for obstruction of justice. PSR ¶ 110. The PSR further recommended a three-level decrease in the offense level under U.S.S.G. § 3E1.1(a) & (b) based on Valente's timely acceptance of responsibility and a government motion. PSR ¶¶ 113, 114. The resulting total offense level was 34. PSR ¶ 115.

### 2. Criminal History Category and Guidelines Range

The PSR identified five criminal dispositions that resulted in the assignment of criminal history points. All of the dispositions involved Valente operating a motor vehicle while under the influence of alcohol and/or his violation of conditions placed on him by a court as a result of previous driving-while-impaired dispositions.

Specifically, the PSR assigned one criminal history point under U.S.S.G. § 4A1.1(c) for each of two prior sentences for "driving while ability impaired" ["DWAI"] infractions. PSR ¶¶ 120, 121. Next, the PSR assigned two criminal history points under U.S.S.G. § 4A1.1(b) for Valente's misdemeanor sentence for DWAI following two or more prior convictions within 10 years, resulting in a sixty-day jail sentence and three years' probation. PSR ¶ 122. Further, the PSR assigned one criminal history point under U.S.S.G. § 4A1.1(c) for Valente's misdemeanor sentence for driving while intoxicated ["DUI"]. PSR

¶ 123. Finally, the PSR assigned one criminal history point under U.S.S.G. § 4A1.1(c) for Valente's misdemeanor sentence for operating a motor vehicle without an ignition interlock device.[10] PSR ¶ 124.

The PSR added two criminal history points under U.S.S.G. § 4A1.1(d) because Valente committed his federal fraud offenses while under criminal justice sentences from two of the dispositions described above. PSR ¶¶ 125, 126. Valente's resulting criminal history score of eight established a criminal history category of IV. PSR ¶ 127. The PSR explained that an offense level of 34 and a criminal history category of IV yields a guidelines imprisonment range of 210 to 262 months. PSR ¶ 164.[11]

---

[10] The interlock device requirement is set out in NYS Vehicle and Traffic Law § 1198. *See infra* note 20 and accompanying text.

[11] The PSR also noted that Count One, the securities fraud count, and Count Two, the mail fraud count, each had a statutory maximum twenty-year term of imprisonment, and that Count Three, the obstruction and impeding count, had a statutory maximum three-year term of imprisonment. PSR ¶ 163.

## D. Sentencing

### 1. Valente's Objections to the PSR

In response to the PSR and after a "resolution conference" involving the Probation Office, defense counsel, and government counsel, Valente objected to the "sophisticated means" and "obstruction of justice" enhancements to the offense level, PSR at pp. 61-62, and contended that his criminal history category was III, not IV, because he was improperly assessed criminal history points for some of his criminal dispositions. PSR at pp. 63-64. In response, the Probation Office generally rejected the defense objections. PSR at pp. 64-66.[12]

---

[12] The PSR noted that, if applied, an amendment in the 2015 version guidelines would replace the four-level 50-or-more-victims increase to Valente's offense level under U.S.S.G. § 2B1.1(b)(2)(B) with a six-level increase under amended U.S.S.G. § 2B1.1(b)(2)(C) because the offense "resulted in substantial financial hardship to 25 or more victims." PSR at pp. 64-65. But, because application of that newly added six-level enhancement would violate the Ex Post Facto clause of Article I, Section 9 of the United States Constitution, the 2014 Manual should be used when sentencing Valente. *See* U.S.S.G. § 1B1.11(b)(1) & (2); PSR at pg. 65. Despite that, the district court announced at sentencing that the "2015 book now controls," A. 151, and applied a higher, more

### 2. Valente's Sentencing Memorandum

In his sentencing memorandum, Valente reiterated his objections to the "sophisticated means" and "obstruction of justice" enhancements, A. 80-82, and argued that the district court should use the $2.2 million that Valente appropriated from defrauded investors as the loss amount. A. 82-85. Valente urged the district court to adopt his various contentions and calculate his total offense level to be 28, not 34. A. 85-86. Valente also attached a letter that he had sent to the Probation Office raising additional objections to the PSR's computation of his offense level and criminal history category. A. 112-21.

Valente further argued in his memorandum that he was entitled to two downward departures: one under U.S.S.G. § 4A1.3(b) because, according to him, his

---

defendant-friendly "floor" to the range in the loss amount table that provides for an 18-level increase. A. 152 (referring to $3.5 million lower end of the range in the 2015 version of U.S.S.G. § 2B1.1(b)(1)(J) rather than the $2.5 million lower end in the 2014 version). It did not, however, apply the amended U.S.S.G. § 2B1.1(b)(2)(C). As a result, and given that the loss amount as determined by the court exceeded the amended higher floor, PSR ¶ 104; A. 154-55, differences between the 2014 and 2105 versions of the sentencing guidelines did not result in any unwarranted increase in Valente's guidelines' imprisonment range.

criminal history category of IV over-represented the seriousness of his criminal history and the likelihood that he would re-offend; and one under U.S.S.G. § 5H1.3 based on his mental and emotional conditions. A. 86-87. Valente also asked the district court to vary downward for a variety of reasons, including to avoid unwarranted sentencing disparities and to take into account the sentencing factors in 18 U.S.C. § 3553(a). A. 86-96.

### 3. The Sentencing Hearing

At the sentencing hearing, defense counsel reiterated the argument that the court should employ a $2.2 million loss amount. A. 152-54. The defense rested on its previous arguments with respect to the obstruction of justice and sophisticated means enhancements. A. 155, 158. The district court rejected all of the defense arguments concerning calculation of Valente's offense level. A. 154-55, 156-58, 158-60.

In connection with his challenge to the PSR recommendation of a criminal history category of IV, Valente raised for the first time a Separation of Powers Clause challenge to an amended application note that, according to the PSR, undermined case law on which Valente relied. The district court found it unnecessary to resolve that claim, instead exercising its discretion to adopt the PSR-recommended criminal history category. A. 163-68.

Turning next to Valente's motion for departure, the district court agreed that the guidelines provided a basis for departure on the grounds that Valente had identified, but concluded that "the facts of this case warrant no departure." A. 169-70.

Then, after hearing from some of the victims of the fraud scheme and the daughter of one victim, A. 171-81, and government counsel, A. 181-83, the district court provided defense counsel and Valente an opportunity to address the court. A. 183-95. After speaking to the crime victims in the courtroom, the district court addressed Valente:

> The question for me is what is a reasonable sentence in light of the facts that are before me, and in assessing that, I have to be guided by my evaluation, which I am, of the presentence report, the addendums to the presentence report, the submissions by the parties, the Sentencing Guidelines, and the factors, sentencing factors, that are outlined in federal law, Title 18, Section 3553. I have taken all of those things into consideration in arriving at a sentence which I believe is fair and reasonable.
>
> As I have already said, at one time or another in these proceedings, Mr. Valente, you continue to defraud yourself just as you have defrauded these more than 100 people. I hear you again today, as I heard you in the presentence report

when you talked to Probation. “I never intended to hurt these people.” That’s a deception of yourself. That is a deception that says I thought this would all work out great, and I would take their money, generate these great profits and make their lives just wonderful. Well, if you really thought that, you would not have created ELIV, in your wife’s name, hiding your identity, knowing full well that you’d been barred from this kind of behavior by the financial regulatory agencies before you ever created the organization. If that were true, that you had their best interests in mind, there wouldn’t be $230,000 cash withdrawals from you and your wife’s account, there wouldn’t be $443,000 in credit card purchases, there wouldn’t be two condominiums in Vermont, there wouldn’t be $35,000 worth of jewelry, there wouldn’t be $424,000 worth of home improvements, $29,000 worth of mortgage payments and $20,000 in liquor purchases. Instead, the money would have gone to the best interests of these folks, instead of the best interests of you and your wife.

This was a fraud from the outset and when you look at that, in my view, this sentence must reflect the seriousness of this offense, it must promote respect for the law, it must provide just punishment and it must serve to deter similar criminal conduct that’s committed by others.

I concur with the Government's observations in its sentencing memorandum. In 1989 (sic), you were barred from the broker/dealer industry after making unauthorized, excessive and unsuitable trades. Within a year, you created ELIV through your wife's name, as a nominee, a new investment firm that was never registered with the SEC, FINRA or any other regulatory agency. Ya then lied to more than a hundred investors for 42 months about the returns you were generating, the security of their investments and the tax consequences that then resulted from your actions as you solicited more than $10 million.

In the meantime, you were spending the money as I just outlined. The mental, physical and emotional toll to these folks is incalculable. I hope, as your attorney indicated to me, you have read that entire presentence report, which includes that stack of victim witness letters that are contained in it. One of the most cogent observations I heard, I heard it this morning, but it's in the presentence report, is you were confronted with the notion "are you a Bernie Madoff," and you denied that you were, when, in fact, you are.

But probably one of the most cogent observations I read is this, and I'm not

attributing this to anybody in particular, I am not gonna drag them through this proceeding. “I asked how this can be considered a white collar crime? Is it because there’s no physical violence in the act of committing these crimes? As a victim of Scott Valente’s crimes, I’ll tell you there certainly is violence. He used the tip of his pen just like a knife to hack away and destroy my wellbeing, my hopes, my dreams and my financial future. Along with the financial devastation, he has left me full of distrust and anger and anxiety that I will never recover from.”

That observation, while not said by many, is felt by every one of them. You have destroyed lives here, you have caused physical, emotional harm.

It is my sentence that a guideline sentence, as I have found the guidelines to be, is a reasonable sentence. I concur with the Government’s recommendation. I hereby sentence you to 240 months on each of Counts I and II. I sentence you to the maximum three years on Count III to be served concurrently.

A. 198-201.

## SUMMARY OF ARGUMENT

The district court did not err when calculating Valente's criminal history score. An amended application note makes clear that Valente's prior sentences for driving while impaired by alcohol were properly counted as part of that score. In any evernt, it was within the district court's discretion to count these prior sentences. Similarly, the district court properly counted Valente's prior sentence for use of a vehicle without an ignition interlock device. In addition, although Valente had not yet served a sixty-day jail term for a recidivist driving-while-impaired disposition, the district court properly added a second point for that prior sentence because Valente's incarceration was merely delayed due to medical issues, not suspended. Even if an undeserved extra point had been included in Valente's score, such error would have been harmless.

Similarly, there was no error in the calculation of Valente's offense level. Of the three figures used to determine his loss amount, he admitted that two are accurate and has not established any error as to the third. Nor has he challenged the methodology used to determine loss amount. Further, the district court properly increased Valente's offense level for his use of sophisticated means to execute and conceal his fraud, such as creating and regularly sending false account statements to his victims, and for obstruction of justice, by having another person create a false document that Valente used in an attempt to impair the

government's civil investigation into his fraudulent conduct.

Valente's challenges to the district court's refusal to depart downward are not appealable. His related claim that his within-guidelines term of imprisonment is substantively unreasonable, which essentially is a contention that the district court was required to vary downward, is unavailing. Under the circumstances present here, where Valente violated the trust of unsophisticated investors to steal their life savings, thereby inflicting significant harm, the 240-month term of imprisonment was both deserved and reasonable.

## ARGUMENT

### POINT I: The District Court Did Not Err by Determining That Valente's Prior Sentences for Driving While Impaired and Use of a Vehicle Without an Ignition Interlock Device Should Be Counted When Calculating His Criminal History Score.

### A. Background

The PSR assigned one criminal history point under U.S.S.G. § 4A1.1(c) for each of Valente's first two sentences for DWAI violations. Specifically, Valente was sentenced for a DWAI infraction on May 4, 2006,

in Green Island Town Court, Green Island, NY. This sentence resulted from Valente being stopped by police at 1:23 a.m. on March 11, 2006 for speeding. He failed a field sobriety test and was found to have a blood-alcohol content ["BAC"] of .11% and a suspended license. PSR ¶ 120.

Valente was again sentenced for a DWAI violation on April 20, 2009, in Colonie Town Court, Colonie, NY. This violation resulted from Valente being stopped for speeding at approximately 11:38 p.m. on January 8, 2008, and failing both a field sobriety test and a portable breath test. PSR ¶ 121.

The PSR also assigned a criminal history point under U.S.S.G. § 4A1.1(c) for Valente's sentence for using a vehicle without an ignition interlock device. This sentence arose from an arrest that followed several additional alcohol and driving-related violations. PSR ¶¶ 122-24. After being stopped for use of a mobile telephone while driving, Valente provided a false name and date of birth, as well as other untruthful information to the arresting officer. Eventually, police identified him and determined that he had no valid driver's license. PSR ¶ 124.

Valente objected to the use of the two DWAI sentences to increase his criminal history score, contending that this Court's decision in *United States v. Potes-Castillo*, 638 F.3d 106 (2d Cir. 2011) and the resulting district court decision on remand in *United*

*States v. Gonzalez-Rivera*, Case No. 05-CR-402, 2011 WL 4916395 (S.D.N.Y. Oct. 17, 2011) preclude that outcome. A. 113; PSR at pg. 63. He also argued that the sentence for use of a vehicle without an interlock device was akin to driving without a license and lying to a police officer, *see* U.S.S.G. § 4A1.2(c)(1), and thus should not be scored. A. 115; PSR at pg. 64.

The Probation Office rejected the objections to the DWAI sentences based on an amendment to Application Note 5 to U.S.S.G. § 4A1.2 that effectively overruled *Potes-Castillo*. PSR at pg. 65-66. It likewise differed with the objection to the scoring of the sentence for using a vehicle without an interlock device, determining that this offense was not similar to the non-qualifying ones that Valente identified because of his "extensive history of driving under the influence related offenses" and obligation to use the device as a result of that history. PSR at pg. 66.

At sentencing, defense counsel argued that the guidelines amendment, which resolved differing views among Courts of Appeal, raised a "separation of powers issue" because "[t]he Sentencing Commission cannot resolve a split in the Circuits," thus leaving intact the Second Circuit and district court authority on which Valente relied. A. 161-62.

The district court concluded that it did not need to determine whether there was a Separation of Powers

Clause concern because "[t]he Circuit essentially leaves [the decision whether to count the DWAI sentences] to my discretion." A. 163. The court continued:

> I believe the alcohol-related offenses should score under the guidance which the Circuit provided in the case that you cite. And in particular, it should score, given the entire history of the criminal history here, which is not just the criminal convictions as they relate to alcohol. There are other episodes involved in those convictions that escalate the consequences of the alcohol-related behavior, but it's also the history of that behavior that persuades me that these things are correctly scored. Whether that history reflects the failure to abide by restrictions placed on him as a result of the convictions . . . . So, in each of these things, there are the failure by Mr. Valente to abide by any restrictions on his behavior imposed by the Courts as a result of these convictions.

162-63.[13]

---

[13] When sentenced for his first DWAI, Valente also was sentenced for the misdemeanor offense of "facilitating the aggravated unlicensed operation of a motor vehicle second." PSR ¶ 120. The district court determined that Valente's sentence for this

Without comment, the district court also rejected the objection to scoring the prior sentence for the use of a vehicle without an interlock device. A. 167.

Valente reiterates his contentions on appeal. Valente's Opening Brief at 31-37.

---

misdemeanor served as an alternate ground for the criminal history point that the PSR assessed for the DWAI sentence. A. 162-64. Valente also challenges that determination on appeal. Valente's Opening Brief at 31. Although Valente agreed at the sentencing hearing that the aggravated unlicensed operation sentence served as an independent basis for assessing a criminal history point, A. 163, and therefore likely waived his appellate claim, in this brief, the government relies only on the DWAI sentence as a basis for that criminal history point. Because "unlicensed operation" is similar to "[d]riving without a license or with a revoked or suspended license," as listed in U.S.S.G. § 4A1.2(c)(1), and Valente received only a fine, PSR ¶ 120, the sentence for that violation likely should not have been counted in the alternative. *See infra* pages 33-34.

## B. Governing Law

### 1. Determining Whether Prior Sentences for Non-Felony Offenses are "Counted" for the Purpose of Assessing Criminal History Points

In order to determine a convicted offender's "criminal history category" for the purpose of identifying a guidelines sentencing range, a district court first counts the offender's criminal history "points." U.S.S.G. § 4A1.1. Points are added to the offender's total score for various reasons, including for each qualifying "prior sentence." *Id.* A prior sentence, defined as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense," *id*. at § 4A1.2(a)(1), is either "counted" or "excluded" for this purpose based on rules set out in the sentencing guidelines. *Id*. at § 4A1.2(c); *Potes-Catillo*, 638 F.3d at 109 n.2 (explaining that "counted" in the guidelines means "countable" because other provisions "may direct the sentencing court not to assign points to the sentences for a variety of reasons").

Section 4A1.2(c) sets out rules for determining whether "prior sentences" are counted or excluded. "Sentences for all felony offenses are counted." *Id.* In contrast, sentences for "misdemeanor and petty offenses" fall into three categories, which are best

described in the reverse order that they appear in the guideline.

First, a prior sentence for a non-felony offense is not counted if the offense either is listed in U.S.S.G. § 4A1.2(c)(2)[14] or, by whatever name known, is "similar to" those listed (c)(2) offenses. *Id*.; *United States v. Martinez-Santos*, 184 F.3d 196, 200 (2d Cir. 1999) ("Subsection 4A1.2(c)(2) . . . directs a court never to count the offenses listed there . . . or offenses 'similar' to them.").

Second, a prior sentence for a non-felony offense is counted if the offense is either listed in U.S.S.G. § 4A1.2(c)(1)[15] or, by whatever name known, is

---

[14] The offenses listed in U.S.S.G. § 4A1.2(c)(2) are:

> Fish and game violations
> Hitchhiking
> Juvenile status offenses and truancy
> Local ordinance violations (except those violations that are also violations under state criminal law)
> Loitering
> Minor traffic infractions (e.g., speeding)
> Public intoxication [and]
> Vagrancy.

[15] The offenses listed in U.S.S.G. § 4A1.2(c)(1) are:

"similar to" one of those listed (c)(1) offenses, and, in addituion, "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." *Id; Martinez-Santos*, 184 F.3d at 199 ("under the remarkably opaque language of § 4A1.2(c)(1), a prior misdemeanor or petty offense should be counted in calculating a defendant's criminal history score unless three conditions are met: (1) the sentence imposed was less than a term of probation of one year or a term of imprisonment of 30 days; (2) the prior offense and the instant offense are not 'similar;' and (3) the prior offense is one of those listed in § 4A1.2(c)(1).").

---

Careless or reckless driving
Contempt of court
Disorderly conduct or disturbing the peace
Driving without a license or with a revoked or suspended license
False information to a police officer
Gambling
Hindering or failure to obey a police officer
Insufficient funds check
Leaving the scene of an accident
Non-support
Prostitution
Resisting arrest [and]
Trespassing.

Third, prior sentences for non-felony offenses are always counted if the offense at issue is neither one of the offenses listed in U.S.S.G. § 4A1.2(c)(1) or (c)(2) nor similar to any of those listed offenses. *See* U.S.S.G. § 4A1.2(c) ("Sentences for misdemeanor and petty offenses are counted, except as follows. . . ."); *United States v. Ubiera*, 486 F.3d 71, 74-76 (2d Cir. 2007) (holding that shoplifting offenses were properly used to increase criminal history score without further analysis because they were not similar to "insufficient funds check" offense listed in U.S.S.G. § 4A1.2(c)(1)); *Martinez-Santos*, 184 F.3d at 200 ("Although the Guidelines limit the degree to which relatively minor infractions affect criminal history, they in no way suggest a presumption that misdemeanors and petty offenses should be disregarded. In fact, the exception begins with the introduction: 'Sentences for misdemeanor and petty offenses are counted, except as follows.'").

The "similar to" comparison used in subsections (c)(1) and (c)(2) necessitates inquiry into whether "the unlisted offense under scrutiny" is "categorically more serious" than a listed offense. *United States v. Morales*, 239 F.3d 113, 118 (2d Cir. 2000) (citations omitted). Importantly, in this context, "categorically" does not require an elemental approach or foreclose inquiry into the facts underlying an offender's prior offense of conviction. Rather, it means "without qualification or reservation." *Id*. at 118 n.5. Although "the prior offenses [often] are defined and the

sentences imposed under state law . . . classification of unlisted offenses pursuant to § 4A1.2(c) is a matter of federal law." *Martinez-Santos*, 184 F.3d at 198.

An Application Note added in Sentencing Guidelines Amendment 709 provides further guidance:

> In determining whether an unlisted offense is similar to an offense listed in subsection (c)(1) or (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

U.S.S.G. § 4A1.2 cmt. n.12(A); *see also United States v. DeJesus-Concepcion*, 607 F.3d 303, 304-5 (2d Cir. 2010) (*per curiam*) ("A district court may consider multiple factors in making its determination, including: [1] a comparison of punishments imposed for the listed and unlisted offenses, [2] the perceived seriousness of the offense as indicated by the level of punishment, [3] the elements of the offense, [4] the level of culpability involved, and [5] the degree to which the commission of the offense indicates a

likelihood of recurring criminal conduct.") (citation and internal quotation marks omitted); *Morales*, 239 F.3d at 118 (adopting the Fifth Circuit's "common sense approach which relies on all possible factors of similarity").

This Court has held that a district court also can consider "any other factor the court reasonably finds relevant in comparing prior offenses and Listed Offenses." *Martinez-Santos*, 184 F.3d at 206. This analysis includes consideration of "the actual conduct involved and the actual penalty imposed." *Ubiera*, 486 F.3d at 75 (quoting *United States v. Sanders*, 205 F.3d 549, 553 (2d Cir. 2000) (*per curiam*)). Thus, the facts underlying a prior conviction are relevant. *Id*. Further, "[i]n comparing an unlisted offense to the Listed Offenses, we look to the law of the state that obtained the prior conviction." *Id*. In addition, "as the multifactored nature of the relevant inquiry makes clear, the 'seriousness' of the offense is not measured merely by looking at the degree of physical danger posed. Rather, an assessment of an offense's seriousness should consider the degree of moral culpability required to obtain a conviction, how the state perceives the offense's seriousness, as well as other societal costs associated with it." *DeJesus-Concepcion*, 607 F.3d at 306.

### 2. The Guidelines' Treatment of New York State DWAI Infractions

#### a. The New York State DWAI Offense

Under New York Vehicle and Traffic Law ["NY VTL"] § 1192(1), the offense of "driving while ability impaired" or "DWAI" provides that "[n]o person shall operate a motor vehicle while the person's ability to operate such motor vehicle is impaired by the consumption of alcohol." A violation of this subsection is "a traffic infraction . . . punishable by a fine of not less than three hundred dollars nor more than five hundred dollars or by imprisonment in a penitentiary or county jail for not more than fifteen days, or by both such fine and imprisonment." NY VTL § 1193(1)(a).

#### b. Governing Law Before *United States v. Potes-Castillo*

In a series of decisions, this Circuit held that a prior sentence for a New York State DWAI infraction is properly used to increase an offender's criminal history score. *See United States v. Loeb*, 45 F.3d 719, 722 (2d Cir. 1995) ("we find that the district court properly counted [Loeb's New York DWAI sentence] towards his criminal history calculus"); *United States v. Moore*, 968 F.2d 216, 225 (2d Cir. 1992) ("Because Donahue's [New York] DWAI convictions are not 'minor traffic infractions' under the Guidelines, they

should have been taken into account in determining Donahue's Criminal History Category."); *United States v. Jakobetz*, 955 F.2d 786, 806 (2d Cir. 1992) ("Section 4A1.2(c)'s restrictions on the consideration of misdemeanor convictions, then, do not constrain the sentencing judge's discretion to consider the [New York] DWAI sentence, and the court below acted properly in considering this prior conviction when calculating appellant's criminal history."). Other Circuits reached the same conclusion with respect to sentences for non-felony offenses involving driving while under the influence of alcohol or with a blood-alcohol content above the legal limit. *See United States v. Pando*, 545 F.3d 682, 683-85 (8th Cir. 2008); *United States v. Thornton*, 444 F.3d 1163, 1165-67 (9th Cir. 2006); *United States v. LeBlanc*, 45 F.3d 192, 193-95 (7th Cir. 1995); *United States v. Deigert*, 916 F.2d 916, 918 (4th Cir. 1990).

These in-Circuit and out-of-Circuit decisions relied on Application Note 5 in the commentary to U.S.S.G. § 4A1.2. *See Pando*, 545 F.3d at 684; *Thornton*, 444 F.3d at 1166; *Loeb*, 45 F.3d at 719; *LeBlanc*, 45 F.3d at 194; *Moore*, 968 F.2d at 224; *Jakobetz*, 955 F.2d at 806; *Deigert*, 916 F.2d at 918. At the time of these decisions, before the application note was amended in November 1, 2012, it provided:

> Sentences for Driving While Intoxicated or Under the Influence. Convictions for driving while intoxicated or under the influence (and

> similar offenses by whatever name they are known) are counted. Such offenses are not minor traffic infractions within the meaning of §4A1.2(c).

U.S.S.G. §4A1.2 cmt. n.5 (2012).

### c. *United States v. Potes-Castillo* and Guidelines Amendment 766

*Potes-Castillo* addressed whether a sentence for a New York DWAI infraction "must categorically be counted when calculating a defendant's criminal history score." 638 F.3d at 107. The Court first explained that Application Note 5 – which, as quoted above, then provided that DWAI infractions "are not minor traffic infractions within the meaning of §4A1.2(c)" – establishes only that a DWAI sentence is not automatically excluded from consideration in increasing a criminal history score under U.S.S.G. § 4A1.2(c)(2). 638 F.3d at 110. Then, noting that "minor traffic infractions" are listed in U.S.S.G. § 4A1.2(c)(2), not in (c)(1), the *Potes-Castillo* Court decided that "whether the language of Application Note 5 forecloses the possibility that the exception set forth in section 4A1.2(c)(1) might apply" to a DWAI infraction was an open question. *Id*. Despite language in the application note that such sentences "are counted," *Potes-Catillo* concluded that a sentence for a DWAI infraction could be determined to be similar to "careless or reckless driving," one of the offenses listed in (c)(1) and that, in such a case, a prior DWAI

sentence should not be counted when computing a criminal history score unless the other requirements in that subsection were satisfied. *Id*. at 111-12. The Court made clear that the question whether a DWAI infraction was "similar" to "careless or reckless driving" was a matter for the district court to decide in the first instance, using the multi-factor test described in Application Note 12(A) and *DeJesus-Concepcion*. 638 F.3d at 113.[16]

In 2012, the United States Sentencing Commission addressed the split that *Potes-Castillo* created between the Second Circuit and the four other circuits that had held that DWAI sentences always counted in the

---

[16] On remand, the district court found that "a DWAI offense cannot be said to be 'categorically more serious' than a reckless driving offense," *Gonzalez-Rivera*, *supra*, 2011 WL 4916395 at *5. Because this was tantamount to finding that DWAI was "similar to" a reckless driving offense, making U.S.S.G. § 4A1.2(c)(1) applicable, the DWAI sentence was not counted because the other requirements of that subsection were not satisfied. *See Potes-Castillo*, 638 F.3d at 113 ("We do note that Gonzalez–Rivera's sentence on the driving while ability impaired conviction was not more than one year of probation or imprisonment for at least thirty days, and his prior offense is not similar to his drug distribution conspiracy convictions. Thus, neither condition (A) nor (B) of section 4A1.2(c)(1) applies . . . .").

criminal history computation. *See* Federal Sentencing Guidelines Manual, Supp. to App. C., Amend. 766 ("This amendment resolves differences among circuits regarding when prior sentences for the misdemeanor offenses of driving while intoxicated and driving under the influence (and any similar offenses by whatever name they are known) are counted toward the defendant's criminal history score."); *see also Potes-Catillo*, 638 F.3d at 113 n.4 ("We acknowledge that other circuits have adopted the government's reading of Application Note 5.").

The Commission explained its awareness that "convictions for driving while intoxicated and similar offenses can be classified as anything from traffic infractions to misdemeanors and felonies, and . . . are subject to a broad spectrum of penalties." U.S.S.G. App. C, Amendment 766. It amended Application Note 5 to reflect its "view that convictions for driving while intoxicated and other similar offenses are sufficiently serious to always count toward a defendant's criminal history score." *Id*. As amended, the application note, which applied at Valente's sentencing, now reads:

> <u>Sentences for Driving While Intoxicated or Under the Influence</u>. − Convictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are always counted, without regard to

> how the offense is classified. Paragraphs (1) and (2) of §4A1.2(c) do not apply.

U.S.S.G. § 4A1.2 cmt. n.5.

### C. Standard of Review

This Court reviews a sentencing court's "interpretation of the Sentencing Guidelines *de novo*, but review[s] its related findings of fact only for clear error." *Potes-Castillo*, 638 F.3d at 108-09. "The *de novo* standard applies to our consideration of the proper interpretation of U.S.S.G. § 4A1.2(c)." *Id*. at 109.

When deciding whether on offense for which an offender previously has been sentenced is "similar to" an offense listed in U.S.S.G. § 4A1.2(c), this Court has articulated a nuanced approach, one that applies *de novo* review when the offender's prior offense "punishes only one basic form of conduct" and shows "due deference" when the offense punishes "a range of conduct" and requires "a sentencing judge making the 'similar to' comparison" to apply[ ] the guideline to the facts." *United States v. Morales*, 239 F.3d 113, 117–18 (2d Cir. 2000).

## D. Discussion

### 1. As Amended Application Note 5 Makes Clear, the District Court, as a Matter of Law, Properly Counted Valente's DWAI Sentences When Determining His Criminal History Score.

By challenging the amended Application Note 5 as a violation of the Separation of Powers and Due Process Clauses, and as inconsistent with the text of U.S.S.G. § 4A1.2, *see* Valente's Opening Brief at 31-33, Valente tacitly concedes that, if applied, it forecloses his challenge to the district court's decision to count the two DWAI convictions. The text of the new application note – "[c]onvictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are always counted, without regard to how the offense is classified. Paragraphs (1) and (2) of § 4A1.2(c) do not apply." – could not be more clear.

Valente's various challenges to the amended application note are not persuasive. His unsupported contention that the Sentencing Commission violated the Separation of Powers Clause of Article I by amending guidelines' commentary to resolve a split between Courts of Appeals is inconsistent with this Court's decision in *United States v. Ravelo*, 370 F.3d 266 (2d Cir. 2004). Without expressing any concerns about constitutionality, *Ravelo* applied a split-

resolving guidelines amendment that added a definition of "intended loss" to the commentary for U.S.S.G. § 2B1.1. *Id.* at 270-71. Nor has this Court doubted the Commission's power to overturn judicial interpretations of guidelines provisions. *See, e.g.*, *United States v. Patasnik*, 89 F.3d 63, 71 n.4 (2d Cir. 1996) (referring to decisions of other circuits having been overturned by an amendment to the commentary to U.S.S.G. § 3B1.1). Indeed, split-resolving amendments to guidelines commentary have occurred in several contexts. *See, e.g.*, Amendment 500 (amending commentary to U.S.S.G. § 3B1.1); 617 (amending commentary to U.S.S.G. § 2B1.1); 780 (amending commentary to U.S.S.G. § 1B1.10). Research by government counsel did not locate any federal court decision suggesting that such amendments violate the Separation of Powers Clause.

Valente's Due Process Clause challenge is similarly unpersuasive. He (somewhat tentatively) contends that a defendant who admits to a DWAI infraction in court may be told that he has not committed a crime and that "[a]rguably, when such conduct is later treated as a crime [by increasing the defendant's criminal history score following a later federal conviction], it violates the defendant's right to due process." Valente Opening Brief at 33. But, it cannot be the case that a criminal defendant is constitutionally entitled to advance warning about every judicial event that a federal district court judge may later consider at sentencing. Federal courts are

empowered to take into account any and all matters relevant to the sentencing factors in 18 U.S.C. § 3553(a) when imposing sentence. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). A due process limit on the advisory guidelines like the one that Valente proposes is inconsistent with well-settled law. *See Williams v. New York*, 337 U.S. 241, 247 (1949) (no due process limit on a sentencing court's consideration of "the fullest information possible concerning the defendant's life and characteristics").

Nor is the amended application note "inconsistent with the text" of the guideline as Valente argues. Valente's Opening Brief at 31-32. The exclusionary provisions of U.S.S.G. § 4A1.2(c)(1) and (c)(2) embody judgments about the relative severity of various non-felony offenses. The amendment to the application note simply reflects the Sentencing Commission's determination that offenses that involve driving a motor vehicle while impaired by alcohol − whether labeled "misdemeanor," "petty offense," "violation," "infraction," or something else − are sufficiently harmful to escape those exclusionary rules and instead always merit inclusion in an

offender's criminal history scoring. There is substantial support for that judgment.[17]

Finally, Valente relies on the decision in *United States v. Paredes*, ___ F. Supp. 3d ___, 2016 WL 2619845 (E.D.N.Y. May 5, 2016). In *Paredes*, Senior Judge Weinstein refused to apply amended Application Note 5 and did not count Paredes' New York DWAI sentence when imposing sentence. *Paredes* held that the application note did not apply because (a) it refers to "convictions," and violations of the New York DWAI statute are "infractions," meaning that Paredes "probably" was advised in state court that he was not admitting to a crime; and (b) a person can commit a DWAI offense even if not driving and thus it is not categorically more serious that offenses listed in U.S.S.G. § 4A1.2(c)(1), including reckless driving. *Id*. at *7.

Valente's reliance on *Paredes* is unavailing. First, the "infraction/conviction" distinction does not matter. The Application Note makes clear that it applies "without regard to how the offense is classified." U.S.S.G. § 4A1.2 cmt. n.5. Indeed, Amendment 766

---

[17] *See, e.g.*, http://www.cdc.gov/motorvehicle safety/impaired_driving/impaired-drv_factsheet.html (Centers for Disease Control fact sheet about alcohol-impaired driving, noting an average of 28 fatalities per day in the United States and an annual cost of $44 billion).

explains that "convictions for driving while intoxicated and similar offenses can be classified as anything from traffic infractions to misdemeanors and felonies and they are subject to a broad spectrum of penalties." It would lead to unwarranted nationwide sentencing disparities, inconsistent with 18 U.S.C. § 3553(a)(6), to condition criminal history scoring on the manner in which each state chooses to name and classify its alcohol-related driving offenses and the advice about future consequences it requires, if any, when an offender pleads guilty or otherwise admits such conduct in state court.

Further, although it may be possible for an offender to commit a DWAI infraction in a less dangerous way, such as when not driving a vehicle, that does not prevent the Sentencing Commission from assigning a criminal history point to all violations without regard to the facts of any particular violation. Indeed, the guidelines' approach of assigning criminal history points to groups of offenses necessarily presupposes that within each group there may be differences in the underlying conduct. That such an approach estimates severity without absolute precision does not render it invalid. And, in most cases, district courts have discretion to depart under U.S.S.G. § 4A1.3(b) for an over-stated criminal history category or vary downward to account for any perceived unfairness.[18]

---

[18] Because the criminal history scoring required by Application Note 5 in *Paredes* would have foreclosed

In short, Valente offers no sound reason why Application Note 5 does not apply here. Nor does he dispute that the district court's scoring of the DWAI sentences were consistent with that note.

#### 2. Even If Application Note 5 Did Not Require Counting of Valente's DWAI Sentences, the District Court Properly Exercised Its Discretion by Doing So.

Even if this Court were to agree with Valente that amended Application Note 5 does not apply, it nonetheless should reject his challenge to the district court's decision to count the DWAI sentences. As the guidelines and this Court's decisions, including *Potes-Castillo*, make clear, the district court appropriately could consider all relevant circumstances, including Valente's conduct, when deciding whether his DWAI infractions were "categorically more serious" than the offenses listed in U.S.S.G. § 4A1.2(c)(1), such as "careless or reckless driving." 638 F.3d at 113 (remanding for district court to apply multi-factor test, including the actual conduct and "the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct").

---

application of the so-called "safety-valve" provision in 18 U.S.C. § 3553(f), thereby necessitating imposition of a statutory mandatory minimum sentence, such discretion was not available there. *See id*. at 2-3. The same is not true here.

Consideration of the full range of Valente's alcohol-related-driving conduct reveals the following: Valente's first challenged DWAI sentence arose from Valente having been stopped while speeding with a suspended license, his failure of field sobriety tests, and a determination that he had a BAC of 0.11%. PSR ¶ 120. Under New York law, a person who operates a motor vehicle while having a BAC of 0.08% or higher is *per se* intoxicated. NY VTL § 1192(2).

Valente's second DWAI arrest occurred less than two years later, again when he was speeding, this time at 11:38 p.m. Valente failed a field sobriety test and a portable breath test. PSR ¶ 121. The PSR and the district court noted that Valente was originally charged with misdemeanor "driving while intoxicated" ["DWI"] for this offense. PSR ¶ 121; A. 164.[19] The district court judge also noted that "[h]e was never charged with a felony as a result of the second arrest for DWI, and he pled guilty to the DWAI and speeding

[19] Under NY VTL § 1192(3), the offense of "driving while intoxicated," or "DWI," provides that "[n]o person shall operate a motor vehicle while in an intoxicated condition." DWI is a misdemeanor, "punishable by a fine of not less than five hundred dollars nor more than one thousand dollars, or by imprisonment in a penitentiary or county jail for not more than one year, or by both such fine and imprisonment." *Id*. at § 1193(1)(b)(i).

. . . ." A. 164. The court explained that Valente was placed on a conditional discharge, "in essence, a probationary sentence," which was later revoked due to his failure to comply. A. 164-65; PSR ¶ 121.

Within seven months of the sentencing for this second DWAI, Valente was again arrested for driving while impaired, again at night, this time after making an illegal left turn and failing to use his turn signal. Both a portable breath test and a chemical test showed his BAC was 0.08% or higher. This offense resulted in a misdemeanor conviction for DWAI with two prior convictions. *See* NY VTL § 1193(1)(a). PSR ¶122.

Before this third DWAI arrest was resolved by guilty plea, Valente was again arrested for driving with a BAC over the legal limit, his fourth alcohol-related driving arrest in a little over six years. PSR ¶ 123. This resulted in a misdemeanor DWI conviction and a probationary sentence. Less than three months after sentencing, Valente violated probation by driving a vehicle without an ignition interlock device. PSR ¶ 123. Before that probation violation was resolved, Valente was again arrested for driving a vehicle without an interlock device. He repeatedly provided false identification information to the arresting officer. PSR ¶ 124.

This is compelling evidence that Valente was an unrepentant recidivist drunk and reckless driver with little or no regard for court-ordered restrictions on his

conduct. Under those circumstances, the district court was well within its discretion, after considering "the entire history of the criminal history here," which included both "alcohol-related behavior" and "the failure by Mr. Valente to abide by any restrictions placed on his behavior imposed by the Courts as a result of these convictions," A. 163-64, to determine that Valente's first two DWAI offenses were categorically more serious than "careless or reckless driving." Thus, the district court could properly assess a criminal history point for each of the DWAI sentences under U.S.S.G. § 4A1.2(c).

#### 3. The District Court Correctly Counted Valente's Conviction for Using a Vehicle Without an Ignition Interlock Device.

Under New York State law, a person convicted of driving while intoxicated under NY VTL § 1192(3) (as Valente was so convicted on February 4, 2013, *see* PSR ¶ 123) is ordered "to install and maintain, in accordance with [NY VTL § 1198] an ignition interlock device in any motor vehicle owned or operated by such person during the term of" that person's probation. NY VTL §§ 1193(1)(b)(ii) and 1198(2).[20] A person subject to that requirement who

---

[20] An "ignition interlock device" is defined as "[a]ny blood alcohol concentration equivalence measuring device which connects to a motor vehicle ignition system and prevents a motor vehicle from

uses a vehicle not equipped with an ignition interlock device is guilty of a misdemeanor. NY VTL § 1198(7)(a) and (c).

Based on Valente's history of driving a vehicle when impaired by alcohol, including with a BAC over the legal limit for on several occasions, as well as his earlier violation of probation by using a vehicle without an interlock device, all as recounted above, the district court acted within its discretion when it determined that Valente's offense was categorically more serious than the § 4A1.2(c)(1) offenses that Valente claims on appeal are similar: reckless driving, driving with a revoked or suspended license, and providing false information to a police officer. Valente's Opening Brief at 36-37. Remarkably, during the relevant incident, Valente did *all three* of those things − drove recklessly by using a cellular telephone, repeatedly lied to police, and drove without a valid license – *in addition to* the interlock offense for which he was sentenced. Under all of these circumstances, his challenge should be rejected.

---

being started without first determining through a deep lung breath sample that the operator's equivalent breath alcohol level does not exceed the calibrated setting on the device as required by [NY VTL § 1198]."

## Point II: The District Court Properly Assessed Two Criminal History Points for Valente's Recidivist DWAI Sentence Despite the Delay in Valente's Service of His Resulting Sixty-Day Jail Term Due to Medical Issues.

### A. Background

Relying on U.S.S.G. § 4A1.1(b), the PSR recommended that the district court assign Valente two criminal history points for his sentence for a recidivist DWAI offense[21] – committed after two previous convictions – for which he was sentenced to 60 days in jail and three years' probation. PSR ¶ 122.[22] In the district court, Valente objected, arguing that he should receive only one point for this sentence under § 4A1.2(c)(1), and that the second point was unwarranted because he had not yet actually served the sixty-day jail sentence as required to trigger U.S.S.G. § 4A1.1(b). He further contended that the

---

[21] See *supra* page 51 for a more complete description of this offense, as well as the statutory basis.

[22] Valente remained subject to this three-year term of probation, which was imposed on January 27, 2014, PSR ¶ 122, when the district court imposed sentence in this case on November 20, 2015.

circumstances "strongly suggest[ ]" that he received a "revocable disposition" under a provision of New York law that he characterized as "essentially" a suspended sentence. A. 114; PSR at pp. 63-64.

Valente's contention prompted the Probation Office to conduct further investigation. It provided the following explanation for the delay in Valente's service of the sixty-day jail sentence:

> Records from Albany County Probation indicate the defendant has not yet been mandated to serve the jail time due to ongoing medical issues. However, Albany City Court records do not indicate the jail time has been officially suspended or stayed. It appears the 60 days jail was imposed as a condition of Valente's probation which has not yet been enforced. Furthermore, on October 15, 2015, the probation officer consulted with the U.S. Sentencing Commission which advised that this offense should be scored 2 criminal history points based upon the pronounced sentence which shows no record of having been officially suspended by the Court. Therefore, this conviction has been scored pursuant to U.S.S.G. §4A1.1(b) and 4A1.2(a)(3) has been found not to apply.

PSR at pg. 66.

At sentencing, the district court rejected the defense objection to the scoring of the second point. A. 166.

### B. Governing Law: The "Actually Served" Requirement

Subsection 4A1.1(b) of the sentencing guidelines provides that two points are added to an offender's criminal history score "for each prior sentence of imprisonment of at least sixty days" not exceeding one year and one month. Under U.S.S.G. § 4A1.2(b)(1), "[t]he term 'sentence of imprisonment' means a sentence of incarceration and refers to the maximum sentence imposed." Importantly, Application Note 2 to U.S.S.G. § 4A1.2 further provides that "[t]o qualify as a sentence of imprisonment, *the defendant must have actually served a period of imprisonment on such sentence* (or, if the defendant escaped, would have served time). *See* §4A1.2(a)(3) and (b)(2)." U.S.S.G. § 4A1.2 cmt. n.2 (emphasis added).

As the citations to sections 4A1.2(a)(3) and (b)(2) in Application Note 2 make clear, a prior suspended or stayed sentence, under which a sentenced offender does not actually serve a term of imprisonment, does not qualify for the two-point addition to the offender's criminal history score under U.S.S.G. § 4A1.1(b). Rather, at most, such a sentence would merit a one-point addition under U.S.S.G. § 4A1.1(c). *See* U.S.S.G. § 4A1.2(a)(3) ("A conviction for which the imposition or execution of sentence was totally

suspended or stayed shall be counted as a prior sentence under §4A1.1(c).”). Similarly, if a portion of a prior term of imprisonment is suspended, the duration of that portion would not count as a “sentence of imprisonment.” *See* U.S.S.G. § 4A1.2(b)(2) (“If part of a sentence of imprisonment was suspended, ‘sentence of imprisonment’ refers only to the portion that was not suspended.”).

Although perhaps not contemplated by the Sentencing Commission, courts have had to confront situations in which an offender who previously was sentenced to a term of imprisonment did not actually serve that term for reasons other than “escape” (which, under the commentary, still would qualify as a “sentence of imprisonment”) or suspension or a stay of the sentence (which would not).

For example, in *United States v. Thompson*, 925 F.2d 234 (8th Cir. 1991), Thompson was “tried, convicted and sentenced in Arkansas circuit court to three years imprisonment for keeping a gambling house” and that conviction was affirmed on appeal. *Id*. at 235. But, “[f]or some inexplicable reason,” which may have been negligence, “Thompson was never picked up by the Arkansas authorities and, consequently, he never served a single day of this state conviction.” *Id*.

When Thompson was later convicted in federal court for drug trafficking offenses, the district court

added three points to his criminal history score under U.S.S.G. § 4A1.1(a) based on a prior "sentence of imprisonment." *Id.* Relying on the language in Application Note 2 that an offender "must have actually served a period of imprisonment on such sentence," Thompson challenged this three-point increase on appeal. *Id.* The appellate court rejected the challenge. Acknowledging that "a suspended imposition of sentence does not count as a 'sentence of imprisonment' for purposes of determining criminal history points," the court noted that "[t]he State of Arkansas took no affirmative steps to relieve Thompson of his obligation to serve eighteen months in prison." *Id.* Accordingly, it concluded that "[a]bsent some type of affirmative conduct by the state relieving Thompson of his penal obligation, this Court must affirm the three criminal history points assessed against him for a past 'sentence of imprisonment.'" *Id.* at 235-36.

More recently, in *United States v. Reid*, ___ F.3d ___, 2016 WL 3606371 (8th Cir. July 5, 2016), the defendant, relying on the "actually served" language in the application note, contested a three-point addition to his criminal history score for a ten-year term of imprisonment that he had not yet begun to serve because it was consecutive to a pre-existing twenty-five-year sentence. *Id.* at *3. The appellate court rejected this contention, explaining that "the provisions [referring to suspended sentences] cited in the commentary elucidate the meaning of this

passage." *Id*. "In other words, where a State takes 'affirmative steps' designed to relieve a defendant of his obligation to serve time in prison, the term of imprisonment formally imposed by the court does not count." *Id*. (citation omitted).

> Where, on the other hand, the State imposes an obligation to serve a term of imprisonment for a prior conviction, the conviction results in a prior sentence of imprisonment. The parenthetical in the commentary concerning escaped prisoners shows that actual service of a sentence is not a universal prerequisite. We held in *Thompson*, for example, that where authorities simply failed to pick up a defendant after sentencing, and he avoided prison through inadvertence or negligence of the State, his sentence still constituted a "sentence of imprisonment." The Fifth Circuit in *United States v. Duffy*, 29 F.3d 625, ___ (5th Cir. 1994), rejected Reid's precise argument. The court explained that adopting Reid's interpretation of the commentary would reward aberrant behavior by treating a harsher consecutive sentence yet to be served more leniently than a concurrent sentence already in progress. We agree. Reid was sentenced to a term of imprisonment in 1998, and the State has done nothing to relieve him of the obligation to serve it. The district court therefore properly assessed three criminal history points based on the 1998 conviction.

*Id*. at *4 (citation and footnote omitted); *see also United States v. Rayborn*, 957 F.2d 841, 844-45 (11th Cir. 1992) (affirming addition of three criminal history points for prior sentence of imprisonment when defendant was free on bond following imposition of term of imprisonment because he was subject to the control of that sentence and could have been required to report at any time).

In *United States v. Shick*, 258 F. App'x 370 (2d Cir. 2007) (summary order), this Court was presented with arguments concerning the proper interpretation of the "actually served" language in Application Note 2 but found it unnecessary to resolve them. *Id*. at 372.

### C. Standard of Review

"The district court's interpretation and application of the Sentencing Guidelines is a question of law, which [this Court] review[s] *de novo*." *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016) (citation omitted). It "review[s] the district court's findings of fact as relevant to the sentencing decision for clear error." *Id*.

### D. Discussion

#### 1. The District Court Properly Assessed Two Criminal History Points for Valente's Yet-Unserved Sixty-Day Jail Term for His Recidivist DWAI Conviction.

Valente seeks a windfall from New York's willingness to delay for medical reasons his imprisonment following sentencing for his recidivist DWAI conviction. This effort should fail for several reasons.

First, Valente's speculative claim that his sixty-day jail term was effectively suspended, Valente's Opening Brief at 33-35, is simply wrong. Instead, as the Probation Office investigation determined, "[r]ecords from Albany County Probation indicate the defendant has not yet been mandated to serve the jail time due to ongoing medical issues." PSR at pg. 66.

Second, to enable Valente to profit from New York's largesse would be as anomalous as rewarding the defendants in *Reid* and *Duffy* for their delayed imprisonment due to the consecutive nature of their prior sentences or providing an undeserved benefit to the defendant in *Rayborn*, merely because he remained free on bond at the time of his federal offense. The decisions in those cases demonstrate that the only sensible reading of the "actually served" language in Application Note 2 is that it draws a line between prior

unserved terms of imprisonment that result from a determination that the defendant does not deserve or require imprisonment, such as when the sentence is suspended, and those that don't, such as when an offender escapes, the prior sentence is made consecutive to one that the offender already is serving, or the offender is released pending appeal. Thus, it is hardly surprising that the Sentencing Commission, when contacted by the Probation Office in this case, opined that two points should be added to Valente's criminal history score based on the sixty-day term of imprisonment imposed for his recidivist DWAI conviction, despite the delay in his actual imprisonment due to medical issues. PSR at pg. 66.

Third, because Valente is subject to court supervision for the recidivist DWAI conviction during the three-year term of probation, which remained in effect when he was sentenced in federal court in this case, he, like the defendant in *Rayborn*, could have been required to report to serve his sentence at any time.

For all of these reasons, the district court properly added two points, not one, to Valente's criminal history score for his recidivist DWAI conviction.

### 2. In Any Event, Any Error in Scoring Valente's Recidivist DWAI Conviction Was Harmless.

Even if this Court were to conclude that the district court erred by assessing the second criminal history point for Valente's recidivist DWAI conviction because he had not yet served the sixty-day jail sentence, that error would be harmless. Such a determination would result in Valente having seven, not eight, criminal history points. That correction would leave Valente in criminal history category IV. Thus, his advisory guidelines range would be unaffected. Accordingly, no remand would be necessary. *See, e.g., United States v. Defeo*, 36 F.3d 272, 277 (2d Cir. 1994) (deciding that it was unnecessary to resolve dispute about criminal history score because either outcome would leave the criminal history category unaffected); *United States v. Caesar*, 124 F. App'x 60, 61 (2d Cir. 2005) (summary order) (explaining that error under those circumstances would be harmless and citing out-of-Circuit decisions to that effect).

## Point III: The District Court Did Not Abuse Its Discretion in Determining the Loss Amount.

### A. Background

The PSR determined that the guidelines loss amount from Valente's fraud was $4,724,579.69. PSR

¶ 104. This figure was derived from the amount that victims invested with Valente as a result of the fraud scheme – $10,605,506.27 – reduced by the amount that Valente returned to some investors while ELIV was in operation – $2,404,926.58 – and further reduced by the estimated value of ELIV funds at the time they were frozen by federal court order – $3,476,000.00. PSR ¶ 89. The PSR-recommended loss amount would result in an 18-level increase to Valente's offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J) (2014). PSR ¶ 104.

Initially, Valente did not object to either the figures used to determine loss or the conclusion as to the loss amount in the PSR, but instead explained that he "wishes to insert a 'placeholder' pending the ultimate determination of these figures . . . so as not to be viewed as waiving a future challenge." PSR at pp. 61-62. Valente also noted that anticipated guidelines amendments in November 2015 might affect the loss calculation. *Id.* In his later-filed sentencing memorandum, Valente argued that the proper loss amount was $2.2 million, which would yield a 16-level increase. A. 82-84. Valente reiterated this contention at the sentencing hearing. A. 152-54.

The district court rejected Valente's challenge. It determined that the methodology the Probation Office used to determine the loss amount was "reasonable" and that "it results in a conservative loss amount."

A. 154. It accordingly increased Valente's offense level by 18. A. 155.

Valente renews his argument on appeal. Alleging that there were difficulties in valuing the frozen ELIV assets, he argues that the resulting uncertainty required that the district court use "intended loss" to determine the guidelines loss amount, and that $2.2 million was the intended loss. Valente's Opening Brief at 44-48.

## B. Governing Law

Under U.S.S.G. § 2B1.1, the guideline provision used to determine Valente's offense level, an offender's offense level is increased based on specified ranges of "loss." *Id*. at § 2B1.1(b)(1). Application Note 3 to U.S.S.G. § 2B1.1 provides guidance to courts on determination of loss amount. Several subsections are relevant here.

As a "general rule," and subject to exclusions not relevant here, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A); *United States v. Rivernider*, No. 13-4865-CR, 2016 WL 3632496, at *13 (2d Cir. July 7, 2016). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." *Id*. at n.3(A)(ii). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances,

reasonably should have known, was a potential result of the offense." *Id*. at n.3(A)(iv).

"A district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." *Rivernider*, 2016 WL 3632496, at *13 (citations and internal quotation marks omitted); *see also United States v. Norman*, 776 F.3d 67, 79 (2d Cir.), *cert. denied*, 135 S. Ct. 2333 (2015). "The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors [including] the following: (i) The fair market value of the property unlawfully taken . . . ." U.S.S.G. § 2B1.1 cmt. n.3(C).

### C. Standard of Review

"Facts in support of a sentencing calculation need only be proven by a preponderance of the evidence, and the district court's findings will not be disturbed unless clearly erroneous." *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016) (citation and internal quotation marks omitted). "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(C).

## D. Discussion

The district court properly adopted the PSR-recommended loss amount, which was based on three figures, two of which Valente admitted and a third that he has never alleged or demonstrated to be inaccurate. The first step in the loss calculation was identification of the total amount of money that investors provided to Valente and ELIV as a result of the fraud. That figure, $10,605,506.27, is itemized by victim in the PSR at pages 58-60. The PSR then deducted the dollar amount that Valente returned to victims, falsely claiming that it was principal or return on their investments. PSR ¶ 89. This amount, $2,404,926.58, also is itemized by victim in the PSR. In his plea agreement, Valente admitted that both of these figures are accurate: "[a]t the time that ELIV ceased operations pursuant to the court-ordered preliminary injunction and asset freeze, approximately $2.4 million of the more than $10 million dollars of investor principal that VALENTE had received from investors during ELIV's operational period had been returned to investors with the false representations that these payments were a return of principal or a distribution of profits." A. 19 at ¶ 5(n).

Finally, the PSR deducted the value of the assets in the ELIV account on June 2014, the end of the mail fraud scheme, *see* GA. 16, when they were frozen by district court order. At this time, the assets were valued at approximately $3,476,000. Subtracting the amount returned and the amount frozen from the

investor's payments to Valente yielded the loss amount of $4,724,579.69 that the PSR recommended and the district court adopted. PSR ¶ 89. Such use of the actual amount lost by defrauded investors is appropriate. *See, e.g.*, *Norman*, 776 F.3d at 79–80 (affirming loss amount based on evidence of the dollar amount of investments); *United States v. Ware*, 577 F.3d 442, 454 (2d Cir. 2009) (loss amount properly based on investor losses).

Valente does not directly challenge the approximate value of the frozen assets *in June 2014* that the PSR and the district court used to determine loss amount. Rather, he focuses on difficulties in determining the value of the frozen funds *at a later time*. As the PSR explained:

> Of note, *as of this writing*, the Government has indicated that agents are working on determining the fair market value of the frozen investor funds *which as of June 2014 was $3,476,000*. The Government has indicated that determining the *current value* of the frozen assets has been challenging given the nature of the illiquid, non-public investments which are held by Felix Advisors. On July 21, 2015, the Government obtained a spreadsheet from Felix Advisors which purported to show *the present value* of ELIV investments which are currently held by Felix Advisors. The Government's interpretation of the spreadsheet provided by

> Felix Advisors is that based upon the current price per share, the number of shares, and without the determination of fees, the current value of the frozen investments is $1,531,215.44. The government has noted this number is continually changing due to the liquid nature of the investments. It is noted many of the stocks have a current value of less than $1.00 per share, and this current value is based upon the assumption that any stock with a value of less than $1.00 per share is not readily saleable. Furthermore, the spreadsheet also indicates that there are several items listed in the spreadsheet with no value.

PSR ¶ 31 (emphasis added).

But, the PSR also made clear that this less certain present value played no role in the loss calculation. PSR ¶ 89, n.5 ("the value of the assets on the date they were frozen has been utilized to calculate the loss figure instead of the current value of the frozen assets"). Thus, when Valente argues that "[t]he Justice Department . . . found it difficult" to ascertain the value of the frozen assets; that "factors other than Valente's conduct negatively affected the value of the remaining assets"; and "a reasonable estimate could not be made of the actual loss," Valente's Opening Brief at 47, he is referring to difficulties that arose in valuing the frozen assets at the time the PSR was

prepared, not the earlier valuation that the PSR and the district court used to determine his loss amount.

Valente's brief includes only one reference to the valuation of the frozen assets that the PSR actually used to compute his loss amount. He states, without supporting citation to the record, that, after the ELIV assets were frozen, "[a] third party accountant was engaged to estimate the value of the assets but due to a fee dispute the accountant's work was never completed." Valente's Opening Brief at 46-47. This assertion paraphrases a passage in Valente's sentencing memorandum. A. 83.[23] As support, the sentencing memorandum (but not the brief) cites to filings in the SEC action against Valente, *Securities and Exchange Commission v. Valente et al*,. S.D.N.Y. Case No. 7:14-cv-03974-VB. *See* A. 83, n.11.

These passages about an uncompleted accounting are misleading. The supporting court filings cited in the Valente sentencing memorandum all pertain to Valente's motion in the SEC action to use a portion of the frozen assets to pay *Valente's accountant* for an

[23] The sentencing memorandum states: "A third party accountant was engaged to estimate the value of the remaining ELIV investments, but because of disputes over how her fee was to be paid, the work never was completed." A. 83.

accounting of the assets.[24] That an accounting by Valente's agent was not completed due to non-payment of fees has no import here. The PSR made clear that its recommended loss determination was based wholly on other sources of information. PSR ¶ 31.

Because Valente has not provided a reason to question any of the figures in the PSR, which the district court used to calculate the loss amount, or challenged the methodology used, the district court's actual loss determination should be affirmed.

## Point IV: The District Court Properly Applied the "Sophisticated Means" Enhancement.

### A. Governing Law

Under the 2014 version of U.S.S.G. § 2B1.1(b)(10), a defendant's offense level is increased by two if "the offense . . . involved sophisticated means." An Application Note explains that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id*. at § 2B1.1 cmt. n.9(B).

[24] The documents cited in the Valente sentencing memorandum as support, referenced in docket entries 43 through 50 in the SEC action, appear at GA. 10 to 107.

## B. Standard of Review

The standard of review for a district court's application of a sophisticated means enhancement is not entirely clear. Recently, this Court explained that, as a general matter:

> The district court's factual findings at sentencing need be supported only by a preponderance of the evidence. In reviewing a sentence, we will not overturn the district court's findings of fact unless they are clearly erroneous. We give due deference to district court sentencing decisions, taking into account totality of circumstances.

*Norman*, 776 F.3d at 76 (citations and internal quotation marks omitted).

In another decision, addressing a sophisticated means enhancement, the Court noted that the defendant "argues that the standard of review is *de novo*, with due deference to the sentencing court's application of the Guidelines." *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1449 (2015). In contrast, "[t]he government contends that we should review the application of this enhancement for clear error because the district court's determination of the issue was primarily factual." *Id*. This Court decided that "[w]e need not wade into the nuances of the different

standards of review because even on *de novo* review the sophisticated means enhancement was warranted in this case." *Id*.

### C. Discussion

Despite Valente's protestation that his conduct was not "especially" complex or intricate, Valente's Opening Brief at 55-56, the district court did not err by applying the enhancement. The PSR explained that Valente's "especially intricate or complex offense conduct" included "the creation of fictitious IRAs, falsifying statements related to the creation and rollovers of IRAs, and creating falsified documents in connection with such fraudulent activities related to IRAs which were ultimately sent to the IRS; and falsification of general account statements sent to investors . . . ." PSR ¶ 106. Despite defense objection, the district court agreed and elaborated on the sophisticated means that Valente employed:

> Unquestionably, he issued written, monthly, quarterly and annual statements containing lies about investment returns, the safety of the investment and such things as the existence of an auditor. He lies about his ability to accept, hold and manage IRAs, and the issuance of altered documents in an effort to deceive the IRS and the investors about the propriety of the IRAs. All of these things perpetuated his crimes, made them harder to detect, and further perpetuated the time frame in which the

> defendant could carry out his fraudulent behavior and continue to escalate the losses to the victims.

157-58.

Valente's conduct should be considered in totality. S*ee United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) ("even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together"). His consistently and thoroughly deceptive conduct with investors and the IRS was more sophisticated than an ordinary fraud scheme and sufficient to warrant the "sophisticated means" enhancement, whether that decision is reviewed *de novo* or more deferentially. *See Fofanah*, 765 F.3d at 146–47 ("We have recognized that the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense.").

## Point V: The District Court Properly Increased Valente's Offense Level for Obstruction of Justice.

### A. Background

The PSR recommended a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1 based on Valente's response to an SEC document demand during its civil investigation. As described above,

*supra* at pp. 8-9, and in the PSR, Valente "falsified a Felix Advisors spreadsheet which was sent to the SEC . . . and procured another person to conceal evidence that was material to the SEC investigation by directing Catherine Giaquinto to change a figure in that same spreadsheet to reflect an account holding of $10,000,000." PSR ¶ 93; *see also* PSR ¶¶ 61, 70.

Valente objected, arguing that his conduct related to a civil SEC action, not a criminal investigation. PSR at p. 63. He reiterated this contention in his sentencing memorandum, and further argued that the evidence used for this enhancement overlapped with the evidence used for the sophisticated means enhancement. A. 80-81.

At sentencing, the district court thoroughly described the relevant facts and law and applied the challenged enhancement:

> This, again, is paragraph 110, and it relates to whether or not there should be a plus two obstruction enhancement under 3C1.1 of the Guidelines. The PSR, at paragraph 110, relies on the conduct which is set forth in paragraph 93 to support the obstruction enhancement. In turn, paragraph 93 cites the bogus spreadsheet provided to the SEC and the fact that Mrs. [sic] Valente had Giaquinto change a figure in the spreadsheet to reflect that the investor account held assets of 10 million. And in turn, paragraph

93 cites paragraphs 61 and 70 for support of the assertion.

Paragraph 61 notes that the Felix Advisors provided a spreadsheet to Mr. Valente in March 2014 showing the gross holdings by he and his wife as 3.25 million, not 10 million, all of which Mr. Valente was aware of in the SEC investigation.

The paragraph also notes other actions by Mr. Valente to fraudulently show an escalated value of the holdings and to remove the information showing that some of the holdings belonged to him and his wife, not the investors. Paragraph 70 notes that the FBI served Miss Giaquinto with grand jury subpoenas in early August of 2014.

Reviewing the submissions of the parties, I concur with the observations of Probation and the Government. Probation, in the addenda, notes that the Felix spreadsheet and the Giaquinto changes took place in the SEC civil investigation, but it is relevant conduct that forms the basis of the criminal investigation. As such, 3C1.1, note 1, provides, “Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this Guideline if the conduct was purposely calculated and likely to thwart

the investigation or prosecute the offense of conviction." 3C1.1, note 4(C), further lists "producing or attempting to produce a false, altered or counterfeit document or record during an official investigation or judicial proceeding" as an example of covered conduct. There's no definition of official investigation requiring a criminal investigation and the SEC conduct evolved into the criminal investigation.

The Government further adds that Mr. Valente's conduct was clearly designed to induce the SEC to drop its investigation and forestall a criminal investigation. That's a logical conclusion that I believe is amply supported by the facts that are contained in the presentence report. Again, I note, the information alleges and the defendant admitted in his plea agreement and at the time of the plea that his criminal conduct occurred from December 2010 through June 16 of 2014. He further knew that as of April of 2009 he'd been barred from engaging in the business and conduct that forms the basis for the charges that are contained in the information. Thus, he well knew that his conduct after December 2010 was criminal. There's no question that the facts supporting the obstruction adjustment were designed to obstruct any investigation into his illegal conduct either by the SEC or other criminal investigating agencies, such as the FBI.

> It’s clear to me, again, that the enhancement applies and I so find.

A. 158-60.

On appeal, Valente contends that “there was insufficient evidence he willfully and purposefully obstructed the criminal investigation in this case,” that his conduct does not apply because the false statements in the spreadsheet were not under oath, and that his conduct is “similar to examples in the Commentary of conduct not covered by the enhancement.” Valente’s Opening Brief at 54. None of these contentions has merit.

### B. Governing Law

Guidelines section 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant’s offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

“Relevant conduct” includes “all acts . . . committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of

conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1).

"Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. n.1. A non-exhaustive list of examples of obstructive conduct in the commentary includes "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction," *id*. n.4(B), and "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." *Id*. n.4(C).

Efforts to obstruct an SEC civil investigation into the same conduct that forms the basis for the offense of conviction warrants an "obstruction of justice" enhancement under U.S.S.G. § 3C1.1. *Ware,* 577 F.3d at 454 (holding that increase "based on Ware's filing of the false Williams affidavit in the SEC civil investigation, which dealt with the same conduct for which Ware was found criminally liable here, was appropriate"); *United States v. Fiore,* 381 F.3d 89, 94–95 (2d Cir. 2004) (affirming enhancement based on

undisputed evidence "that DeSimone perjured himself in an SEC investigation involving the precise conduct for which he was criminally convicted: conspiracy to commit securities fraud and securities fraud"); *United States v. Bennett*, 252 F.3d 559, 566 (2d Cir. 2001) (affirming enhancement for conduct obstructing SEC investigation that occurred before criminal indictment).

## C. Standard of Review

"Obstruction of justice enhancements are subject to a mixed standard of review." *United States v. Ayers*, 416 F.3d 131, 133 (2d Cir. 2005) (citations omitted). A district court's findings of fact are upheld unless clearly erroneous. "Whether those facts constitute obstruction of justice, however, is a matter of legal interpretation subject to *de novo* review." *Id*. (citations omitted).

## D. Discussion

Valente's effort to obstruct the civil SEC investigation into the same conduct that resulted in his conviction merited an enhancement under U.S.S.G. § 3C1.1. When he responded to the SEC demand for records, it was clear that an honest response – one that would reveal that Valente had squandered the investors' funds and consistently defrauded them with false account statements – would subject him to criminal investigation and likely prosecution. Thus, the district court's determination that the obstructive

conduct "was clearly designed to induce the SEC to drop its investigation and forestall a criminal investigation" and "designed to obstruct any investigation into his illegal conduct either by the SEC or other criminal investigating agencies, such as the FBI," A. 160, was not clearly erroneous. Because this conduct fit clearly within the "obstruction of justice provision, which includes "producing . . . a false, altered, or counterfeit document or record during an official investigation or judicial proceeding," U.S.S.G. § 3C1.1 cmt. n.4(C), the district court properly increased Valente's offense level.

Valente's further contentions merit little comment. That the obstructive conduct was not under oath makes no difference. *Ayers*, 416 F.3d at 133-35 (holding that enhancement was appropriate when defendant had another destroy evidence during the pendency of a state criminal investigation). Finally, it is not surprising that Valente does not identify which of the examples of non-covered conduct in the commentary to U.S.S.G. § 3C1.1 was similar to his conduct. None of the examples are remotely similar to Valente's conduct. *See* U.S.S.G. § 3C1.1 cmt. n.5 (listing examples).

## Point VI: The District Court's Denial of Valente's Departure Motions is Not Appealable.

### A. Background

In his sentencing memorandum, Valente moved for a downward departure under U.S.S.G. § 4A1.3(b), claiming that his criminal history category overstated the seriousness of his criminal history and the likelihood that he would reoffend; and under U.S.S.G § 5H1.3 based on his mental and emotional conditions. A. 86-87. The government opposed the departure motions. A. 138-39.

The district court denied the motions:

> I'm satisfied that while those two sections do afford a basis for a Court to depart from the Guidelines, the facts of this case warrant no departure. As I've already noted, this view of Mr. Valente's past criminal behavior ignores the fact that he committed numerous misdemeanor violations, although associated with his penchant for driving while intoxicated. It also ignores his persistent disregard of court orders, conditional discharge and probation to obey the law. It also ignores the fact that his fraudulent behavior was designed to escape police detection. I'm hard-pressed to understand how a history of alcohol abuse justifies the fraud he imposed on more than a hundred people here

> and I don't believe that his criminal history is overstated in that regard. It reflects a penchant on his part for disregarding the law, just as his creation of ELIV in the first place ignored the fact that he'd been barred from the industry a year earlier.
>
> In addition, while clearly there are mental and emotional conditions that are reflected in the presentence report and reflected in his sentencing submissions, none of those things warrant a departure here in light of the fraudulent nature of the conduct and the harm that he caused the investors, which is amply demonstrated in the victim witness statements which I have seen and reviewed. Therefore, I don't believe any departures are warranted and I decline to reduce the scoring on the basis of the departures.

A. 169-70.

Valente reiterates his departure claims on appeal. Valente's Opening Brief at 38-43, 48-50. He also advances a new departure claim, arguing that the "sophisticated means" and "obstruction of justice" "overlapped in this case and therefore the district court should have departed downward on that basis." Valente's Opening Brief at 56. This contention is based on the fact that a preliminary draft of the PSR "listed the 'obstructive' conduct under both

enhancements." *Id*. Although Valente complained about this alleged "overlap" in the district court, he did not do so in the context of a departure motion. A. 81.

## B. Governing Law and Standard of Review

A district court's denial of a departure motion is generally unreviewable on appeal.

> As was true when the Guidelines were mandatory, we have held in the post-*Booker* sentencing regime that a refusal to downwardly depart is generally not appealable, and that review of such a denial will be available only when a sentencing court misapprehended the scope of its authority to depart or the sentence was otherwise illegal.

*United States v. Stinson*, 465 F.3d 113, 114 (2d Cir. 2006) (*per curiam*) (citations and quotation marks omitted); *see also United States v. Robinson*, 799 F.3d 196, 201–02 (2d Cir. 2015) ("a district court's decision not to depart from the Guidelines is generally unreviewable, unless it misunderstood its authority to do so."); *United States v. Cuevas*, 496 F.3d 256, 267–68 (2d Cir. 2007) (refusing to consider appeal of denial of departure motion when "[t]he District Court here clearly understood that it had the authority to grant the requested departures, but decided not to depart in consideration of the particular circumstances of Cuevas's case.").

### C. Discussion

Valente is not entitled to review of the district court's denial of his departure motions. He has not alleged, much less established, that the district court misunderstood its departure authority. Nor could he when, as the record quoted above demonstrates, the court explained that it had authority to depart but would not do so because of the facts in this case.

Nor can Valente credibly claim that the district court erred by not departing on a ground that was never the subject of a departure motion. In any event, that one facet of Valente's criminal conduct could be cited as evidence of both an obstruction of justice and the use of sophisticated means to perpetrate a fraud provides no basis for relief of any kind. *See, e.g.*, *United States v. Stevenson*, ___ F.3d ___, No. 14-1862-CR, 2016 WL 4375010, at *2 (2d Cir. Aug. 17, 2016) ("Nonetheless, multiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct. The relevant question, then, is whether the two enhancements serve identical purposes − in which case applying both would be double counting and would demonstrate procedural irregularity − or whether they address separate sentencing considerations.") (citations and internal quotation marks omitted).

## Point VII: Valente's 240-Month Within-Guidelines Term of Imprisonment Was Substantively Reasonable, Especially in Light of the Devastating Effect His Fraud Had on His Many Victims.

### A. Governing Law

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*). "Substantive reasonableness 'focuses on a district court's explanation of its sentence in light of the factors contained in 18 U.S.C. § 3553(a).'" *United States v. Matta*, 777 F.3d 116, 124 (2d Cir. 2015) (quoting *United States v. Gonzalez*, 529 F.3d 94, 98 (2d Cir. 2008)).

### B. Standard of Review

This Court's "review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). Under such review, district court sentences will be vacated on appeal only when they are "so 'shockingly high, shockingly low, or otherwise unsupportable as a matter of law' that allowing them to stand would 'damage the administration of justice.'" *Id*. (quoting *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009)).

In determining whether a sentence is substantively unreasonable, an appellate court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. Ultimately, this Court will set aside a sentence "only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *Id.* at 189 (quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)). While this Court does not presume that a within-Guidelines sentence is substantively reasonable, in "the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

### C. Discussion

Valente challenges the substantive reasonableness of his sentence by refashioning his departure claims as variance claims and by arguing further that reliance on the loss amount to determine offense level resulted in a sentence more severe than those imposed in other fraud cases; that, at age 58, he is unlikely to reoffend; that a lengthy sentence is unlikely to promote rehabilitation; and that he received no credit for his acceptance of responsibility, cooperation, and remorse. Valente's Opening Brief at 43-44, 50, 59-68.

None of his arguments demonstrate that the district court abused its considerable sentencing discretion by imposing a within-guidelines sentence.

First, it was well within the district court's discretion to refuse to vary downward based on a claim that Valente's criminal history category is overstated. In addition to the reasons that the district court provided for denying Valente's motion for a criminal history departure, *see supra* at 82-83, Valente's criminal record shows that on four occasions between 2006 and 2012, and despite previous convictions, he operated a motor vehicle while under the influence of alcohol, often without a valid license, threatening the lives and safety of other users of the roadways. It further shows that Valente repeatedly violated court-ordered restrictions on his conduct, including twice ignoring an obligation to use only vehicles that were equipped with ignition interlock devices to prevent intoxicated driving. PSR ¶¶ 120-24. Under these circumstances, it was not an abuse of discretion to refuse to impose a below-guidelines sentence based on a claim of an overstated criminal history score.

Second, although Valente suffers from various non-trivial medical and emotional problems, *see* PSR ¶¶ 134-58, there was no evidence presented to the district court that these challenges impaired his ability to function while he executed the fraud scheme and squandered the investors' savings by purchasing a ski condominium, jewelry, and liquor. Nor was there a

showing that the Federal Bureau of Prisons is unable to provide adequate care. Further, the district court was entitled to be skeptical about reducing Valente's sentence on this ground given his history of failing to appear for and cancelling various sessions designed to address his mental and emotional needs as well as his other non-compliance with treatment regimens. *See* PSR ¶¶ 146, 147, 153, 154. Further, it is unclear how a reduction in sentence would address Valente's medical and emotion problems. Under these circumstances, the district court did not abuse its discretion by refusing to vary downward from the guidelines range to address Valente's medical and emotional challenges.

Third, that the district courts in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) and *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), in stock fraud cases, chose to impose less severe sentences than the district court imposed here does not establish an abuse of discretion.

*Adelson* is dissimilar from this case for a host of reasons, including that the defendant there "was sucked into the fraud not because he sought to inflate the company's earnings, but because, as President of the company, he feared the effects of exposing what he had belatedly learned was the substantial fraud perpetrated by others." 441 F. Supp. 2d at 513. Further, he joined the charged conspiracy only near the end. *Id*. at 507. In contrast, Valente was the

mastermind and lone perpetrator of the crimes here from the outset. In addition, unlike Valente, Adelson's past history was "exemplary." *Id*. at 513. Also, in *Adelson*, loss was determined from intended loss based on stock devaluation, *id*. at 510, not the actual losses that investors suffered.

Finally, and significantly, in *Adelson*, there was no mention of the effect of the fraud scheme on victims. In contrast, as tragically demonstrated by the many victim statements attached to the PSR, Valente's victims often trusted him because of a personal relationship. The fraud devastated many of the investors and their families, both financially and in myriad other ways. The district court was entitled to conclude that the substantial harm that Valente caused to his victims merited the within-guidelines sentence it imposed. Such a focus on the extent of harm to victims is reflected in a 2015 amendment to U.S.S.G. § 2B1.1. *See* Federal Sentencing Guidelines Manual, Supp. to App. C, Amend. 792 at p. 112 ("Consistent with the Commission's overall goal of focusing more on victim harm, the revised victims table ensures that an offense that results in even one victim suffering substantial financial harm receives increased punishment . . . .").

This central feature of Valente's fraud also separates it from *Parris*. There, the district court distinguished the fraud defendants before it from those, like Valente, whose victims "were financially

ruined." 573 F. Supp. 2d at 746. Further, *Parris* involved "a rather typical 'pump and dump' scheme in the world of the high-risk penny-stock investor," *id*., not a defendant who developed personal relationships with unsophisticated investors in order to cheat them out of their life savings.

Nor does this Court's decision in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) lend support to Valente's claim that the sentence here was substantively unreasonable. In *Corsey*, the defendants concocted a bizarre loan fraud scheme by which they sought to defraud an FBI informant out of three billion dollars by claiming to represent "a purported coalition of Buryatian nationals and Yamasee tribesman using AOL email accounts to offer five billion dollars in collateral for a loan to build a pipeline across Siberia." *Id*. at 368-70, 377. Although no money changed hands as a result of the criminal conduct – which one member of the appellate panel characterized as "more farcical than dangerous," *id*. at 377 (Underhill, *J*., concurring) – the district court, relying on the multi-billion dollar intended loss amount, imposed the statutory maximum sentences. *Id*. at 370. This Court determined that remand was appropriate for several reasons, including that "the sentencing court gave only a passing mention to any of the section 3553(a) factors." *Id*. at 376. More specifically, although the defense attorneys "highlighted significant issues with the intended loss calculation both in their briefs and at sentencing . . . the sentencing court never resolved appellants'

significant arguments," including "whether treating intended loss like actual loss under all the circumstances of this case leads to a sentence consistent with the dictates of section 3553(a)." *Id*. at 377. In contrast, Valente's fraud caused real people to lose much of their savings and the district court carefully considered and rejected departure and variance claims.

Valente's additional contentions that the district court abused its discretion by not varying downward to account for his reduced risk of recidivism and need for rehabilitation lack merit. It is true that these are appropriate sentencing considerations. *See* 18 U.S.C. § 3553(a)(2)(C) and (D). But, Valente's claim that the district court abused its discretion by not varying downward for these reasons runs afoul of this Court's determination that "the requirement that a sentencing judge consider an 18 U.S.C. § 3553(a) factor is not synonymous with a requirement [that] the factor be given determinative or dispositive weight in the particular case." *United States v. Florez*, 447 F.3d 145, 157 (2d Cir. 2006) (internal quotation marks, citation, and emphasis omitted). This Court has made clear that "the weight to be given any § 3553(a) factor[ ] is a matter firmly committed to the discretion of the sentencing judge and is beyond our [appellate] review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." *Id*. at 158 (internal quotation marks and citation omitted).

Valente's claim that his sentence was unreasonable because he was not credited for acceptance of responsibility and remorse is simply untrue. The PSR included in its guidelines calculations a two-level "acceptance of responsibility" reduction under U.S.S.G. § 3E1.1(a) and an additional one-level reduction, upon government motion, under § 3E1.1(b). PSR ¶¶ 113, 114. This reduced Valente's total offense level from 37 to 34. PSR ¶¶ 111, 115. The district court adopted the PSR guidelines recommendations, A. 168, and imposed a punishment in the middle of the resulting 210-262 range. A. 150, 201.

Had the district court not credited Valente's acceptance of responsibility, his imprisonment range would have been 292 to 365 months (based on a criminal history category of IV), exposing him to a considerably longer term of imprisonment than the one that he received. Valente seems to assume that he received the maximum sentence the court could impose. Valente's Opening Brief at 67. Such an assumption is wrong. Although no single count permitted a term of imprisonment above twenty years, there were multiple counts of conviction. The guidelines provide for the imposition of consecutive sentences to achieve the total punishment. U.S.S.G. § 5G1.2(d).

Finally, the district court acted within its discretion by not varying downward for the post-guilty plea

assistance to the government that Valente describes. A. 95-96. The information that Valente provided, much of which pertained to his own conduct, *id*., did not prompt a government downward departure motion or a defense claim that the government acted in bad faith by not so moving. Under those circumstances, there was no obligation to vary downward to reward Valente's claimed cooperation.

## CONCLUSION

For the reasons stated above, Valente's within-guidelines sentence should be affirmed.

Dated: Syracuse, New York
August 30, 2016

Respectfully submitted,

Richard S. Hartunian
*United States Attorney for the*
*Northern District of New York*
*Attorney for Appellee*

/s/ *Steven D. Clymer*
By: STEVEN D. CLYMER
*Assistant United States Attorney*

RICHARD D. BELLISS
*Assistant United States Attorney*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellant Procedure, the undersigned counsel for the United States hereby certifies that this brief complies with the type volume limitation of Rule 32(a)(7)(B). As measured by the word-processing system used to prepare this brief, there are approximately 19,320 words in the brief.

RICHARD S. HARTUNIAN
*United States Attorney for the*
*Northern District of New York*

/s/ *Steven D. Clymer*
By: STEVEN D. CLYMER
*Assistant United States Attorney*

**CERTIFICATE OF SERVICE**
**BY NEXTGEN CM/ECF**

UNITED STATES OF AMERICA
v.
VALENTE

Docket No. 15-3912

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of New York, and is a person of such age and discretion as to be competent to serve papers.

She further certifies that on August 30, 2016, she served a copy of the appellee's Brief and Government Appendix on the United States Court of Appeals for the Second Circuit and counsel for appellant, Bruce R. Bryan, Esq., by uploading to the Second Circuit's ECF system a Portable Document Format (PDF) version of the Brief.

/s/ *Deanna Lieberman*
Deanna Lieberman